

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Olga Domínguez Castro Sandra J. Guzmán Hernández, Militza López Mateo, Carlos Rivera Figueroa<br><br>    Recurridos<br><br>        v.<br><br>Gobierno del Estado Libre Asociado de Puerto Rico, Secretario de Justicia, Honorable Luis Fortuño, Gobernador del Estado Libre Asociado de Puerto Rico, Departamento de la Familia y Junta de Reestructuración y Estabilización Fiscal<br><br>    Peticionarios | Certiorari<br><br>2010 TSPR 11<br><br>177 DPR \_\_\_\_ |

Número del Caso: CT-2009-4
                     CT-2009-5
                     CT-2009-6
                     CT-2009-9

Fecha: 2 de febrero de 2010

Abogados de la parte peticionaria:

        Lcdo. Eliezer Aldarondo Ortiz
        Lcda. Rosa Campos Silva
        Lcdo. Eliezer A. Aldarondo López
        Lcdo. Simone Cataldi Malpica

Abogados de la Parte Recurrida:

        CT-2009-9
        Lcda. Vivian Negrón Rodríguez
        Lcda. Jeanette Rodríguez Claudio
        Lcdo. José R. Pérez Ayala
        CT-2009-6
        Lcdo. Arcelio Maldonado Avilés II
        CT-2009-4
        Lcdo. David Noriega Rodríguez
        Lcda. Myrna E. Cruz Colón
        Lcdo. Frank Zorrilla Maldonado
        CT-2009-5
        Lcda. Sylvia M. Soto Matos
        Lcda. Evelyn López Díaz
        Lcda. Jinelly Laureano Vázquez

Materia: Interdicto Preliminar, Permanente y Sentencia Declaratoria

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Olga Domínguez Castro,<br>Sandra J. Guzmán Hernández,<br>Militza López Mateo,<br>Carlos Rivera Figueroa<br><br>        Recurridos<br><br>              v.<br><br>Gobierno del Estado Libre Asociado de Puerto Rico, Secretario de Justicia, Honorable Luis Fortuño, Gobernador del Estado Libre Asociado de Puerto Rico, Departamento de Justicia, Departamento de la Familia y Junta de Reestructuración y Estabilización Fiscal<br><br>        Peticionarios | CT-2009-4<br>CT-2009-5<br>CT-2009-6<br>CT-2009-9 | Certificación |

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 2 de febrero de 2010.

> **La Ley no crea el interés social, lo reconoce y delimita.** *La sociedad civilizada impone ciertos compromisos entre la libertad individual y el interés social.* **En primer plano está el interés social en la seguridad general;** *el reclamo, el deseo o la exigencia de sentirse libre de aquellos actos y conducta que amenazan la existencia misma de la sociedad. Cuando la sociedad desarrolla su economía nace el interés individual en asegurar lo adquirido y en la certeza de las transacciones,* **moderado por el interés general en el progreso, en la continuada mejoría y avance de la ingeniería social que es tutela del Estado.**[1] (Énfasis nuestro)

Nuestro País, y podríamos afirmar que el resto del mundo, vive momentos muy convulsos en el aspecto económico

---

[1] *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903, 907 (1975) citando con aprobación a Pound, *Jurisprudence*, Tomo III, pág. 235 y ss. (Énfasis suplido).

y financiero. Parecería que las economías de los países del mundo se encuentran entrelazadas y atadas al rabo de una chiringa que no consigue finalmente elevarse.

El 25 de septiembre de 2009, y en virtud de la Ley Núm. 7 de 9 de marzo de 2009, *infra*, el gobierno de Puerto Rico anunció el despido de casi 17,000 empleados públicos. Lamentablemente, tales despidos se suman a los aproximadamente más de 120,000 empleados en la empresa privada que en los pasados tres años también han perdido sus empleos en nuestra Isla. De una u otra forma todos hemos sido afectados por estas cesantías. Todos tenemos algún miembro de nuestra familia íntima, algún familiar cercano, algún buen amigo, algún compañero de trabajo o algún buen vecino que ha perdido su empleo durante estos tiempos tan difíciles.

Muy conscientes de esta dura realidad, nos confrontamos con una igualmente dura y antipática. Antipática por aparentar ser una insensible o poco empática para con aquellos compañeros en el servicio público que sufren la pérdida de sus empleos. La realidad de que corresponde al Estado velar por el bienestar económico colectivo, a expensas del bienestar individual. Y la realidad de que le atañe a esta Curia —pues a los jueces no nos puede dominar el temor a decidir— resolver finalmente si es constitucional o no, a la luz de un escrutinio racional y del balance de intereses, la ley que autoriza tales despidos.

I


Los recurridos[2] son empleados de carrera, algunos unionados, del Gobierno de Puerto Rico, a quienes se les anunció mediante carta que, el 6 de noviembre de 2009 o el 8 de enero de 2010, quedarían cesantes de sus puestos[3].

---

[2] Durante el trámite procesal de los casos CT-2009-5 y CT-2009-6 se nos peticionó la consolidación de los mismos con el CT-2009-4. Este Tribunal denegó el petitorio por entender que atrasaría la resolución del caso.  No obstante, ante el trámite expedito seguido en los otros recursos y en aras de la economía procesal, consolidamos en esta Opinión los recursos CT-2009-4, CT-2009-5, CT-2009-6 y CT-2009-9.

[3] En el CT-2009-4: La̶s̶ Sra. Olga Domínguez Castro se desempeña como Técnico de Sistemas de Oficina del Departamento de Justicia, desde hace diez (10) años y unos meses; la Sra. Sandra J. Guzmán también labora para el Departamento de Justicia pero como Oficinista Entrada de Datos, desde hace diez (10) años; la Sra. Militza López Mateo funge como Contador IV del Departamento de la Familia desde hace siete (7) años, y el Sr. Carlos R. Rivera Figueroa trabaja igualmente para el Departamento de la Familia, pero como Técnico de Presupuesto III, desde hace ocho (8) años.
En el CT-2009-5: Durante el trámite del caso ante este Foro los recurridos instaron una *Moción de Desistimiento Parcial sin Perjuicio*. Plantearon que las circunstancias de varios de los recurridos había cambiado y que se les había informado que estaban en el grupo que continuarían laborando. En consecuencia, peticionaron el desistimiento sin perjuicio de dichos empleados. El peticionario presentó oposición.  Declaramos Ha Lugar el petitorio de los recurridos en cuestión.  A tales efectos, a continuación el listado de los recurridos que permanecen en el pleito.  `

El Sr. Luis Ramos Comas se desempeña como Inspector de Tiendas de Instituciones Penales de la Administración de Corrección, desde hace nueve (9) años y dos (2) meses; la Sra. Ivelisse Marrero Marcano labora para la Administración de Servicios de Salud Mental y Contra la Adicción como Especialista de Recursos Humanos desde hace más de ocho (8) años; la Sra. Mirys Rodríguez Jiménez funge como Auxiliar de Sistema de Oficina II del Departamento de Recreación y Deportes desde el 6 de noviembre de 2003, la Sra. Leemaris Rodríguez Aponte  trabaja para la Administración de Corrección, como Especialista Administrativa Humana I, hace más de siete (7) años; la Sra. Yarigna Leslie Osorio Santiago se desempeña como Analista de Presupuesto II en el Departamento de Recreación y Deportes hace más de (6) años; y la Sra. Ruth Daisy Fontanez Sánchez labora para la Administración de Corrección desde el 8 de junio de 2002 como Administradora Sistema de Oficinas hace más de diez (10) años.
De otra parte, la Sra. Ruth Evelyn Rivera Rosario funge como Auxiliar Administrativo I en el Departamento de Recursos Humanos hace más de doce (12) años; el Sr. Nelson Guzmán Algarín se desempeña como Oficinista en el Departamento de la Vivienda desde hace más de seis (6) años; la Sra. Luz C. León Rivera labora para el Departamento de la Educación desde hace más de trece (13) años como Auxiliar Administrativo I; Oscar E. Luna Ugarte funge como Conserje en el Departamento de Educación más de siete (7) años; Biterbo Caldero

Las cesantías de todos estos empleados se dan en virtud de la aprobación de la Ley Núm. 7 de 9 de marzo de 2009, *Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico* (Ley Núm. 7).

Con la aprobación de la Ley Núm. 7, se creó la *Junta de Estabilización y Reconstrucción Fiscal de Puerto Rico* (JREF), con el propósito de implantar, en toda su extensión, el referido Plan de Cesantías.[4] Como parte de la preparación del Plan de Cesantías, y conforme al estatuido criterio de antigüedad, se solicitó a cada empleado gubernamental –incluyendo a los aquí recurridos– que remitieran sus status de antigüedad a la agencia para la cual laboran, o sea, el número de años trabajados en

---

Pérez labora como Empleado de Custodia I (Conserje) en el Departamento de Educación; la Sra. Mireille Rodríguez Rodríguez se desempeña como Auxiliar Administrativo I del Departamento de Educación hace más de cinco (5) años.

CT-2009-6: La Sra. Zoraida Martínez Román se desempeña como empleada de la Administración para el Sustento de Menores desde hace más de seis (6) años; y la Sra. Saudy Leilany Hernández Colón labora para la Administración de Sustento de Menores desde hace más de doce (12) años; la Sra. Jesenia Ayala Maldonado labora en la Administración para el Sustento de Menores desde hace más de siete (7) años. Estas empleadas son unionadas.

CT-2009-9: En este caso la parte recurrida es la Sra. Erika Vispo Figueroa, quien se desempeña como Técnica de Sistema de Oficina para la Oficina Compensación de Víctimas de Delito, adscrita al Departamento de Justicia, desde hace siete (7) años y siete meses (7).

[4] El Art. 37.03 (b)(5) de la Ley Núm. 7 establece que la JREF estará compuesta por el Presidente del B.G.F. (el cual dirigirá la Junta), el Secretario del Trabajo, el Secretario del Departamento de Desarrollo Económico y Comercio de Puerto Rico, el Secretario del Departamento de Hacienda y la Directora Ejecutiva de la OGP Sus miembros, en el desempeño de esta encomienda, no habrán de recibir remuneración adicional a la que reciben por el desempeño de sus labores en sus agencias o departamentos.

el gobierno.[5] En vista de lo anterior, el 25 de septiembre de 2009, y como ya señalamos, se les notificó a cada uno de los aquí recurridos que quedarían cesantes de sus puestos.

En las cartas de cesantías entregadas a cada uno de los recurridos se les informó, entre otras cosas, la razón de su despido. Además, se les notificó claramente de su derecho a solicitar revisión de la determinación de la agencia ante la Comisión Apelativa del Sistema de Administración de Recursos Humanos (CASARH), o, en el caso de los empleados unionados, ante la Comisión de Relaciones del Trabajo del Servicio Público. Para la consecución de lo anterior los recurridos tendrían un término de treinta (30) días, contados a partir del recibo de la carta.

Una vez notificados de sus cesantías, los recurridos presentaron ante el Tribunal de Primera Instancia demandas contra el Gobierno de Puerto Rico (Gobierno)[6] solicitando un *Injunction* Preliminar y Permanente, así como una solicitud de Sentencia Declaratoria, en la que peticionaban, entre otras cosas, el que se declarara

---

[5] El Art. 37.04 (b)(4) de la Ley Núm. 7 señala que "[a] los fines de determinar la antigüedad de empleados afectados se considerarán todos los servicios prestados por los empleados afectados en el servicio público, independientemente de las disposiciones de los convenios colectivos, reglamentos, cartas circulares y otros documentos normativos".

[6] En el CT2009-4 la demanda fue instada el 9 de octubre de 2009; en el CT-2009-5 el 13 de octubre de 2009, en el CT-2009-6 el 21 de octubre de 2009 y en el CT-2009-9 el 6 de noviembre de 2009.

inconstitucional la Ley Núm. 7, y como consecuencia, se declararan nulas sus cesantías.[7] Así las cosas, en todos estos casos el Gobierno presentó, entre otras mociones, recursos de certificación. Habiendo considerado el asunto, expedimos los recursos, paralizando los procedimientos ante el Tribunal de Primera Instancia, ordenando que se elevaran los autos y concediendo a las partes término para presentar sus alegatos.[8]

En el ínterin, y en el CT-2009-4, el 19 de octubre de 2009, los recurridos nos solicitaron, en auxilio de jurisdicción, que emitiéramos una orden provisional a los efectos de paralizar las cesantías decretadas por el Estado. El 26 de octubre de 2009, emitimos una resolución en la que declaramos no ha lugar tal solicitud.[9]

***Planteamientos de las partes recurridas:***

En los recursos CT-2009-4 y CT-2009-5, los recurridos argumentan que tienen un derecho o interés

---

[7] La demanda en el CT-2009-4 incluye como partes demandadas al Gobernador de Puerto Rico, Hon. Luis G. Fortuño, al Departamento de Justicia, al Departamento de la Familia y a la Junta de Reestructuración y Estabilización Fiscal, en el CT-2009-5 la parte demandada es el Gobernador de Puerto Rico, Hon. Luis G. Fortuño y el Estado Libre Asociado y en el CT-2009-6 los demandados son el Estado Libre Asociado, el Departamento de la Familia y la Administración para el Sustento de Menores. En el CT-2009-9 las partes demandadas son el Gobierno del Estado Libre Asociado de Puerto Rico, la Junta de Reestructuración Fiscal y Estabilización Fiscal y el Departamento de Justicia.

[8] En el recurso CT-2009-6 el peticionario solicitó prórroga para someter un escrito de réplica al alegato, el cual, en aras de la economía procesal, declaramos N/H/L.

[9] **Por el efecto de lo que se solicitaba, acogimos tal solicitud de orden provisional en auxilio de jurisdicción como si fuera una solicitud de *injuction* preliminar, declarándola no ha lugar por no cumplir con los requisitos de tal recurso extraordinario.**

propietario sobre sus puestos como empleados de carrera, el cual está protegido por el debido proceso de ley que emana, tanto de la Constitución de Puerto Rico, como de la Constitución Federal. Argumentan asimismo que ese debido proceso de ley ha sido afectado mediante la Ley Núm. 7, tanto en su aspecto sustantivo como procesal.

Señalan los recurridos en el CT-2009-4 que una cesantía es el último recurso a seguir, pudiéndose tomar otras medidas como lo son reducir el horario de trabajo e, incluso, el salario de los empleados, y que dichas medidas no se tomaron. En otras palabras, reclaman que no se especificaron las razones económicas ni se presentó prueba sobre la necesidad imperiosa de despedir personal y no tomar otras medidas. Además, plantean los recurridos en el CT-2009-4 que la aplicación de la Ley Núm. 7, *supra*, elimina retroactivamente derechos adquiridos por éstos, en contravención al Art. 3 del Código Civil de Puerto Rico, 31 L.P.R.A. sec.3.

Por otro lado, en ambos recursos (CT-2009-4 y CT-2009-5) los recurridos argumentan que la Ley Núm. 7 viola su debido proceso de ley al eximir del estricto acatamiento unos procesos anteriores a una cesantía, establecidos en la Ley Núm. 184,[10] como lo son, el que el plan de cesantías no fue publicado y que tampoco se

---

[10] Ley Núm. 184 de 3 de agosto de 2004, según enmendada, conocida como *Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico*, 3 L.P.R.A. secs. 1461 *et seq.*

publicaron listas de antigüedad por clasificación ocupacional. Además, éstos reclaman que el Plan de Cesantías de la Ley Núm. 7 no sigue un debido proceso de ley en su implantación, al no ser publicada la metodología ni las listas de antigüedad, ni proveérseles una vista previa a sus cesantías.

Por su parte, en el CT-2009-6, se nos argumenta, entre otros, que la notificación de cesantía fue contraria al Convenio Colectivo suscrito entre las partes, al tenor de la Ley Núm. 45 de 25 de febrero de 1998, conocida como *Ley de Relaciones del Trabajo para el Servicio Público,* por lo que violenta el debido proceso de ley de los recurridos. Éstos plantean que tienen un derecho propietario sobre su empleo y que la Ley Núm. 7 deja sin efecto dichos derechos así como los negociados colectivamente, en menoscabo de las obligaciones contractuales.

Finalmente, en el CT-2009-9, se reproducen esencialmente los mismos planteamientos esbozados en los antedichos recursos. No obstante, la parte recurrida también señala que el Art. 37.04 (b)(5),(6) y (7) de la Ley Núm. 7, *supra*, delega a la JREF unos poderes sin guías claras que ocasionan una concentración indebida de

poderes en dicho organismo.[11] Perfeccionados todos los casos aquí consolidados, procedemos a resolver.

## II

### *Ley Núm. 7 de 9 de marzo de 2009*

La Ley Núm. 7 es un extenso estatuto que establece un plan de tres fases para la reducción de los gastos del Gobierno.[12] Entre estos gastos se incluyen los directamente relacionados con la nómina de los empleados públicos.[13] La reducción de los gastos de la nómina gubernamental se configura específicamente en el "Plan

---

[11] En el CT-2009-09 la parte recurrida también alegó que la Oficina de Compensación a Víctimas de Delito adscrita al Departamento de Justicia, que es donde labora, está excluida de la aplicación de la Ley Núm. 7, *supra*. Sin embargo, los méritos de ese planteamiento deben ser dilucidados en el foro de instancia. Nótese que éste Tribunal acogió el recurso de certificación para resolver las impugnaciones relacionadas a la constitucionalidad de la susodicha ley. Por lo tanto, todos los asuntos que no comprendan la constitucionalidad de la Ley Núm. 7, *supra*, deberán ser atendidos por el Tribunal de Primera Instancia a no ser que estén relacionados a la antigüedad del empleado público afectado, en cuyo caso será CASARH o la Comisión de Relaciones del Trabajo de Servicio Público los foros con jurisdicción para atender tal reclamo de forma primaria.

[12] **Esta Ley cuenta con un extenso Informe Conjunto, emitido por las Comisiones de Hacienda y de Gobierno de la Cámara de Representantes. Las Comisiones de Hacienda y de Gobierno celebraron vistas públicas sobre la medida el 5 de marzo de 2009, en la que participaron el Presidente del Banco Gubernamental de Fomento, la Directora de la Oficina de Gerencia y Presupuesto, el Secretario de Hacienda, el Secretario del Trabajo y Recursos Humanos, la Sub-Secretaria del Departamento de Justicia, los economistas Juan Lara y Vicente Feliciano, y representación del sector sindical del país.**

[13] El Art. 37.02 de esta Ley excluye de su aplicación a los siguientes empleados públicos: policías y bomberos; oficiales de corrección y oficiales juveniles; maestros asignados al salón de clases; bibliotecarios de escuelas; profesionales de la salud (médicos, paramédicos, enfermeras, farmacéuticos y técnicos de laboratorio); trabajadores sociales; operadores del sistema de llamadas de emergencia 911; y patólogos del Instituto de Ciencias Forenses. Además, surge de su Exposición de Motivos que estarán exentas del plan para la reducción de la nómina gubernamental, la Rama Judicial, las corporaciones públicas, la Universidad de Puerto Rico, la Comisión Estatal de Elecciones y la Oficina de Ética Gubernamental.

de Cesantías" que se detalla en el Capítulo III de la ley, titulado "Medidas de Reducción de Gastos". A su vez, este plan de cesantías se rige por el criterio de antigüedad en el servicio público, esto es, deben ser cesanteados aquellos empleados con nombramiento de carrera o permanentes de menor antigüedad, independientemente de la agencia o dependencia en la que estén destacados.[14] La única excepción a la utilización de este criterio es para aquellos empleados que prestan servicios esenciales a la ciudadanía, y que son necesarios para mantener la continuidad de estos servicios.

Del análisis de la Ley Núm. 7 se distinguen seis fines principales que ésta persigue: (1) el atender de manera integrada y responsable la crisis fiscal por la cual atraviesa el Gobierno de Puerto Rico, (2) proteger el crédito de Puerto Rico de conformidad con la Sec. 8 del Art. VI de la Constitución;[15] (3) proveer para un plan de estabilización fiscal; (4) eliminar el déficit estructural en cumplimiento con el mandato de la Sección

---

[14] Véanse Exposición de Motivos y el Art. 37.03 (b)(3)de la Ley Núm.7.

[15] El Art. VI, Sec. 8 de nuestra Constitución establece lo siguiente:

Sección 8. Prioridad de desembolsos cuando recursos no basten.

Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley. Art. VI, Sec. 8, Const. E.L.A., Tomo 1.

7 del Artículo VI de la Constitución;[16] (5) devolverle al Gobierno su salud fiscal; y (6) establecer las bases para que el Gobierno pueda impulsar el desarrollo económico de Puerto Rico, mediante **un plan integrado que consiste de Medidas de Ingresos y Mejor Fiscalización, Medidas de Reducción de Gastos y Medidas Financieras.**

La Ley Núm. 7 es un estatuto de carácter económico ("*economic regulation*") que conlleva un impacto socioeconómico, no sólo en el contexto de las cesantías que autoriza, sino además por las medidas de ingresos gubernamentales (recaudos para el fisco) y de fiscalización y reducción de gastos gubernamentales que impone.[17] Conviene entonces mencionar con algún detalle, lo que comprende este estatuto en sus partes más pertinentes.

Esta ley abarca cinco (5) capítulos, algunos de ellos subdivididos a su vez en subcapítulos, en los que se establecen en total 72 artículos. El Capítulo I

---

[16] El Art. VI, Sec. 7 de nuestra Constitución establece lo siguiente:

Sección 7. Asignaciones no excederán de los recursos.

Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones. Art. VI, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

[17] Esta ley no sólo dispone para la reducción de los gastos gubernamentales, sino que establece una serie de contribuciones y/o créditos a individuos (Art. 4), contribuciones a productos (cigarrillos, Art. 5); a vehículos de motor (Art. 6) y a licores (vinos y cervezas, Art. 14).

establece las "Disposiciones Iniciales", y consta de apenas tres artículos. El Art. 2 (Declaración de Propósito y Política Pública) específicamente declara un estado de emergencia económica y fiscal en el Gobierno, ante el cuadro económico y fiscal actual de la Isla. Como consecuencia de lo anterior, se establece como política pública del Gobierno **"la necesidad apremiante de establecer un plan integrado y coherente de estabilización fiscal, la eliminación del déficit estructural, la amortización de la deuda pública, el restablecimiento de la salud fiscal y las bases para que el Gobierno pueda impulsar el desarrollo económico de Puerto Rico".**[18] (Énfasis nuestro.)

El Art. 3 establece la primacía de esta ley por ser una ley especial, señalando a su vez que se aprueba en el ejercicio del **poder de razón de Estado**, así como en la facultad constitucional que tiene la Asamblea Legislativa, reconocida en las Secs. 18 y 19 del Art. II de nuestra Constitución,[19] y al amparo de las Secs. 7 y 8

---

[18] Art. 2 de la Ley Núm. 7, *supra*.

[19]  Las Secs. 18 y 19 del Art. II de  la Constitución de Puerto Rico, en lo pertinente, señalan:

**Sección 18. Derecho a la huelga, a establecer piquetes, etc.**

...
Nada de lo contenido en esta sección menoscabará la facultad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad públicas, o los servicios públicos esenciales. Art. II, Sec. 18, Const. E.L.A., L.P.R.A., Tomo 1.

del Art. VI de la Constitución de Puerto Rico, antes citadas.

El Capítulo II consta de tres subcapítulos en el que se establecen las "Medidas de Ingresos y Mejor Fiscalización". En el Subcapítulo I se disponen las "Medidas Permanentes" y en el Subcapítulo II las "Medidas Temporales". El Subcapítulo III se titula "Efecto en Otras Leyes" y dispone unas enmiendas a dos estatutos distintos, ambas relacionadas con transferencias de fondos: una enmienda relacionada con la Universidad de Puerto Rico y otra que se relaciona con transferencias de fondos municipales.

En el Capítulo III, eje principal de la controversia que nos ocupa, se establecen las "Medidas de Reducción de Gastos". En el Art. 33 de este Capítulo se establecen las "Definiciones" que han de aplicarse al texto de la ley, en el que destacamos el Art. 33(g). Este artículo señala que el **"Objetivo" de esta ley es el establecimiento de un plan de emergencia dirigido a reducir en dos mil ($2,000) millones de dólares los gastos operacionales y de nómina**

---

**Sección 19. Interpretación liberal de los derechos del ser humano y facultades de la Asamblea Legislativa.**

La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo. Art. II, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1.

**pagaderos del Fondo General para el año fiscal 2009–2010,** luego de excluir el servicio de la deuda, las asignaciones por fórmulas de la Universidad de Puerto Rico, la Rama Judicial y los Municipios, y las asignaciones a la Rama Legislativa, armonizado con el interés gubernamental de asegurar la calidad y la continuidad en el ofrecimiento de los servicios a la ciudadanía. El Art. 34 instituye la aplicabilidad de la misma.

Los Arts. 35 al 37 establecen lo que la Ley llama "Plan de Emergencia de Medidas de Reducción de Gastos". Este plan está compuesto por tres fases, una de las cuales, la Fase II, entrará en vigor progresivamente, mientras no se alcance el Objetivo establecido como política pública en el Art. 33(g) de la Ley. El Art. 36 comprende la Fase I, en la cual se establece un "Programa Voluntario de Reducción Permanente de Jornada" y un "Programa de Renuncias Voluntarias Incentivadas", disponible para los empleados elegibles en las agencias afectadas.[20]

---

[20] Específicamente, el Art. 36.01 señala que todo empleado de las agencias a las que les aplique el Capítulo III y que tenga veinte (20) años o más de empleo en el servicio público, sería elegible para el programa, el cual constaría de la reducción de una jornada regular diaria del empleado en cada quincena, es decir, un día en cada quincena. (Art. 36.01(a) y (b) de la Ley Núm. 7, supra). El referido artículo también advierte que la reducción de jornada dispuesta, al igual que la consecuente reducción en paga, serán de carácter permanente. (Art. 36.01 (e)de la Ley Núm. 7, supra.)

El artículo 36.02 establece el Programa de Renuncias Voluntarias Incentivadas, cuyo proceso de implementación y notificación estará a cargo de la Oficina de Gerencia y Presupuesto

El Art. 36.04 (Certificación) reviste una importancia particular. Este artículo establece que al concluir el plazo de los 30 días para acogerse al Programa de Renuncias Voluntarias Incentivadas y al Programa de Reducción Permanente de Jornada, las agencias tendrán un término no mayor de siete (7) días para presentar a la OGP un informe indicando el monto de la economía lograda. Es a partir de la fecha en que vence la entrega de estos informes por parte de las distintas agencias, y en un término no mayor de diez días, que la OGP tiene que certificar a la JREF y a los Presidentes de los Cuerpos Legislativos la economía proyectada como resultado de la implantación de la Fase I y la certificación de la economía proyectada del Art. 38.02, Fase III. Es basado en el análisis de esos resultados que la OGP tiene que anunciar si el objetivo se ha alcanzado y, de no ser así, recomendar poner en efecto la Fase II.

El Art. 37.01 establece que una vez la OGP emite la certificación (Art. 36.04) en la que se concluye que el

(OGP). El mismo acoge a todo empleado de las Agencias a las que le es aplicable el Capítulo III, pero señala un término improrrogable de 30 días para poder acogerse, contados a partir de la notificación de la OGP. Este artículo establece un incentivo económico que consiste del pago de una cantidad monetaria, basado en el término de empleo en el servicio público del empleado. Este incentivo es libre del pago de contribuciones sobre ingresos, y de descuentos por concepto de ahorros y aportaciones a los sistemas de retiro de los empleados gubernamentales, o de contribución sobre ingresos. Además, el empleado recibe, conjuntamente con el pago de sus días por vacaciones a liquidarse en el término plazo de 30 días, el pago de la prima de cobertura médica por un término máximo de doce (12) meses o hasta que éste sea elegible para cobertura de seguro de salud en otro empleo. (Art. 36.03 (a), (b) y (c)de la Ley Núm. 7, supra).

objetivo establecido como política pública (Art. 2) no ha sido alcanzado, el plan de cesantías entrará vigor. El Art. 37.02 enumera los empleados de las distintas agencias que, con el fin de evitar un impacto negativo en los servicios brindados por el Gobierno, están excluidos de la aplicación de la Fase II.[21] El Art. 37.03 señala que la certificación por parte de la OGP enunciando que no se alcanzó el objetivo establecido en la Fase I, pone en vigor inmediatamente la Fase II.

Una vez se inicia la Fase II, el Art. 37.04 se torna en uno de principal importancia. Este artículo establece los parámetros y el procedimiento a llevarse a cabo durante esa fase. Por ser de particular pertinencia a los planteamientos de los aquí recurridos, lo citaremos casi en su totalidad:

**Artículo 37.04.–Procedimiento.**

El procedimiento para llevar a cabo la Fase II será el dispuesto en este Artículo.

(a) Suspensión Temporera. Con el comienzo inmediato de la Fase II, automáticamente se suspenderá toda cláusula, precepto y/o disposición aplicable a los empleados y/o puestos sujetos a las disposiciones de este Capítulo III, contenidas en leyes, convenios colectivos, acuerdos, acuerdos suplementarios, políticas, manuales de empleo, cartas circulares, cartas contractuales, addenda, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación y/o planes de retribución, referentes a:

---

[21] Este artículo también excluye, entre otros, a los empleados de confianza. Art. 37.02 de la Ley Núm. 7, *supra*.

(1) ascensos, descensos, reubicaciones y/o traslados;

(2) retención y cesantía, que conflija con lo adoptado en esta Ley;

(3) reducción de fuerza laboral o cesantía, al igual que cualquier otra disposición que requiera observar ciertas medidas necesarias previo a la implantación de cualquier reducción de fuerza laboral o cesantía;

(4) reingreso y de adopción de registro de elegibles;

(5) toda disposición que impida asignar tareas correspondientes a un grupo de empleados, clases de puestos, niveles, unidad sindical o unidad apropiada;

(6) toda disposición que impida la sub-contratación de tareas asignadas a un grupo de empleados, clases de puestos, niveles, unidad sindical o unidad apropiada;

(7) toda disposición que impida consolidar tareas en puestos, clases de puestos o niveles;

(8) disposiciones en cuanto a limitaciones de los derechos de gerencia o de administración de las Agencias; excepto en aquello que no esté en conflicto con este Capítulo III;

(9) disposiciones o cláusulas donde la Agencia se obligue a dar fiel cumplimiento a lo acordado o pactado, en cuanto a los aspectos que estén en conflicto con las disposiciones de este Capítulo III;

(10) requisitos de utilizar antigüedad, en la medida en que las disposiciones de antigüedad sean contrarias a lo dispuesto en este Capítulo III o constituyan una limitación para efectuar cambios en funciones, ascensos, descensos, reubicaciones, traslados, destaques u otras transacciones necesarias para evitar que se afecten los servicios; y

(11) procedimientos de resolución de controversias, revisión y/o apelación que estén en conflicto con las disposiciones que, en cuanto a esas áreas, se proveen en este Capítulo III.

La suspensión de las cláusulas y disposiciones descritas en el inciso (a) de

este Artículo será por un término de dos (2) años, pudiendo el Gobernador reducir este período mediante Orden Ejecutiva, de certificar la OGP que las economías resultantes de la implantación de los mecanismos provistos por este Artículo son suficientes para cubrir los objetivos.

**(b)   Cesantías.**

(1)   En vista del estado de emergencia fiscal, la escasez de recursos fiscales, la gravedad de los problemas que enfrentamos y la urgencia requerida para corregir los problemas fiscales, se exime de agotar medidas tales como reubicación de personal, readiestramiento de empleados, disfrute de vacaciones acumuladas, disfrute de licencia sin sueldo, reducción de jornada de trabajo o descensos, previo a instrumentar las cesantías.

(2)   Las Agencias notificarán la terminación a todo empleado que a la fecha de la vigencia de esta Ley tenga un nombramiento transitorio o irregular, por lo que no será necesario observar, en cuanto a éstos, el criterio de antigüedad. La notificación escrita que a esos efectos las Agencias envíen, le apercibirá al empleado de su derecho de solicitar revisión de la decisión de la Agencia, ante la CASARH, en conformidad a lo dispuesto por el Artículo 13, sección 13.14, de la Ley Núm. 184 del 3 de agosto de 2008, y su reglamento. La notificación se hará mediante entrega a la mano o por correo certificado con acuse de recibo a la dirección que obra en los expedientes de la Agencia.

(3)   Las cesantías de los empleados con nombramiento permanente o de carrera se efectuarán observando exclusivamente el criterio de antigüedad, de modo que sean cesanteados en primer término aquellos que tengan menor antigüedad.

(4)   …

(5)   Se crea la JREF, la cual estará compuesta por el Presidente del BGF, el cual dirigirá la Junta, el Secretario del Trabajo, el Secretario del Departamento de Desarrollo Económico y Comercio de Puerto Rico, el Secretario del Departamento de Hacienda, y la Directora Ejecutiva de la OGP. Sus miembros, en el desempeño de esta encomienda, no habrán de recibir remuneración adicional a la que

reciben por el desempeño de sus labores en sus agencias o departamentos.

(6) Además de las facultades otorgadas por este Capítulo III, la JREF tendrá todas las facultades necesarias y convenientes para descargar la encomienda aquí asignada, incluyendo pero sin limitarse a la de realizar o encomendar, a las agencias o departamentos que están a su cargo, que se realicen los estudios que sean necesarios; requerir a las Agencias la información necesaria para realizar su encomienda; asesorar al Gobernador y a las Agencias en todo lo relativo a los empleados a ser cesanteados; evaluar, aprobar o rechazar peticiones de empleados para reducir la jornada de los puestos que ocupan; llevar a cabo reuniones entre sí y con los jefes de las Agencias; y reclutar de forma temporal, mediante destaque, el personal necesario para realizar la encomienda. Su Presidente tendrá la facultad, además, para asignar y/o poner a la disposición de la JREF todo recurso del BGF que sea necesario para descargar sus obligaciones bajo este Capítulo III. La encomienda de la JREF, y su duración finalizará una vez se cumpla el objetivo de la ley.

(7) La JREF habrá de determinar la cantidad global de empleados a ser cesanteados, en conformidad con las disposiciones del Artículo 2 de esta Ley y en armonía con la necesidad de asegurar la continuidad y calidad de los servicios gubernamentales, dentro de un término no mayor de cinco (5) días calendario de iniciada la Fase II.

**(8) Las Agencias identificarán y certificarán a la JREF la antigüedad de cada uno de sus empleados, dentro de un término no mayor de quince (15) días calendario de iniciada la Fase II.**

**En el mismo término, las Agencias certificarán por escrito a sus empleados afectados, individualmente, su fecha de antigüedad según surge de sus récords. En el caso de empleados miembros de una unidad apropiada representada por una organización sindical se notificará, además, a dicha organización sindical. Dicha certificación se notificará a los empleados, y, además, de ser el caso, a la organización sindical, mediante entrega a la mano o por correo certificado con**

**acuse de recibo, a la dirección que obra en los expedientes de las Agencias y apercibiéndole del derecho que tiene el empleado a exponer y fundamentar por escrito su versión en cuanto a su fecha de antigüedad. La fecha de notificación será la de su entrega o envío.**

(9) **El empleado, y de ser el caso, éste a través de su organización sindical, tendrá un término no mayor de treinta (30) días calendario, a partir de la fecha de la notificación, para presentar por escrito a la Agencia, evidencia documental oficial emitida por la autoridad o entidad gubernamental competente ("evidencia documental fehaciente") que refute la antigüedad que le ha sido certificada.** Para ello utilizará el formulario que para esos fines será provisto por su respectiva Agencia, el cual completará y someterá a su propia Agencia, con copia de la evidencia documental fehaciente que refute la fecha de antigüedad notificada por la Agencia.

(10) En la eventualidad de que el empleado afectado no refute o no presente, dentro del término aquí dispuesto, evidencia documental fehaciente que sostenga su posición, la antigüedad a ser utilizada será aquella que le fue notificada por la Agencia. Dicha antigüedad será concluyente para todo propósito relacionado con este Capítulo III.

(11) **En la eventualidad de que el empleado afectado presente, dentro del término aquí dispuesto, evidencia documental fehaciente que controvierta la antigüedad que le ha sido notificada, la Agencia no tomará determinación final sobre la antigüedad sin antes darle la oportunidad de tener una vista previa.**

(12) **La Agencia notificará al empleado su determinación final que sobre la antigüedad tome, y, además, de ser el caso, a la organización sindical, en un término no mayor de treinta (30) días calendario, apercibiéndole de su derecho de solicitar revisión de dicha determinación, conforme a lo dispuesto a esos fines en el inciso incisos (13) y (14), del Artículo 37.04 (b) de esta Ley. Dicha notificación se hará a los empleados, y, además, de ser el caso, a la organización sindical, mediante entrega a la mano o por correo certificado con acuse de recibo, a la dirección que obra en los**

**expedientes de las Agencias**. La fecha de notificación será la de su entrega o envío. No obstante, la presentación del recurso de revisión no habrá de paralizar las cesantías; disponiéndose, no obstante, que en el caso que el empleado prevalezca, se le restituirá a su puesto, efectivo a la fecha de su cesantía.

(13) **El empleado afectado podrá solicitar revisión de la determinación final tomada por la Agencia, solamente en cuanto a su antigüedad ante la CASARH, en conformidad a lo dispuesto por el Artículo 13, sección 13.14, de la Ley Núm. 184 del 3 de agosto de 2004, y su reglamento.**

(14) Aquellos empleados que sean miembros de una unidad apropiada, afiliados o no a una organización sindical, podrán revisar la determinación tomada final por la Agencia, solamente en cuanto a su antigüedad, mediante una petición que a esos efectos presenten a los árbitros de la Comisión, creada al amparo de la Ley Núm. 45 del 25 de febrero de 1998, en un término no mayor de treinta (30) días calendario del recibo de la notificación de la Agencia.

(15) **La Agencia notificará las cesantías con al menos treinta (30) días calendario de anticipación a la fecha de su efectividad, mediante comunicación escrita dirigida al empleado y, además, de ser el caso, a la organización sindical, indicando la fecha de efectividad de la misma. La notificación se realizará conforme al Artículo 37.04(b), inciso (12) de este Capítulo III.** (Énfasis nuestro).

Por otra parte, el Art. 37.05 instaura los beneficios que recibirán los empleados cesanteados.[22] El

---

[22] Esto, además de la liquidación de vacaciones regulares. Asimismo, para aquellos empleados elegibles para ello, también les corresponde una liquidación por licencia por enfermedad y por tiempo extraordinario acumulado. Tales beneficios se resumen de la siguiente manera: pago de la prima de cobertura médica por un término ininterrumpido de seis (6) meses o hasta que éste sea elegible para cobertura de seguro de salud en otro empleo; serán considerados elegibles al Programa de Alternativas para Empleados Públicos según dispuesto en el Artículo 39 de la propia ley; y podrán elegir que se les liquide lo acumulado como beneficio de retiro, o se les transfiera, o se adopte cualquier otra alternativa de las dispuestas

Art. 37.06 dispone que al concluir la Fase II las agencias deberán presentar a la OGP un informe, que refleje las economías logradas por las cesantías realizadas. Con esa información, la OGP certificará a la JREF y a los Presidentes de los Cuerpos Legislativos, la economía proyectada como resultado de la implantación de la Fase II, indicando, además, sus conclusiones en cuanto a si el objetivo se alcanzó. La OGP y el Departamento de Hacienda someterán a los Presidentes de los Cuerpos Legislativos un informe conjunto cada noventa (90) días sobre el progreso de los recaudos y la reducción de gastos como el resultado de la implantación de la Fase II.

Con el Art. 38 se establece la Fase III, la que entró en vigor inmediatamente advino vigente la ley (Art. 38.01). La Fase III establece un plan de suspensión temporera, por el término de dos (2) años (Art. 38.02(b)), **de leyes, convenios colectivos, preceptos y acuerdos, así como de toda cláusula, precepto y/o disposición contenidas en leyes, convenios colectivos, acuerdos, acuerdos suplementarios, políticas, manuales de empleo, cartas circulares, cartas contractuales, addenda, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación y/o planes de retribución, aplicable a los empleados sujetos**

_____

por, y en conformidad con la ley que regula su retiro, su reglamento y/o el plan correspondiente.

**a lo establecido en el Capítulo III de la propia Ley, y referentes a veintisiete (27) aspectos que se enumeran en el propio artículo.**

Además, este Art. 38 suspende la eficacia de toda disposición reglamentaria, o contenida en documentos tales como políticas, certificaciones, circulares, addenda, reglas y condiciones de empleo o por manuales de empleo, de cualquier índole, que provea para una licencia con paga, que no sea una establecida estatutariamente. El Art. 39 establece el Programa de Alternativas para Empleados Públicos. Este programa consiste en proveerle al empleado cesanteado bajo el Art. 37, como beneficio adicional y con preeminencia, el que pueda escoger una de tres (3) alternativas u opciones.[23]

El Art. 40 (Negociación de convenios vencidos), señala que los convenios colectivos expirados a la fecha de vigencia de la ley o que expiren durante la vigencia de ésta, no podrán ser extendidos ni negociados. Esta prohibición se extenderá por un término de dos (2) años, a partir de la vigencia de la propia ley.

---

[23] Estas opciones no consisten de pagos o beneficios a recibirse directamente por el empleado, sino que los mismos serán tramitados o canalizados a la institución educativa, vocacional técnica o al nuevo patrono de éste, sujeto a las directrices a establecerse por la JREF a esos efectos. Las alternativas son las siguientes: un vale educativo por una cantidad total de cinco mil ($5,000) dólares; un vale vocacional/técnico o para relocalización por una cantidad total de dos mil quinientos ($2,500) dólares; o un subsidio de cincuenta (50%) por ciento del salario de transición a un empleo en el Sector Privado o en el Tercer Sector aplicable a un salario bruto de hasta un máximo de treinta mil ($30,000) dólares. Por tanto, el beneficio máximo a concederse en virtud de este inciso es de quince mil ($15,000) dólares.

El Art. 41 (Traslados) establece que durante las Fases I, II y III, y con el fin de asegurar la continuidad y calidad de los servicios gubernamentales, la JREF podrá autorizar traslados de empleados entre puestos, clases y niveles de puestos, grupos de empleados, unidades apropiadas; traslados de unidades sindicales a no sindicales y viceversa, en una misma agencia o entre agencias; disponiéndose, que el empleado trasladado deberá cumplir con los requisitos mínimos de preparación académica y experiencia necesaria para ocupar el puesto. El empleado trasladado estará sujeto al período probatorio requerido para el puesto. Además, quedará en suspenso, durante la vigencia de las Fases I, II y III, toda aquella disposición de ley, reglamento, convenio, acuerdo o precepto que sea contrario a lo indicado en el Capítulo III; disponiéndose, que existirá total flexibilidad para realizar los traslados.

El Art. 42 (Subcontratación) establece que durante las Fases I, II y III, y nuevamente con el fin de asegurar la continuidad y calidad de los servicios gubernamentales, la JREF podrá autorizar la transferencia y subcontratación de labores realizadas por empleados, unidades apropiadas o unidades sindicales, quedando en suspenso, durante la vigencia de las tres fases, toda disposición de ley, reglamento, convenio o precepto contrario a lo indicado en el Capítulo III de la ley.

También se dispone que en todo contrato otorgado por las agencias conforme a ese Art. 42, se le requerirá al contratista que, en la prestación de los servicios contratados, emplee empleados cesanteados disponibles, que tengan la preparación y experiencia necesaria para prestar el servicio contratado, conforme a la lista de candidatos a reempleo que habrá de preparar la Oficina de Recursos Humanos del Estado Libre Asociado (O.R.H.E.L.A.), a tenor con lo dispuesto en el Artículo 43 del Capítulo III. El Art. 43 (Normas de reingreso y de contratación de empleados cesanteados) implanta un registro de elegibilidad por el término de un (1) año, de empleados cesanteados. Este registro deberá ser preparado por O.R.H.E.L.A.[24]

En el Artículo 44 (Prácticas Ilícitas) se dispone que la adopción de cualquier medida autorizada por el Capítulo III, ya sea por la JREF, OGP, el BGF, la ORHELA, las Agencias, sus Autoridades Nominadoras, el Gobernador o por cualquiera de los representantes de éstos, no constituirá una violación a los convenios colectivos, ni una práctica ilícita.

---

[24] La aplicación de tal registro se da en la circunstancia de que, si al implantarse la Fase II existiere la necesidad de llenar una posición vacante, y esto no pudiera lograrse mediante traslado, se podrá reemplear a aquellos que figuran en el registro de elegibles y que al momento de su despido estaban desempeñando labores iguales o similares a las del puesto vacante, siguiendo para ello el criterio de antigüedad. En estos casos se reempleará a estos empleados dándole preferencia a los de mayor antigüedad.

En el Art. 46 (Interés público y foro para dirimir controversias) se establece la importancia de los asuntos contenidos en la Ley, por estar revestidos de un gran interés público. A la vez, se resalta la importancia de velar por los derechos de los empleados afectados, en cuanto a las acciones a tomarse conforme a lo dispuesto en el Capítulo III. En ese contexto, el artículo dispone que CASARH tendrá jurisdicción para atender apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme al Capítulo III, en todo aquello que no conflija con éste, de aquellos empleados no cubiertos por las disposiciones de la Ley de Relaciones del Trabajo para Servicio Público, Ley Núm. 45 del 25 de febrero de 1998, según enmendada (Ley Núm. 45).

CASARH tendrá, asimismo, jurisdicción apelativa voluntaria sobre los empleados no organizados sindicalmente de aquellas agencias excluidas de la aplicación de las disposiciones de la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico de 2004" (Ley Núm. 184), en cuanto a apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme al Capítulo III, en todo aquello que no conflija con este último. También dispone que la Comisión de Relaciones del Trabajo del Servicio Público (Comisión) mantendrá jurisdicción para ventilar cargos de práctica ilícita y prestar servicios de arbitraje, en cuanto a acciones o

decisiones cubiertas por la Ley Núm. 45, según enmendada, en armonía con las disposiciones de la Ley Núm. 7.

Finalmente, ante la posibilidad de un aumento en la cantidad de reclamaciones presentadas en la Comisión, y para asegurar un debido proceso de ley y una solución justa y rápida en los procedimientos ante dichos organismos, este Art. 46 aumenta la composición de la Comisión a un (1) Presidente y cinco (5) miembros asociados, y autoriza al Presidente de la Comisión nombrar a los árbitros que sean necesarios para que realicen las labores encomendadas por el Capítulo III de la ley. Asimismo, se autoriza al Presidente de CASARH a nombrar y designar los Oficiales Examinadores que sean necesarios. Los Arts. 47 al 67 configuran las "Medidas Financieras (Cap. IV) y del Art. 68 al 72 se establecen la "Disposiciones Finales" (Cap. V).

## III

La Carta de Derechos de la Constitución de Puerto Rico establece, en lo que nos es pertinente, que:

> [n]inguna persona **será privada de su libertad o propiedad sin debido proceso de ley**, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.[25]

Por su parte, la Quinta Enmienda de la Constitución de los Estados Unidos, en lo pertinente señala:

---

[25] Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. (Énfasis nuestro).

> …nor [shall any person] be deprived
> of life, liberty, **or property,
> without due process of law;**[26]

A su vez la Enmienda Catorce de la Constitución de los Estados Unidos reza:

> nor shall any State deprive any
> person of life, liberty, or property,
> without due process of law; nor deny
> to any person within its jurisdiction
> the equal protection of the laws.[27]

Como se aprecia, tanto nuestra Constitución como la Constitución Federal, reconocen como derecho fundamental el debido proceso de ley. El debido proceso de ley se manifiesta en dos dimensiones: la sustantiva y la procesal.[28] Analizaremos ambas doctrinas en el contexto de los reclamos esbozados por las partes recurridas.

Todos los recurridos en los casos aquí consolidados reclaman tener, como empleados públicos de carrera, un interés propietario sobre sus plazas. Les asiste la razón. Desde *Lupiáñez v. Srio de Instrucción,* 105 D.P.R. 696 (1977), reconocimos por primera vez tal derecho, en esa ocasión basándonos en una expectativa legítima de que un puesto se convertiría en permanente. Un año después, en *Pierson Muller I v. Feijoó,* 106 D.P.R. 838 (1978), reconocimos expresamente tal derecho a los empleados públicos de carrera, como lo son los aquí recurridos. **Ese**

---

[26] Emda. V, Const. EE.UU., L.P.R.A., Tomo I. (Énfasis nuestro).

[27] Emda. XIV, Const. E.E.U.U., L.P.R.A., Tomo I.

[28] *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 273 (1987).

**derecho propietario garantiza, al ser afectado por una acción del Estado (*State Action*), la concurrencia de un debido proceso de ley.**[29]

Por otro lado, y como señala el siempre apreciado profesor Miguel Velázquez Rivera, "la jurisprudencia constante del Tribunal Supremo de Estados Unidos y del de Puerto Rico es clara en el sentido de que el ejercicio del **derecho de propiedad no es absoluto.** Está supeditado a intereses sociales que se agrupan en el concepto de '**poder de razón de estado' o 'police power'**".[30]

### A. *Doctrina de Poder de Razón de Estado (Police Power)*

"[T]oda comunidad políticamente organizada tiene lo que hemos llamado el poder público del estado (*police power*) para salvaguardar la seguridad, la salud y el bienestar de sus habitantes".[31] Desde principios del siglo pasado hemos interpretado las implicaciones que conlleva este poder de razón de Estado. Desde entonces, también hemos reconocido la dificultad que entraña una "definición satisfactoria" de tal concepto.[32] No obstante, y por la presente, adoptamos la siguiente como definición

---

[29] *Torres Solano v. P.R.T.C.,* 127 D.P.R 499 (1990).

[30] M. Velázquez Rivera, *Validez Legal de la Reglamentación por la Asamblea Legislativa de la Importación, Venta y Posesión en Puerto Rico de Perros de la Raza Pit Bull*, 63 Rev. Jur. U.P.R. 1, 15 (1994).

[31] *Bordas & Co. v. Srio. de Agricultura*, 87 D.P.R. 534, 547-548 (1963);citando a *Barbier v. Connolly*, 113 U.S. 27, 31 (1885); *Brown v. Maryland, 12 Wheaton* 419, 442 (1827); Weaver, Constitutional Law (1946), pág. 491.

[32] Véase *El Pueblo v. López*, 28 D.P.R. 377, 380 (1920).

de "poder de razón de estado", por ser una que precisa el concepto de manera práctica, sencilla y muy pertinente a la controversia que nos ocupa:

> Aquel poder **inherente al Estado que es utilizado por la Legislatura** para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y **bienestar general de la comunidad**, el cual puede delegarse a los municipios.[33] (Énfasis nuestro).

Ahora bien, como señala el profesor Serrano Geyls:

> El Tribunal [Supremo Federal] se ha negado consecuentemente a ofrecer una definición exacta **de las fronteras del poder de reglamentación** [police power]. Ha preferido, al enfrentarse a objeciones constitucionales a su uso, resolver cada caso conforme a sus hechos. Originalmente ese poder comprendía la facultad de dictar reglas para proteger la salud, la seguridad y la moral públicas, según las tradiciones del "common law". **[Luego,] se le añadió la frase, aún más amplia, de "bienestar general". Ha mantenido ese significado hasta el presente.**[34] (Citas omitidas y énfasis nuestro).

En ese contexto, ya hemos pautado que el poder de razón de Estado es uno amplio. Por eso, al tratar de delimitar su marco de injerencia debe hacerse de acuerdo a las circunstancias y/o hechos particulares de cada

---

[33] (Reiterando el criterio expuesto en la Opinión del Secretario de Justicia Núm. 1966-40.)  Op. Sec. Just.  Núm. 33 de 1984.

[34] R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico,* 1ra. ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II,  pág. 923.

caso.[35] Entre esas circunstancias, hemos reconocido la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado.[36]

Además, en el pasado hemos reconocido incluso "la estética" como un fundamento único y válido para el ejercicio por la Rama Legislativa del poder de razón de Estado, específicamente en la consecución del bienestar general.[37] De hecho, desde principios del siglo pasado el Tribunal Supremo Federal ha reconocido que, bajo este poder, se pueda hasta limitar en determinadas circunstancias el número de personas que pueden ocupar una vivienda y la relación entre éstas.[38] Y es que, en el ejercicio de su poder de razón de Estado, la Legislatura "goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad. **La única limitación que tiene es la dispuesta por la garantía del debido proceso de ley**".[39]

---

[35] *Vélez v. Municipio de Toa Baja,* 109 D.P.R. 369 (1980).

[36] Véase *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593 (1993).

[37] *Cervecería Corona, Inc. v. Srio. Obras Públicas*, 97 D.P.R. 44 (1969). Esto, en el contexto del poder de la Asamblea Legislativa para la eliminación sumaria de rótulos y anuncios instalados en violación a las leyes y reglamentos de zonificación.

[38] *Village of Belle Terre v. Boraas*, 416 U.S. 1 (1974). Véase también *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922).

[39] *Defendini Collazo et al, v. E.L.A., Cotto,* 134 D.P.R. 28 (1993); véase además *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 80 (1983), *E.L.A. v. Márquez*, 93 D.P.R. 393, 402 (1966).

## B. *Debido Proceso de Ley Sustantivo:*

La controversia con relación a la constitucionalidad de la Ley Núm. 7, en el contexto de las cesantías que autoriza, así como la eliminación de unos procesos anteriores a esas cesantías –establecidos mediante la Ley Núm. 184–, es una estrictamente de debido proceso de ley sustantivo. Por otro lado, la ausencia o inadecuacidad – si ese fuera el caso– de otro proceso que sustituya el dejado sin efecto por la Ley Núm. 7, es un asunto de debido proceso de ley en su aspecto procesal. Conviene entonces revisitar ambas doctrinas, en especial lo relacionado al debido proceso de ley sustantivo y su estrecha relación con lo concerniente a la reglamentación del tipo económico.

"El término debido proceso de ley conlleva una connotación exclusivamente procesal. No obstante, por mucho tiempo se ha aceptado que una ley o actuación gubernamental puede violar el debido proceso de ley por su contenido o su consecuencia, independientemente del proceso para aplicarlas".[40] Para entender con corrección el concepto "derecho procesal sustantivo" y su relación con la reglamentación de tipo económico, conviene considerar su trasfondo en la historia de los Estados

---

[40] J. Álvarez González, *Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos*, Bogotá, Temis, 2009, pág. 629.

Unidos de América. El profesor Serrano Geyls nos señala lo siguiente:

> Los años que siguieron a la aprobación de la enmienda XIV hasta 1934 se distinguieron por tres desarrollos fundamentales:… el acelerado crecimiento del capitalismo norteamericano con su secuela de abusos contra individuos y grupos económicamente débiles;… la intervención en las actividades económicas, gradualmente más acentuada, de los gobiernos de los estados y luego del gobierno federal para eliminar o reducir esos abusos y …el uso frecuente por los tribunales de una doctrina constitucional que limitó extensamente el poder de reglamentación económica de esos gobiernos.
>
> En los *Slaughter-House Cases* el Tribunal Supremo rechazó (5-4) la idea… de que la cláusula de privilegios e inmunidades de la ciudadanía contenida en la Enmienda XIV incluye los derechos comprendidos en las primeras diez enmiendas. Se trataba de una ley de Louisiana que concedía el monopolio de la matanza de ganado en New Orleans a una corporación. Los demandantes alegaron también que la ley violaba el debido proceso de ley.
>
> …
>
> Correspondió al Juez Bradley… discutir en su opinión disidente, el debido proceso. Dijo que "los derechos a la vida, la libertad y la propiedad son derechos fundamentales de los que solo puede disponerse mediante el debido proceso de ley".
>
> …
>
> Así hizo su aparición, en la jurisprudencia del Tribunal Supremo Federal… el concepto de debido proceso de ley "sustantivo" como freno a la reglamentación económica. Expresiones aisladas incluidas en opiniones del Tribunal confirmaron la gradual aceptación de la doctrina.
>
> …
>
> Luego en *Holden v. Hardy*… se sostuvo la validez de una ley estatal que limitaba a ocho horas la jornada de trabajo de los empleados de minas y fundiciones, porque constituía un ejercicio "razonable" del poder legislativo en vista de las insalubres condiciones de trabajo

imperantes en la industria… Unos años después, entró *Lochner v. New York*… [y] se produjo la consagración definitiva del debido proceso de ley sustantivo, a la vez que un intenso debate sobre sus alcances.

…

De 1905 a 1934 [iniciando con *Lochner* en 1905] el Tribunal Supremo invalidó unas [200] leyes de reglamentación económica, federales y estatales, fundamentándose mayormente en el debido proceso de ley sustantivo. Un número mayor fue aprobado.

…

La gravísima situación económica que aquejó a los Estados Unidos de 1930 – 1933… los justos reclamos de los individuos y grupos más perjudicados por ella, la simpatía de los gobiernos hacia esos reclamos y las críticas dentro y fuera del Tribunal a las aplicaciones del debido proceso sustantivo provocaron un cambio de interpretación. *Nebbia v. New York*, 229 U.S. 502 (1934) constituyó el primer paso.

Nebbia, un pequeño tendero [pequeño comerciante], fue condenado por violar una ley de New York que autorizaba  fijar precios mínimos y máximos a la leche. Alegó que la ley violaba el debido proceso y la igual protección garantizados por la enmienda XIV. El Tribunal sostuvo la validez de la ley por votación 5-4.

…

*West Coast Hotel v. Parrish*… marca la aceptación definitiva de una nueva aplicación del debido proceso de ley sustantivo a la reglamentación económica. La jurisprudencia del Tribunal Supremo hasta nuestros tiempos ha reafirmado, en términos aún más enfáticos, esa nueva posición.[41] (Citas omitidas)

---

[41] Op cit., págs. 915-930. En el caso *Lochner v. New York,* 198 U.S. 45 (1905), la Corte de Apelaciones de Nueva York había confirmado la condena del demandante (Lochner), quien había violado una ley de ese estado que prohibía el empleo de panaderos por más de sesenta horas a la semana o diez horas al día. El Tribunal Supremo  Federal declaró inconstitucional esa ley  al considerar que era una irrazonable, innecesaria y arbitraria, y que interfería con la libertad de contratación, sin tener el gobierno un propósito legítimo para regular las condiciones y prácticas de trabajo. Este caso marcó un periodo de casi treinta años que se conoció como la *"era Lochner"*.

Por otra parte, en *West Coast Hotel v. Parrish,* 300 U.S. 379 (1937). el Tribunal Supremo Federal aplicó la doctrina jurisprudencial sentada en *Nebbia, supra,* y señaló que:

Como señala el profesor Serrano Geyls, "la consagración definitiva del debido proceso de ley sustantivo" adviene con el caso de *Lochner v. New York*, 198 U.S. 45 (1905). *Lochner* y su progenie marcan un periodo en el que se presumía la inconstitucionalidad de cualquier ley que intentara regular la propiedad privada, obligando al Estado a probar que la legislación mantenía algún tipo de relación razonable con un fin legítimo. Sin embargo, este criterio judicial no se sostuvo por mucho tiempo. El ocaso de la llamada *"era Lochner"* inició con el caso de *Nebbia v. New York*, 291 U.S. 502 (1934). Es a partir de ese momento que ese control estricto que *Lochner* impuso sobre la legislación económica comenzó a deteriorarse, encontrando su final a partir de 1937, con el caso de *West Coast Hotel Co. v. Parrish*, *supra*. En *West Cost* el Tribunal Supremo Federal sostuvo la validez de una ley del Estado de Washington que establecía un salario mínimo para las mujeres, revocando así la decisión de *Adkin v. Children's Hospital*[42], que había declarado inconstitucional una legislación que establecía exactamente lo mismo, por constituir un menoscabo a las

---

[si] [l]as regulaciones a la propiedad privada guardan una relación razonable con un legítimo fin legislativo, y no son discriminatorias o arbitrarias, los requerimientos del debido proceso se encuentran satisfechos; los tribunales son incompetentes para controlarlas si resulta adecuada y practicable; (…) no puede ser invalidada salvo que el exceso legislativo sea palpable.

[42] 261 U.S. 525 (1923)

obligaciones contractuales. De hecho, Desde *West Coast Hotel v. Parish, supra*, prácticamente toda revisión judicial en casos relacionados con el *Police Power* del Estado bajo la enmienda XIV de la Constitución Federal se han efectuado bajo las cláusulas del debido proceso de ley  y la de igual protección de las leyes. Cuando una ley regula un derecho o una libertad que afecta a la ciudadanía en general por igual, se la somete al escrutinio del debido proceso de ley sustantivo; cuando la ley establece clasificaciones que regulan el ejercicio de un determinado derecho o libertad de un modo distinto a diversos grupos o personas, entonces se aplica el escrutinio ("test") de la igual protección de las leyes.

### *Desarrollo en Puerto Rico:*

En cuanto al desarrollo histórico de la doctrina del debido proceso de ley sustantivo en nuestra Isla, citamos gran parte de lo expuesto por el profesor Álvarez González en su reciente obra:

> El Tribunal Supremo de Puerto Rico se confrontó por primera vez con la aplicación de *Lochner v. New York…* en *Pueblo v. García & García…* Se acusó a una empresa de violar el art. 553 del Código Penal de 1902 por haber tenido abierto al público su establecimiento de provisiones a las ocho y cuarto de la noche. Ambas partes presentaron alegatos sobre la aplicación de *Lochner* a aquella situación.
> El Tribunal en *García* se negó a aplicar a *Lochner*, tras diferenciar los hechos de ambos casos. Concluyó que el estatuto de Nueva York impugnado en *Lochner* establecía un límite al número de horas que un obrero podía trabajar, mientras que el art. 553 establecía una hora

límite para cerrar establecimientos comerciales, las seis de la tarde. A juicio del Tribunal, el art. 553 no imponía un límite al total de horas de trabajo que un obrero podía contratar, por lo que la situación era distinguible de la de *Lochner*.

Lo curioso de *García* no es tanto la forma en que evadió aplicar a *Lochner*, sino que el Tribunal dio señas de inclinarse hacía la posición contraria a ese caso, a pesar de que en efecto estaba interpretando la Constitución federal, en la que la entidad acusada basaba su defensa. El Tribunal enfatizó su deber de sostener la constitucionalidad de una ley a menos que resulte claramente lo contrario y mostró renuencia a escudriñar el interés o propósito legislativo:

> [L]as cortes no investigarán respecto a las razones que los legisladores hayan podido tener en cuenta al aprobar dichas reglamentaciones siempre que las reglamentaciones mismas no sea contrarias a la razón.

Acto seguido, el Tribunal adoptó un escrutinio de razonabilidad para adjudicar la validez constitucional de la Ley de Cierre. Resolvió que el que una reglamentación pueda erigir un obstáculo al libre comercio sólo provocará su invalidación cuando no se pueda encontrar razón alguna que la justifique. En la última oración de su opinión, el Tribunal utilizó una técnica que el Tribunal Supremo federal no vino a popularizar sino hasta después del desplome del edificio *Lochner*: conjeturar sobre el propósito legislativo y sobre el cuadro de hechos que el legislador tuvo ante sí.

…

No obstante, unos años después el Tribunal, que ahora interpretaba la cláusula de debido proceso de ley de la Ley Jones, se sintió obligado por la jurisprudencia federal e invalidó una ley que autorizaba a los municipios a crear monopolios para la venta de carne, desplazando así a los carniceros del ejercicio de su oficio, *Pueblo v. Correa*… e invalidó también la ley de salario mínimo, *Pueblo v. Laurnaga & Co., Sucs.,S en C.*…

…

En 1937, el mismo año en que se decidió *West Coast Hotel Co. v. Parish*… surgió en

Puerto Rico *M. Taboada & Co. v. Rivera Martínez, Comisionado* (1937). Este caso presentó una segunda oportunidad al Tribunal para expresarse sobre el tipo de escrutinio a usarse ante un ataque a la validez constitucional de una medida de reglamentación económica. En *Taboada* se pidió al Tribunal que invalidara la Ley 49 de 1935, que regulaba las horas de trabajo de los empleados de establecimientos comerciales e industriales. Esa era una controversia muy similar a la de *Lochner*, por lo que el Tribunal no pudo evadir discutir a fondo ese caso, cuya fuerza como precedente ya estaba declinando rápidamente para 1937. El Tribunal resumió la posición de los jueces en *Lochner* y concluyó que la minoría postulaba el principio correcto. Añadió que en *Bunting v. Oregon*, (1917), el Tribunal Supremo federal así lo reconoció implícitamente, al negarse a indagar sobre el motivo legislativo de una reglamentación económica. Por ello, concluyó, *Bunting* revocó *sub silentio* a *Lochner*.

…

En 1940, *García v. Municipio de Humacao*, (1940) planteó de nuevo la validez de la Ley de Cierre, según enmendada en 1917 y 1925. Esas enmiendas autorizaron a los municipios a aplicar esa ley a las farmacias. El Tribunal reafirmó a *García & García* y sostuvo expresamente que la opinión del Juez Holmes en *Lochner* se había convertido en la norma imperante.

Desde entonces el Tribunal ha pasado ligeramente sobre solicitudes para que indague sobre la motivación legislativa y la constitucionalidad de medidas de reglamentación económica. En casos como *Montaner v. Comisión Industrial*, (1940); *Hilton Hotels v. Junta de Salario Mínimo*, (1953); *A. Roig, Sucr. v. Junta Azucarera*, (1954), expresó que no es su función enjuiciar la sabiduría o conveniencia política de una ley, sino sólo si ésta es irrazonable, arbitraria o caprichosa, que es lo único que exige el debido proceso [de ley].[43] (Citas omitidas).

---

[43] Op. cit., pág. 631-632.

Como bien señala el profesor Álvarez González, desde 1915, en *Pueblo v. García* & García, 22 D.P.R. 817 (1915)*,* adoptamos un escrutinio de razonabilidad (nexo racional) con relación a los ataques a medidas de reglamentación socioeconómicas, bajo la cláusula de debido proceso de ley en su modalidad sustantiva. Esto, incluso y como refleja el caso de *Pueblo* v. *García, supra,* aun antes de que el Tribunal Supremo Federal abrazara tal criterio.

Desde entonces, y a través de todo el siglo pasado, sostuvimos la validez de múltiples leyes de reglamentación socioeconómica apoyados en el criterio de razonabilidad. Así por ejemplo, en *Marina Ind. v. Brown Boveri Corp.*, 114 D.P.R. 64, 80 (1983), señalamos que la Legislatura, en el ejercicio de su poder de razón de Estado, tiene amplia facultad para la reglamentación de carácter económico, sujeta únicamente a las limitaciones impuestas por la garantía del debido proceso de ley. Señalamos específicamente que "[e]stas limitaciones solo requieren que la reglamentación no sea irrazonable, arbitraria o caprichosa y que el medio elegido tenga una relación real y sustancial con el objetivo que se persigue".[44]

Diez años después de *Marina Ind. v. Brown, supra*, y por voz de la Juez Asociada Naveira, emitimos dos

---

[44] *Marina Ind. v. Brown Boveri Corp., supra,* pág. 77. Véase, además, *Morales v. Lizarribar*, 100 D.P.R. 717 (1972); *Central San Vicente v. Junta Azucarera*, 78 D.P.R. 799 (1955); A. Roig, Sucrs. v. Junta Azucarera, 77 D.P.R. 342, 357 (1954).

opiniones con algunas pautas que es menester citar. En *Defendini Collazo et al, v. E.L.A., Cotto,* 134 D.P.R. 28, 74 (1993), reiteramos que el debido proceso de ley sustantivo impide el que una persona sea privada arbitrariamente de un interés de libertad o propiedad. No obstante, también señalamos que **"[u]na ley no será declarada inconstitucional por violar esta disposición siempre que la misma tenga una relación real y sustancial con el interés estatal que persigue"** y cumpla con los requisitos de razonabilidad y no arbitrariedad o capricho legislativo. Allí, citando expresamente a *Morales v. Lizarribar, supra*, reiteramos que

> [l]os tribunales al examinar una controversia relativa a esta garantía constitucional **"no entrarán en consideraciones sobre la sabiduría de las medidas legislativas, sino que sostendrán su constitucionalidad a menos que no tengan un propósito público legítimo, o sean claramente arbitrarias, o que no guarden una relación razonable con el propósito público que persiguen".**[45]
> (Énfasis suplido).

Como puede observarse, la garantía del debido proceso de ley exige que un estatuto de naturaleza socioeconómico no sea irrazonable, arbitrario, caprichoso y que el medio elegido tenga una relación racional con el interés que se persigue.[46] Es decir, para determinar la

---

[45] *Defendini Collazo et al, v. E.L.A., Cotto, supra*, 74.

[46] *Salas v. Municipio de Moca,* 119 D.P.R. 625, 633 (1987); *Morales v. Lizarribar,* 100 D.P.R. 717, 731 (1972).

constitucionalidad de una ley de carácter económico, bajo el crisol del debido proceso de ley sustantivo, es de aplicación un escrutinio de razonabilidad.[47] Este análisis es esencialmente similar al de la igual protección de las leyes mediante el escrutinio de nexo racional.[48]

Por último, en *San Miguel Lorenzana v. E.L.A.,* 134 D.P.R. 405, 408 (1993), señalamos que al utilizar el escrutinio de nexo racional "el tribunal tiene que adoptar una **actitud de gran deferencia hacia la actuación legislativa** que se impugna. El fundamento de esta norma de deferencia reside en el principio constitucional de separación de poderes".[49] (Énfasis nuestro.) Por esta razón, el estatuto o reglamento, según sea el caso, se presume constitucional y el peso de la prueba recae sobre quien cuestiona su validez.[50]

**En conclusión, es evidente que con relación a reclamos bajo la cláusula de debido proceso de ley en su modalidad sustantiva, y en lo relativo a medidas de corte socioeconómico, este Tribunal ha seguido, hasta el día de**

---

[47] *Defendini Collazo Et al, v E.L.A., Cotto, supra,* pág. 74.

[48] *Marina Ind., Inc. v. Brown Boveri Corp., supra,* pág. 81. Véanse además, *Zachry International v. Tribunal Superior,* 104 D.P.R. 267 (1975); *Hermina González v. Srio del Trabajo,* 107 D.P.R. 667, 673 (1978).

[49] Véanse también *Berberena v. Echegoyen,* 128 D.P.R. 864, 881-882 (1991); *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432 (1985); *Schweiker v. Wilson,* 450 U.S. 221 (1981); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464 (1981).

[50] *Marina Ind., Inc. v. Brown Boveri Corp., supra,* pág. 80.

**hoy, la pauta establecida por el Tribunal Supremo federal de escrutinio o nexo racional; no vemos razón por la cual debemos apartarnos de ésta ahora.**

### C. Debido Proceso de Ley en su Aspecto procesal

El "debido proceso de ley" es uno, pero lo es en virtud de sus circunstancias. En el aspecto procesal y en su sentido literal significa "un proceso justo". Por eso señalamos que es sólo uno, sin más acepciones; porque se trata llanamente de un proceso que emane justicia, aunque no todos advertimos la justicia de la misma manera.

> El filósofo y el moralista ven la justicia abstracta. El hombre, sea abogado, sea político, ha tratado de identificarla con el interés individual de su propia clase, de su propia nación. Para el jurista la justicia es una realidad concreta. Es la síntesis de la vida real. Es una entidad heterogénea compuesta, como el hombre, de materia y espíritu, de oportunidad y de moral, que no se excluyen, sino que se equilibran, de razón y utilidad, de pasado y futuro, de tradición y renovación, que coexisten al igual que en la máquina coexisten freno y motor.[51] (Énfasis omitido.)

Como hemos señalado, "[e]l debido proceso de ley es una de esas fórmulas elásticas de justicia sustancial que no es susceptible de definición genérica. No es una norma invariable que pueda aplicarse por su propia virtualidad

---

[51] B. Biondi, *La ciencia del Derecho como arte de lo justo*, 9 Anales de la Academia Matritense 323, 352 (1957), citado por el Juez Asociado Señor Negrón García en su opinión concurrente en *Pueblo Int'l, Inc. v. Srio. de Justicia*, 122 D.P.R. 703, 748 (1988).

independientemente de las circunstancias que medien el caso".[52]

Al considerar la doctrina del debido proceso de ley en su aspecto procesal, es necesario confirmar, en primer lugar, la existencia de un interés de libertad o propiedad protegido por esta cláusula constitucional y que este interés se encuentre afectado por una acción del Estado (*State Action*). En segundo lugar, es menester determinar las características mínimas que debe reunir el procedimiento mediante el cual el Estado pretende afectar negativamente ese derecho constitucionalmente protegido.

Como ya señalamos, desde *Pierson Muller I v.* Feijoó, *supra,* este Tribunal reconoció que los empleados de carrera como los aquí recurridos ostentan un claro interés propietario que, como tal, se encuentra protegido por la Constitución puertorriqueña, así como por la de los Estados Unidos de América. También hemos señalado que tal protección se concreta a que el derecho propietario en cuestión no pueda ser afectado por el Estado, sin que a los recurridos se les garantice un debido proceso de ley.

En cuanto al procedimiento o proceso debido que se le debe conceder a un empleado de carrera cuando se le priva de su empleo, en *Rivera Rodríguez & Co. v. Lee Stowell, etc.,* 133 D.P.R. 881, 888(1991), señalamos que **"[d]ependiendo de las circunstancias, diversas**

---

[52] *Santiago v. Jones*, 74 D.P.R. 617, 621 (1953).

**situaciones pueden requerir diferentes tipos de procedimientos, pero siempre persiste el requisito general de que el proceso gubernamental debe ser justo e imparcial."** (Énfasis nuestro.) A renglón seguido pautamos, siguiendo la norma establecida por el Tribunal Supremo federal en *Mathews v. Eldridge*, 424 U.S. 319 (1976), que

> [e]l Tribunal Supremo de Estados Unidos estableció los tres (3) criterios que deben sopesarse al determinar cuál es el proceso debido para privarle a un individuo de algún derecho protegido. Estos son: (1) se debe determinar cuáles son los intereses individuales afectados por la acción oficial; (2) el riesgo de una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas, y (3) el interés gubernamental protegido con la acción sumaria y la posibilidad de usar métodos alternos. (Énfasis omitido.)

Asimismo, a la luz de los criterios enunciados en *Mathews v. Eldridge, supra*, y la jurisprudencia subsiguiente, se han establecido diversos requisitos con los que debe cumplir todo procedimiento adversativo para satisfacer las exigencias mínimas de un debido proceso procesal, a saber:

> (1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) oportunidad de ser oído; (4) derecho a contrainterrogar testigos y

> examinar evidencia presentada en
> su contra; (5) tener asistencia
> de abogado, y (6) que la
> decisión se base en el récord.

Luego, en Rivera *Santiago v. Srio. de* Hacienda, 119 D.P.R. 265 (1987), añadimos que la decisión final debe ser explicada o fundamentada. Es a la luz de estos parámetros que debemos resolver, sujeto a las circunstancias de estos casos en particular, los reclamos de los recurridos en cuanto al aspecto procesal del debido proceso de ley.

De otra parte, en *Vélez Ramírez v. Romero Barceló*,[53] -un caso relacionado al área de empleo público- señalamos que los factores reconocidos por el Tribunal Supremo Federal en *Mathews v. Eldridge*, *supra*, son los que se deben considerar para determinar si como requisito mínimo del debido proceso de ley, el empleado público tiene derecho a una vista informal previa a su despido.[54] A la luz de tales requisitos, este Tribunal ha resuelto que el debido proceso de ley, en su modalidad procesal, les garantiza a los trabajadores gubernamentales una vista informal previa al despido, cuando estos demuestran tener un interés propietario reconocido por el Estado.[55]

---

[53] 112 D.P.R. 716, 730-731 (1982).

[54] Véase, *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499, 519 (1990).

[55] *A.E.E. v. Unión de Trabajadores*, 153 D.P.R. 623, 630 (2000); *Marrero Caratini v. Rodríguez Rodríguez*, 138 D.P.R. 215, 221 (1995); *Torres Solano v. P.R.T.C.*, *supra*.

## IV

## A. El estado de "emergencia fiscal"

La Ley Núm. 7 declara reiteradamente un **"estado de emergencia fiscal"** en Puerto Rico.[56] Ésta constituye la primera vez en la historia que nuestra Asamblea Legislativa utiliza el término "estado de emergencia", en el contexto de una situación económica a nivel de todo el País.[57] Ahora bien, ya antes este Tribunal ha reconocido

---

[56] Además de su título, "*Ley Especial Declarando Estado de Emergencia Fiscal…*", la Ley Núm. 7 declara la existencia de un "estado de emergencia fiscal" en su Exposición de Motivos; un "estado de emergencia económica y fiscal" en el Art. 2 (Declaración de Propósito de Política Pública); y, nuevamente, un "estado de emergencia fiscal" en el Art. 37.04(b) (Cesantías).

[57] Podríamos encontrar un tipo de excepción a esta aseveración en dos leyes que se aprobaron en la década de los años 40, a consecuencia de la situación mundial provocada por la Segunda Guerra Mundial. Sin embargo, ninguna de estas leyes abarcaba la magnitud –tanto en las áreas afectadas como en sus implicaciones– de la Ley Núm. 7.

A continuación, hacemos un muy breve resumen de las leyes en las que anteriormente la Asamblea Legislativa ha declarado "estados de emergencia". La Exposición de Motivos de la Ley de Tierras de Puerto Rico, Ley Núm. 26 de 12 de abril de 1941, según enmendada, consigna para la historia el que la Asamblea Legislativa de Puerto Rico declaró un Estado de Emergencia por razón del desarrollo del latifundio corporativo en el Puerto Rico de aquel entonces. La acción que nuestra Asamblea Legislativa requirió en aquel momento, y en virtud del "estado de emergencia" que había declarado, fue el inmediato rescate de las tierras de manos de aquellas personas jurídicas (corporaciones) que las monopolizaban, y exigiendo la terminación del dominio, posesión o control de las tierras por tales personas. Desde entonces, y en virtud de tales artículos de la Ley de Tierras de Puerto Rico (28 L.P.R.A. secs. 268 –273), la Autoridad de Tierras puede expropiar todo terreno perteneciente a una corporación con más de 500 acres.

El 27 de noviembre de 1942, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 16, cuyo propósito esencial, tal y como aparece expresado en su título y en la Exposición de Motivos, era: declarar la existencia en Puerto Rico de un estado de emergencia grave ocasionado por la Segunda Guerra Mundial. Esta ley autorizaba programas de trabajos de emergencia, para dar trabajo a los desempleados; autorizaba proyectos de compensación de desempleo, auxilio, abaratamiento de precios, y siembra y distribución de alimentos, entre otros.

Otro estatuto pre Constitución en el que la Asamblea Legislativa decretó un estado de emergencia lo es la Ley número 464, aprobada el 25 de abril de 1946, conocida como Ley de Alquileres

la posibilidad de que, en **circunstancias de emergencias relacionadas con aspectos económicos**, la Asamblea Legislativa puede hacer uso de sus amplios poderes.[58] De hecho, en el pasado hemos llegado a tomar **conocimiento judicial** de "la precaria situación económica del país", y de cómo esa situación económica se refleja, produciendo una "grave crisis" en las finanzas del Gobierno.[59]

Esta declaración de "estado de emergencia fiscal" que enuncia la Ley Núm. 7 se emite como consecuencia, a su vez, de la determinación de la existencia de una "grave emergencia fiscal" que justifica –según el texto de la propia Ley– el uso del "poder de razón de Estado"

---

Razonables, esto también en el contexto de la Segunda Guerra Mundial.

Asimismo, los Arts. 1 al 6 de la Ley Núm. 3 de 16 de diciembre de 1946, 3 L.P.R.A. secs. 487-492 establecen una serie de medidas que también preceden a la aprobación de nuestra Constitución. Mediante tales artículos el Gobernador, con el consejo y aprobación del "Consejo de Secretarios" puede determinar una emergencia en la prestación de servicios públicos y declara un "estado de emergencia" en un "departamento, dependencia o agencia". Según el texto de la sección 487 esta declaración de emergencia se daría en el contexto del abandono del servicio o amenaza de abandono del servicio, en acción concertada, por parte de un número de funcionarios o empleados, ya sean a sueldo o jornal, de departamentos, dependencias o agencias del Gobierno de Puerto Rico.

Por último, el Art. 48 de la Ley de Bancos, Ley Núm. 55 de 12 de mayo de 1933, según enmendada,7 L.P.R.A. sec. 204, dispone que en caso de "periodos recesionarios o de depresión que afecten en un alto grado la estructura económica y monetaria del país con su consabido efecto desfavorable sobre la banca, el Gobernador podrá proclamar un estado de emergencia y tomar las medidas de emergencia con relación a los bancos para la protección del público y los mejores intereses de Puerto Rico".

[58] *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 396 (1973). Véase además, *Aponte v. Srio. de Hacienda, E.L.A.*, 125 D.P.R. 610, 634 (1990), opinión concurrente del Juez Asociado Señor Negrón García.

[59] *Aponte v. Srio. de Hacienda, supra*, pág.625, esc. 11.

por parte de la Asamblea Legislativa. Corresponde entonces examinar cuáles son las circunstancias que motivan a la Asamblea Legislativa para declarar un estado de emergencia fiscal, invocando de esta forma su amplio poder de razón de Estado y, mediante éste, aprobar una medida que afecta los intereses propietarios de los aquí recurridos.

### B. La situación fiscal del Gobierno de Puerto Rico, a la luz de la legislación aprobada

Para dramatizar la situación tan difícil que enfrenta el País, la Ley Núm. 7 comienza su Exposición de Motivos señalando que:

> Puerto Rico atraviesa por la **crisis fiscal más grave de nuestra historia.** [Encontrándose en] una recesión económica que está en su cuarto año consecutivo y que está **al borde de convertirse en una depresión**—la primera en Puerto Rico desde la década de los 1930's. (Énfasis nuestro).[60]

**Las razones para la crisis:**

Señala la Exposición de Motivos de la Ley Núm. 7 que el Gobierno de Puerto Rico enfrenta un déficit estructural recurrente de aproximadamente $3,200 millones, lo que equivale al 42% de los recaudos estimados para este año fiscal. El Gobierno no cuenta con

---

[60] Exposición de Motivos, Ley Núm. 7 de 9 de marzo de 2009.

los recursos para cubrir sus gastos operacionales.[61] A partir del primer semestre del 2006, Puerto Rico ha sufrido tres años consecutivos de crecimiento económico negativo. De julio de 2007 a junio de 2009, la economía del País se habría contraído a razón de 2.6% anual, proyectándose una caída económica que continuará durante el próximo año fiscal; se estima que la economía se reducirá por lo menos un 2% adicional en el año fiscal 2010.[62]

El problema es que "[c]umulativamente, Puerto Rico habrá experimentado cuatro años corridos de recesión", lo que constituiría "una depresión económica que básicamente anularía todo el crecimiento experimentado en los seis años del 2000 al 2006".[63] Agrava esta situación el hecho de que, según se advierte en la Exposición de Motivos de la Ley Núm. 7, a partir del primer semestre de 2006 y hasta la promulgación de la ley, en Puerto Rico hubo una sobre-estimación del crecimiento económico, lo que a su vez produjo una sobre-estimación en los recaudos del Fondo General del Departamento de Hacienda, durante ese mismo periodo.[64]

---

[61] Íd.

[62] Íd.

[63] Íd

[64] Íd.

Desde el año fiscal 2006 al presente, todos los presupuestos anuales sobre-estimaron los recaudos en un promedio de $919 millones anuales o aproximadamente el 10% del presupuesto. Cumulativamente, durante ese período de cuatro años fiscales, los presupuestos anuales del Gobierno sobre-estimaron los recaudos en una cantidad no menor de $3,675 millones.[65] Advierte la Exposición de Motivos que la consecuencia más seria de este patrón de sobre-estimación de recaudos fue "la confección de presupuestos de gastos operacionales que excedían sustancialmente los recaudos y que hacían caso omiso de la condición recesionaria de nuestra economía".[66] Continúa la Exposición de Motivos señalando que,

> [d]e acuerdo a la proyección de recaudos más reciente del Departamento de Hacienda, la diferencia estimada entre los recaudos y el presupuesto de gastos del año 2009 asciende a $1,888 millones, o aproximadamente el 20% del presupuesto de gastos. **Durante el período del año fiscal 2006 al 2009, los gastos operacionales presupuestados habrán excedido los recaudos en no menos de $4,637 millones. Esta cantidad equivale a más de la mitad del promedio de recaudos anuales durante los últimos cuatro años fiscales.**[67] (Énfasis nuestro.)

---

[65] Íd.

[66] Íd.

[67] Íd. Énfasis suplido.

"La gravedad de esta brecha entre los recaudos y los gastos presupuestados se recrudece cuando se consideran los gastos actuales del Gobierno. Desde el año fiscal 2006 al 2009, el Gobierno incurrió en gastos que excedieron en $5,817 millones los ingresos recurrentes".[68] Finalmente, el resultado neto es de un:

> …desfase total entre los ingresos y los gastos recurrentes del Gobierno y el **entroncamiento de un déficit estructural que para el año fiscal en curso aproxima $3,200 millones y que se proyecta continúe por encima de $3,000 millones anuales por los próximos años fiscales de no tomar medidas inmediatas para estabilizar nuestra situación fiscal y desarrollar nuestra economía.** (Énfasis nuestro.)

***Consecuencias de la Crisis:***

En el 2004, las obligaciones generales de Puerto Rico estaban clasificadas a nivel Baa1/A- por las casas acreditadoras Moody's y Standard & Poor's.[69] Mientras la situación fiscal y económica del Gobierno ha ido empeorando, la clasificación crediticia ha seguido bajando. En el 2005, ambas casas acreditadoras degradaron el crédito a Baa2/BBB; en el 2006, Moody's bajó la clasificación a Baa3, seguido por Standard & Poor's a BBB- en el 2007. **Al presente, nuestra**

---

[68] Íd

[69] Moody's y Standard & Poor's son dos de las tres compañías más importantes en el mundo, dedicadas a la publicación periódica de análisis financieros que fijan la posición de solvencia de las acciones y los bonos, en sus correspondientes mercados.

**clasificación está en Baa3/BBB-, a un paso de caer a nivel de "chatarra" ("junk") y perder su grado de inversión ("investment grade").**[70]

Según la Exposición de Motivos de la Ley Núm. 7, **"la degradación de nuestro crédito a "chatarra" sería catastrófica para Puerto Rico".**[71] (Énfasis nuestro.) Todas las cuentas de retiro individuales, los planes de retiro, tanto públicos como privados, y las cuentas de ahorro e inversión que estén invertidas en bonos del Gobierno se verían seriamente afectadas, al ser fuertemente devaluadas.[72] Esta devaluación vendría acompañada de la necesidad inmediata de que los tenedores de estas obligaciones tengan que prestar colateral adicional para garantizar sus obligaciones con sus acreedores.[73]

En el caso del Gobierno, el estimado del B.G.F. es que el Gobierno tendría que poner, inmediatamente, más de $900 millones en colateral. Por otro lado, todos los individuos, empresas y otras entidades que tengan préstamos u otras facilidades de crédito garantizadas con bonos del Gobierno de Puerto Rico tendrían que prestar colateral adicional para compensar por la pérdida en

---

[70] Íd.

[71] Íd.

[72] Íd.

[73] Íd.

valor de dichos bonos.    El B.G.F. estima que estos requisitos de colateral adicional podrían ascender hasta $1,680 millones.    En total, el Gobierno, individuos, empresas y otras entidades tendrían que poner aproximadamente $2,580 millones en colateral adicional como consecuencia de la degradación.[74] La confluencia de éstos y otros efectos adversos que se señalan en la Exposición de Motivos:

> …recrudecería nuestra recesión económica y **resultaría en la pérdida**, según los modelos econométricos de la Junta de Planificación, **de aproximadamente 130,000 empleos** para un impacto adicional en nuestra economía de aproximadamente $3,250 millones. **El impacto total de la degradación a "chatarra" sería catastrófico.  Según los estimados anteriores, el impacto total no sería menor de $10,000 millones;** esto equivale a aproximadamente el 17% del Producto Nacional Bruto de Puerto Rico ó 1.3 veces los recaudos proyectados del Gobierno para el año fiscal en curso.[75] (Énfasis nuestro.)

Para finalizar, en cuanto a los efectos de esta devaluación, y las consecuencias que tendría sobre la Isla, la Exposición de Motivos señala que **"la degradación llevaría a Puerto Rico a una profunda depresión económica**

---

[74] Íd.

[75] Íd. Énfasis suplido.

**nunca antes vista en nuestra historia"**, cuyo impacto **"sería inimaginable".**[76] (Énfasis nuestro.) Se añade que

> [h]abría una reducción abrupta en los recaudos y una imposibilidad de recurrir a financiamientos para suplir insuficiencias presupuestarias. El déficit operacional del Gobierno ascendería a proporciones nunca antes vistas [y] …**simplemente no tendría los recursos para continuar operando: no podría pagar los salarios de todos sus empleados; no podría cumplir con las obligaciones incurridas** con todos sus proveedores de servicios y materiales; **no podría proveer todos los servicios y beneficios… a la ciudadanía;** y estaría en riesgo de incumplir sus obligaciones con los bonistas. El Gobierno tendría que reducir dramáticamente sus operaciones,… tendría que cerrar temporera o permanentemente algunas de sus dependencias; y tendría que concentrar sus limitados recursos en aquellos servicios esenciales mínimos que más necesita la ciudadanía.
>
> **Este escenario pondría en manifiesto riesgo la salud, la seguridad y el bienestar del Pueblo de Puerto Rico.**[77] (Énfasis nuestro.)

*Las alternativas ante la crisis:*

La Exposición de Motivos de la Ley Núm. 7 advierte una ausencia de soluciones fáciles, señalando que el Gobernador de Puerto Rico ha tomado medidas inmediatas de

---

[76] Íd. Énfasis suplido.

[77] Íd. Énfasis suplido.

control de gastos, incluyendo: la congelación de puestos vacantes; la prohibición a la creación de nuevos puestos; la eliminación de un 30% de los puestos de confianza en las agencias; la reducción de gastos operacionales equivalente al 10% de la mitad de los gastos operacionales presupuestados para el año fiscal 2008-09; la prohibición del uso de tarjetas de crédito; la limitación al uso de vehículos oficiales; y la prohibición del uso de fondos públicos para sufragar gastos relacionados al uso de teléfonos celulares, entre otras medidas.[78]

Ahora bien, añade la Exposición de Motivos que **"un déficit estructural de la magnitud como el que enfrenta la Isla no se puede eliminar solamente con reducciones de gastos o solamente con medidas impositivas"**.[79] También se expresa lo siguiente:

> Las medidas impositivas necesarias para cerrar una brecha de $3,200 millones **ahogarían a la ciudadanía y hundirían a Puerto Rico en una depresión catastrófica.** Requeriría un aumento total en contribuciones no menor de 42% ($3,200 millones adicionales a los recaudos proyectados de $7,400 millones) para poder levantar esta cantidad de dinero. **Requeriría aumentos dramáticos en las tasas del**

---

[78] Íd.

[79] Íd.

> **Impuesto sobre Ventas y Uso ("IVU"), las tasas de contribuciones sobre ingresos, y los arbitrios sobre autos, gasolina, petróleo y otros artículos.** Imponer cargas de esta magnitud en una economía recesionaria sería devastador para Puerto Rico.[80] (Énfasis nuestro.)

Por otro lado, cubrir este déficit estructural solamente con reducciones de gastos gubernamentales podría tener un efecto devastador sobre la operación del Gobierno, los servicios a la ciudadanía y la economía en general.[81] Se indica que:

> [a] modo de ejemplo, **una reducción de $3,200 millones requeriría la cesantía de aproximadamente 110,000 empleados del Gobierno Central (estimando un costo de $30,000 por empleado). En un Gobierno Central de aproximadamente 190,000 empleados, esta reducción representaría el 58% de la plantilla gubernamental.** Este tipo de acción convertiría al Gobierno en inoperante y afectaría seriamente los servicios a la ciudadanía, poniendo en riesgo la salud y la seguridad de nuestro Pueblo. **Nuestro Gobierno se vería prácticamente incapacitado de ayudar a este gran número de empleados cesanteados, sumida en una recesión que ciertamente se agravaría con tal acción, tampoco podría absorber a todos estos empleados en otros sectores.** (Énfasis nuestro.)

---

[80] Íd. Énfasis suplido.

[81] Íd.

Además, la Exposición de Motivos de la Ley Núm. 7 explica claramente que **una reducción de jornada general, como una alternativa viable para reducir el déficit estructural y mantener las operaciones del Gobierno, no es posible, por dos razones.**[82] En primer lugar, la magnitud de la reducción de jornada en todos los empleados públicos que se necesitaría para alcanzar los recortes necesarios, requeriría una reducción de aproximadamente 2 a 3 días a la semana. **Esto equivaldría a una reducción de 40% a 60% en el sueldo de todos los empleados públicos.**[83] Además de impactar enormemente los ingresos de estos empleados y crear un desasosiego general dentro y fuera del Gobierno, **"[u]na reducción de jornada de 2 a 3 días por semana dejaría al Gobierno prácticamente inoperante"**.[84] (Énfasis nuestro.)

Segundo, aún de considerarse alguna combinación de una transición de un número menor de empleados con una reducción de jornada general para los empleados restantes que no rinden servicios esenciales, la reducción de jornada tendría que ser considerable para lograr los ahorros necesarios. Esta reducción tendría que ser por lo menos de un 20% del salario o un (1) día a la semana, y **tendría que ser indefinida.** Esto es, la reducción de

---

[82] Íd.

[83] Íd.

[84] Íd.

jornada duraría un mínimo de tres (3) años fiscales, pudiendo ser más dependiendo de la condición recesionaria de la economía de Puerto Rico.[85]

***La solución implantada por la Asamblea Legislativa***

Ante el cuadro económico y fiscal al que el País se enfrenta, la Asamblea Legislativa decidió que la forma de cerrar el déficit estructural es creando un balance entre medidas de control y reducción de gastos y medidas de ingresos. En ese sentido, se estableció un plan mediante el cual no más del 40% del déficit estructural estimado de $3,200 millones deberá ser cubierto con nuevas medidas de ingresos o de mejor fiscalización y medidas financieras.[86] Con relación al restante 60% de este plan, la Exposición de Motivos de la Ley Núm. 7 señala lo siguiente:

> Luego de la implantación de las medidas impositivas, el restante 60% del déficit estructural, aproximadamente $2,000 millones, se tiene que atender mediante el control y la reducción de gastos. Aproximadamente el 27% del presupuesto de gastos del gobierno está comprometido con el servicio de la deuda del Gobierno… El remanente, aproximadamente 73%, es la base de gastos sujeta a control discrecional. [O sea,]…(a) gastos operacionales que no constituyen nómina y (b) gastos operacionales de nómina. **En el**

---

[85] Íd.

[86] Íd

> **presupuesto del año fiscal 2009, la proporción entre estas dos partidas es 33% en gastos operacionales que no constituyen nómina, $2,700 millones, y 67% en gastos operacionales de nómina, $4,700 millones.**
>
> **En vista de esta distribución de gastos, es prácticamente imposible lograr la reducción necesaria sin afectar la nómina gubernamental.** Si las economías se fueran a capturar solamente en gastos operacionales (que no incluyen nómina) y suponiendo que estos gastos ascienden a $2,700 millones,…habría que recortar aproximadamente 74% de estos gastos. En estos momentos, esto es una imposibilidad. Es lamentable, pero necesario, contemplar una reducción sustancial en la nómina gubernamental.[87] (Énfasis nuestro.)

## V

Como ya hemos señalado, una ley de carácter socioeconómico –como lo es la Ley Núm. 7– requiere que al evaluar su constitucionalidad a la luz de la cláusula de debido proceso de ley en su vertiente sustantiva, apliquemos un escrutinio racional. Este escrutinio implica, en primer lugar, la necesidad de evaluar si la **acción del Estado,** en este caso la Ley Núm. 7 –como una legislación que afecta derechos de propiedad protegidos por la Constitución–, **guarda una relación real y sustancial con el interés estatal que persigue.** En otras palabras, si existe un nexo, una conexión entre lo que se

---

[87] Íd. Énfasis suplido.

hace y lo que se pretende, y si esa acción es de alguna manera significativa. En segundo lugar, debemos discernir si ese nexo real y sustancial es uno además **razonable y, por ende, no arbitrario ni caprichoso.**

***Relación real y sustancial con el interés que persigue:***

La Ley Núm. 7 es muy clara con relación al interés que persigue. Su declaración de propósitos en el Art. 2, *supra,* así lo establece[88]:

> la necesidad **apremiante** de establecer un plan integrado y coherente de **estabilización fiscal, la eliminación del déficit estructural, la amortización de la deuda pública, el restablecimiento de la salud fiscal y las bases para que el Gobierno pueda impulsar el desarrollo económico de Puerto Rico.** (Énfasis nuestro.)

Como se desprende del Art. 2 de la Ley Núm. 7, *supra*, el interés del Estado al promulgar dicha ley no solamente es legítimo sino que es uno apremiante. Así, aunque el interés que se le exige al Estado demostrar bajo el escrutinio racional es uno legítimo, bajo la Ley Núm. 7, *supra*, trasluce ser un interés apremiante.

---

[88] Véase, además, el Art. 33(g) de la Ley Núm. 7, el cual establece que el objetivo de ésta es el establecimiento de un plan de emergencia dirigido a reducir en $2,000 millones los gastos operacionales y de nómina pagaderos del Fondo General para el año fiscal 2009-2010.

En los casos de autos, las acciones por parte del Estado que debemos someter al escrutinio racional lo constituyen las cesantías de los recurridos, así como la eliminación de unos procesos anteriores a esas cesantías, establecidos mediante la Ley Núm. 184, *supra*, esto en virtud de la Ley Núm. 7. **Resolvemos que en este caso existe una clara relación real y sustancial, entre la acción del Estado y el interés que persigue.**

La cesantía de los recurridos, junto a las cesantías de los demás miles de empleados, aunque lamentables, provocarán, sin duda alguna, un **ahorro real y sustancial** en las arcas del gobierno.[89] Por otro lado, la eliminación por parte de la Ley Núm. 7 de todos los procesos anteriores a una cesantía que establece la Ley Núm. 184, *supra*, responden a la necesidad de que el propósito de la ley se alcance **de manera apremiante**. Como expresa el Art. 37.04 (b)(1) de la propia Ley, existe **urgencia** en corregir los problemas fiscales que enfrentamos. El trámite de cesantías que establece la Ley Núm. 184, *supra*, es uno basado en el principio de méritos, el cual es incompatible con el propósito del Art. 2 de la Ley Núm. 7.[90] Este trámite conllevaría el que, antes de decretar una cesantía, se tendrían que agotar todos los

---

[89] Según estiman los propios recurridos en su alegato, el gobierno se economizará $510 millones anuales con los despidos anunciados. Véase Alegato de la parte recurrida, pág. 12.

[90] Véase Art. 2, Sec. 2.1 de la Ley Núm. 184, *supra*.

recursos disponibles al alcance de la agencia.[91] Esto le restaría al Gobierno la agilidad que necesita para alcanzar sus fines, de manera apremiante.

Además, la ley en cuestión presenta un cuadro fiscal de un Gobierno que se encuentra al borde del caos. Esta conclusión no está basada en meras especulaciones sin fundamento, sino en fuentes autorizadas, como lo son: la Junta de Planificación, el B.G.F. y los Informes de Transición 2008, de Presupuestos del Gobierno de Puerto Rico, de la OGP y del Departamento de Hacienda. Tal situación, concluimos, justifica el **estado de emergencia fiscal declarado por la Asamblea Legislativa y, por ende, la necesidad de utilizar procedimientos que realmente respondan a tal urgencia**. Sin duda, existe una relación real y sustancial entre la eliminación de esos procedimientos, y el interés o  fin que el Estado persigue.

---

[91] El referido trámite incluiría acciones como: reubicación de personal en puestos de igual o similar clasificación en departamentos, oficinas o programas en que haya necesidad de personal; readiestramiento del empleado para reubicarlo en otro puesto, cuando esto pueda hacerse razonablemente antes de la fecha límite para decretar tales cesantías; disfrute de vacaciones acumuladas; licencia sin sueldo hasta tanto cese la crisis presupuestaria, cuando la agencia tome la decisión por la insuficiencia presupuestaria temporera que no requiera la eliminación permanente del puesto. En tales casos, deberá observarse el orden de prelación previamente establecido en el método de decretar cesantías; reducción en la jornada de trabajo y descenso de los empleados como último recurso para evitar cesantías.

*La razonabilidad de la acción del Estado*

Habiendo determinado la existencia de una relación real y sustancial entre la acción del Estado y el interés que persigue, nos corresponde establecer si tal acción es una razonable. Ya hemos determinado que la situación fiscal del Gobierno y las consecuencias de no conseguir el objetivo establecido para con la economía del País, justifican el estado de emergencia fiscal declarado por la Asamblea Legislativa. Ahora bien, a la luz de ese estado de emergencia fiscal, ¿se justifica la acción de la Asamblea Legislativa?; ¿es razonable la manera en que se ha pretendido resolver tal emergencia? La respuesta es en la afirmativa.

En *Bayrón Toro v. Serra*, 119 D.P.R. 605, 623 (1987), reconocimos que, ante una grave crisis fiscal, el Estado debe tener la capacidad y la flexibilidad para hacer cambios y enmiendas razonables que sean necesarias para adelantar sus intereses; claro está, siempre que estos sean legítimos. **Ante el cuadro que presenta la propia ley, y nuestra obligación de adoptar una actitud de gran deferencia hacia la actuación legislativa, debemos concluir que el Estado actuó razonablemente.** Como claramente se explica en la Exposición de Motivos:

> …[t]odas las alternativas típicamente usadas como pasos previos a la **reducción de personal** [o sea] traslados, reubicaciones, readiestramientos, licencias sin sueldo y **reducción de jornada,** entre

otros no son viables dentro del contexto de la magnitud del déficit estructural del Gobierno y la precariedad de la situación. **Es necesario reducir dramáticamente y de forma expedita, el gasto gubernamental. En vista del tamaño de la nómina y del tamaño del déficit, ninguna de las demás alternativas es compatible con este objetivo o son viables ante su impacto sobre la operación del Gobierno.** Los traslados, las reubicaciones y los readiestramientos meramente transfieren el empleado y, por consiguiente, el gasto de un lado a otro. **La reducción general de jornada y mucho menos las licencias sin sueldos, no son alternativas viables pues tendrían que ser de tal magnitud y duración que impactarían gravemente la gobernabilidad de la Rama Ejecutiva.**[92] (Énfasis nuestro.)

Por otro lado, y como también se explica en la Exposición de Motivos de la ley, **el establecer medidas impositivas únicamente, tampoco es una alternativa viable.** De manera que, la Asamblea Legislativa, como funcionarios electos y legítimos representantes del Pueblo de Puerto Rico, determinaron que la imposición al contribuyente de los recaudos necesarios para cerrar una brecha de $3,200 millones en el déficit ahogarían a la ciudadanía y hundirían a Puerto Rico en una depresión catastrófica. Sin duda, no nos corresponde intervenir con tal determinación.

Concluimos entonces que la actuación del Gobierno al promulgar la Ley Núm. 7, *supra*, en el contexto de las

---

[92] Véase Exposición de Motivos Ley Núm., *supra*.

cesantías que autoriza y promueve, así como la eliminación de unos procesos anteriores a esas cesantías, constituye una acción razonable dirigida a salvar la solvencia del erario, a la luz de las circunstancias que vive el País.

**Siendo que, ante un análisis jurídico de escrutinio racional, la actuación de la Asamblea Legislativa claramente se sostiene, resolvemos que la Ley Núm. 7, en el contexto de las cesantías que autoriza y promueve, así como la eliminación de unos procesos anteriores a esas cesantías, no viola el debido proceso de ley sustantivo.**

## VI

Resuelto el aspecto procesal sustantivo, nos corresponder analizar si las cesantías anunciadas violan el debido proceso de ley en su aspecto procesal. Debemos determinar entonces, si la Ley Núm. 7, dentro de las circunstancias que se han descrito, le provee a las partes una "oportunidad de ser oídos", o sea, de un proceso justo. Además, debemos determinar si, contrario a lo esbozado, la Ley Núm. 7 le concede a los empleados cesanteados una vista previa informal antes de ser cesanteados.

Como hemos advertido, las cesantías que autoriza la Ley Núm. 7 se rigen **única y exclusivamente por el**

**criterio de antigüedad.**[93] Es de notar que el procedimiento que establece la ley en cuestión es bastante similar al que establece la Ley 184, *supra,* para este tipo de despido. La Sección 1462e(9)(a)de la Ley 184, *supra,*[94] en lo pertinente, dispone lo siguiente:

> **(a)**…
> A los fines de determinar **antigüedad, se considerara todo servicio prestado en puestos de las agencias comprendidas en el Sistema. La autoridad nominadora de cada agencia notificará por escrito a todo empleado a quien haya de cesantear con no menos de treinta (30) días de antelación a la fecha en que habrá de quedar cesante. Ninguna cesantía de empleados será efectiva a menos que se cumpla con el requisito de notificación.** (Énfasis nuestro.)

De una lectura de las disposiciones pertinentes en ambos estatutos podemos colegir, en primer lugar, que ambas requieren, para determinar la antigüedad, el que se considere todo servicio prestado en el servicio público por los empleados afectados.[95] Además, ambas leyes requieren que la autoridad nominadora de cada agencia notifique por escrito a todo empleado a quien haya de cesantear.[96] Ambas leyes requieren que la notificación de

---

[93] Véase Art. 37.04(b)(3) de la Ley Núm. 7.

[94] 3 L.P.R.A. Sec. 1462e.

[95] Véase Art. 37.04(b)(4) de la Ley Núm. 7.

[96] Véase Art. 37.04(b)(15) de la Ley Núm. 7.

la cesantía se haga con no menos de treinta (30) días de anticipación.[97]

Además, ambos estatutos les conceden a los empleados la oportunidad de cuestionar las determinaciones, no sólo ante la propia agencia, sino ante la CASARH o ante la Comisión creada al amparo del Art. 11 de la Ley Núm. 45, *supra*. **En otras palabras, la Ley Núm. 7 recoge los procedimientos que rigen bajo la Ley Núm. 184, *supra*, y los adapta con el propósito de expeditar el trámite para decretar cesantías mediante un mecanismo más ágil.**

Por otro lado, la Ley Núm. 7 le concede al empleado el que, aún antes de ser notificado finalmente de su cesantía, cuestione la certificación de antigüedad emitida por la agencia, concediéndole treinta (30) días para presentar evidencia que refute la antigüedad que le fue certificada.[98] También y en la eventualidad de que el empleado presente esa evidencia en el término concedido, la agencia vendrá obligada a celebrar una vista donde éste pueda ser oído.[99]

En el caso de que se decida finalmente su cesantía, los Arts. 37.04(b)(12), 37.04(b)(13) y  37.04(b)(14) de la Ley Núm. 7, establecen que el empleado tendrá que ser

---

[97] Íd.

[98] Véase Art. 37.04(b)(9).

[99] Véase Art. 37.04(b)(11).

notificado de manera personal o por correo certificado, y en caso de pertenecer a una organización sindical, también deberá notificársele a ésta. Además, tal notificación deberá advertir que el cesanteado cuenta con treinta (30) días para acudir en revisión a C.A.S.A.H.R. o ante la Comisión Apelativa creada al amparo de la Ley Núm. 45, *supra*, conforme sea el caso.[100]

**Al evaluar el procedimiento de cesantías establecido por la Ley Núm. 7 a la luz de los criterios pautados en *Rivera Rodríguez & Co. v. Lee Stowell, supra,* es claro que éste sobrepasa los requisitos esperados.** Nótese que las cesantías bajo este estatuto se dan en razón del criterio de antigüedad únicamente, por lo que, una revisión de la decisión de la Agencia se daría, como señala el Art. 37.04(b)(13) de la Ley Núm. 7, solamente en cuanto a ese criterio. Eso redunda en que la controversia, por meritoria que sea, siempre será relativamente sencilla: si el empleado cuenta con la evidencia de los años trabajados.

En los casos ante nuestra consideración, los recurridos fueron notificados de sus cesantías, por escrito, y mucho antes de los 30 días que requiere la Ley

---

[100] De hecho, el Art. 46 de la Ley Núm. 7, en atención a que los cesanteados tengan la oportunidad de lograr una solución rápida y justa de sus reclamaciones ante CASARH o la Comisión creada al amparo de la Ley Núm. 45, *supra,* aumenta el número de miembros a un Presidente y cinco miembros asociados en el caso de CASARH y autoriza al Presidente de la Comisión a nombrar los árbitros que entienda necesarios para realizar las labores encomendadas por el Cap. III de la Ley Núm. 7.

Núm. 7, como establece el Art. 37.04(b)(15). Nada en los expedientes de autos indica que tales cartas no fueran notificadas de conformidad al Art. 37.04(b)(12) de la ley, esto es, personalmente o por correo certificado. Las cartas de cesantías claramente indicaban la razón de sus despidos y de su derecho a solicitar revisión de la determinación de la agencia ante CASARH o ante la Comisión, en el término de treinta días, contados a partir del recibo de la misiva. Sin duda, los recurridos contaron con una adecuada notificación.

Por otro lado, la Ley Núm. 7 dispone para que un organismo competente e imparcial atienda sus reclamos y aquilate la evidencia que éstos puedan presentar, en caso de que decidan recurrir finalmente de la decisión de la agencia. De manera que es claro que la Ley Núm. 7 garantiza a los aquí recurridos una oportunidad real y justa de ser oídos.

Es evidente entonces que, a la luz de las circunstancias, el proceso establecido por el Capítulo III de la Ley Núm. 7 es uno que sobrepasa el mínimo requerido por la normativa jurisprudencial en lo referente al debido proceso de ley en su aspecto procesal. Por lo tanto, a**l evaluar el procedimiento de cesantías establecido por la Ley Núm. 7 a la luz de los criterios pautados en *Rivera Rodríguez & Co. v. Lee***

*Stowell,* es claro que éste sobrepasa los requisitos esperados.

Por otro lado y como adelantamos, tanto en los recursos CT-2009-4 y CT-2009-5, como en el CT-2009-9, los recurridos han planteado que el Estado les violó el debido proceso de ley por no concederle una vista informal previa a las cesantías. No les asiste la razón. La Ley Núm. 7, claramente les concede al empleado público cesanteado bajo esa ley, la oportunidad de una vista previa antes de que se le anuncie su cesantía, **si éste así lo solicita.**

Como hemos dicho, las cesantías que autoriza la Ley Núm. 7 se dan única y exclusivamente bajo el marco o el criterio de antigüedad del empleado público. En ese contexto, una vez la JREF dispuso la cantidad global de empleados a ser cesanteados -Art. 37.04(b)7-, el Art. 37.04(b)8 dispone que cada agencia notificará tanto a la JREF como **al propio empleado** -y a la organización sindical si fuera el caso- "su fecha de antigüedad según surge de sus récords… apercibiéndole del derecho que tiene… a exponer… por escrito su versión en cuanto a la fecha de su antigüedad".[101] El Art. 37.04(b)9 dispone que el empleado tendrá un término de treinta (30), contados a partir de la fecha de la notificación por parte de la agencia de "su fecha de antigüedad según surge de sus

---

[101] Véase Art. 37.04(b)(8).

récords", para "presentar por escrito… evidencia documental… que refute la antigüedad que le ha sido certificada".[102]

Si el empleado no presenta la evidencia documental requerida para refutar la certificación de la agencia en el término dispuesto, "la antigüedad a ser utilizada será aquella que le fue notificada por la agencia", antigüedad que sería entonces concluyente para efectos del capítulo III de la Ley Núm. 7. A contrario *sensus*,

> [**e**]**n la eventualidad de que el empleado afectado presente**, dentro del término aquí dispuesto, **evidencia documental fehaciente que controvierta la antigüedad que le ha sido notificada**, la Agencia no tomará determinación final sobre la antigüedad sin antes darle la **oportunidad de tener una vista previa**. (Énfasis nuestro)

Nada en los expedientes de los casos de autos evidencia que a alguno de los recurridos no se les hubiera certificado su antigüedad y se les hubiera negado la oportunidad de refutar la misma en una vista anterior a que se les anunciara sus cesantías, de haberlo solicitado. Por lo tanto, es evidente que tampoco les asiste la razón a los recurridos en este punto.

---

[102] Véase Art. 37.04(b)(9).

**VI**

*Derechos adquiridos*

En su alegato, las partes recurridas en el caso CT-2009-4 argumentan que el Art. 3 del Código Civil de Puerto Rico, *supra*, dispone que "[l]as leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario y, en ningún caso, podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior, conforme lo establece la doctrina de derechos adquiridos".[103] En ese contexto señalan que la aplicación de la Ley Núm. 7, *supra*, elimina derechos laborales garantizados mediante legislación laboral protectora que estaba en vigor con anterioridad a la aprobación de dicha ley, por lo cual vulnera el principio de la aplicación retroactiva de las leyes, tal como el derecho de retención y el derecho propietario sobre su empleo garantizado en la Constitución.[104] Específicamente argumentan los recurridos que:

> El derecho propietario que tiene el empleado público sobre su empleo no se (*sic*) le (*sic*) puede ser eliminado a menos que éste tenga una participación activa y consciente en el método que ha de utilizarse para la eliminación de ese derecho. Nuestro más alto foro ha expresado

---

[103] Véase alegato de la parte recurrida en el CT-2009-4, pág. 27.

[104] Id. Con relación a la inmunidad por irretroactividad que ostentan los derechos adquiridos y que dispone el Art. 3 del Código Civil, *supra*, no nos expresaremos por no ser necesario.

> que ninguna nueva ley promulgada por la legislatura puede tener (*sic*) dejar sin efecto y de facto derogar disposiciones que estaban en vigor antes de entrar en efecto la misma y que tenga como consecuencia eliminar derechos adquiridos".[105]

Además, citando lo resuelto recientemente por esta Curia en *Hernández Colón, et al. v. Policía de Puerto Rico*, 2009 TSPR 154, 177 DPR \_\_\_\_, y con relación a los derechos adquiridos, los recurridos señalan que "…ni la Legislatura al promulgar una nueva ley, ni el Gobernador mediante una orden ejecutiva, los puede lesionar o ignorar."[106]

Estas argumentaciones claramente parten de la premisa de que los recurridos ostentan un derecho adquirido. Sin embargo, y como señalamos también en *Hernandez Colón v. Policía de Puerto Rico, supra,* "[l]os derechos adquiridos protegidos pueden concebirse como consecuencia de un hecho idóneo, al producirlos en virtud de **una ley vigente en el tiempo en que el hecho ha sido realizado**, y que se han incorporado a una persona".[107] (Énfasis nuestro.) Ese no es el caso con los empleados de carrera en el servicio público.

---

[105] Id.

[106] Íd.

[107] *Hernández Colón, et al. v. Policía de Puerto Rico, supra,* citando *Consejo de Titulares v. William Hospitality Group*, 168 D.P.R. 101 (2006). Véase además, *Vélez Reboyras v. Srio. de Justicia*, 115 D.P.R 533 (1984).

Indudablemente, un derecho adquirido, como secuela de un derecho propietario, se encuentra cobijado por la protección que la sección siete de nuestra Carta de Derechos provee. **Sin embargo, no todo derecho o interés propietario es a su vez un derecho adquirido.**[108] Asimismo, "no toda situación jurídica que surge al amparo de una ley anterior es un derecho adquirido cobijado por el principio de irretroactividad frente a otra ley posterior".[109] Como señala Santos Briz:

> Un derecho adquirido sólo puede ser aquél que se deriva de un título individual y privado, producto de una situación subjetiva consumada que es, a su vez, resultado de un acto o negocio jurídico **amparado en un estado de derecho creado por una ley anterior.** (Énfasis nuestro.)[110]

También, Noguera Barreneche señala que un derecho adquirido implica:

> "la conjunción de una **norma jurídica existente** (situación abstracta de derecho) y la ejecución de un hecho por ella misma previsto (situación

---

[108] *Vélez Reboyras v. Srio. de Justicia*, *supra.*

[109] *Asociación de Maestros de Puerto Rico por si y en representación de sus socios v. Departamento de Educación*, 2007 TSPR 123, 171 D.P.R. __, opinión disidente de la Juez Asociada, Señora Fiol Mata.

[110] J. Santos Briz y otros, Tratado de Derecho Civil, 1ra ed., Barcelona, Editorial Bosch, S.A., 2003, Tomo I, pág. 137.

concreta); pero que, por razón de la importancia del derecho desde el punto de vista del interés social, **ha recibido vida perdurable de la ley que lo generó"**. (Énfasis nuestro.)[111]

Asimismo, en *Consejo de Titulares v. William Hospitality Group*, 168 D.P.R. 101, __ (2006), pautamos que "[e]l derecho adquirido… es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al **amparo de la ley anterior**". (Énfasis suplido.)

Como hemos señalado, un empleado en el servicio público tiene un reconocido interés en la retención de su empleo, si dicho interés está protegido por ley o cuando las circunstancias crean una expectativa de continuidad. Es la presencia de estos factores lo que determina la existencia de un interés propietario.[112] Asimismo, un empleado público ostenta un evidente interés en la retención de su empleo, siempre y cuando ese interés se encuentre protegido por una ley, como en el caso de un empleado de carrera, o cuando las circunstancias crean una expectativa razonable de continuidad.[113]

---

[111] R. Noguera Barreneche, *De la no retroactividad de las leyes civiles*, 3ra ed., Santa Fe de Bogotá, Fondo de Publicaciones Institución Universitaria Sergio Arboleda, 1995, págs. 73-74.

[112] *Pierson Muller I v. Feijoó, supra*; véase también *Perry v. Sinderman*, 408 U.S. 593 (1972); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).

[113] *Lebrón Bonilla v. E.L.A.*, 2001 T.S.P.R. 145 (2001); *Ortiz v. Padilla Ayala*, 131 D.P.R. 227, 241 (1992); *Torres Solano v. PRTC*, 127 D.P.R. 499 (1990).

**Sin embargo, ninguna ley al  momento le reconoce al empleado público un derecho sin limitaciones a  la retención, o un derecho a no ser cesanteado.** Al contrario, todas las leyes concernientes al asunto reconocen como una realidad la posibilidad de que el empleado público no sea retenido o sea cesanteado de su puesto, si se dan unas condiciones y se cumple con unos procesos.[114]  En ese sentido, no cabe hablar de un derecho adquirido a la retención o a no ser cesanteado de un empleo en el servicio público, pues se encuentra ausente el elemento del **amparo de una ley anterior** que hubiere concedido tal derecho.

## VII

### *Igual Protección de las Leyes*

**A.**

La Sección 7 del Artículo II de la Constitución de Puerto Rico consagra el derecho a la igual protección de las leyes. En lo pertinente dispone que: "[n]inguna persona será privada de su libertad o propiedad sin el debido proceso de ley, **ni se negará a persona alguna en Puerto Rico la igual protección de las leyes**".[115]

La **igual protección de las leyes** se funda en el principio cardinal de trato similar para personas

---

[114] Véase Ley Núm. 184, de 3 de agosto de 2004, según emendada, *supra.*

[115] Art. II Sec. 7 Const. E.L.A., L.P.R.A., Tomo I. (Énfasis nuestro)

similarmente situadas.[116] Esto significa que el gobierno puede hacer clasificaciones entre las personas para cualesquiera propósitos legítimos siempre que observe esa norma básica.[117] "El fundamento de este precepto surge de la concepción básica de que para gobernar una sociedad tan compleja y variada, en la cual existen distintos intereses individuales y grupales, y diversas relaciones sociales, es necesario establecer clasificaciones".[118] Es decir, gobernar cualquier sociedad y en especial una sociedad moderna sin instituir clasificaciones entre personas, sin construir desigualdades que favorezcan a algunos y perjudiquen a otros es imposible.[119]

Como corolario de lo anterior, hemos expresado que el principio constitucional de la **igual protección de las leyes** no exige que siempre se de un trato igual a todos los ciudadanos sino que prohíbe un trato desigual e injustificado.[120] El Estado puede hacer clasificaciones entre las personas sin que se quebrante el consabido principio siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés

---

[116] R. Serrano Geyls, Op. cit, pág. 1082.

[117] *Íd.*

[118] *López v. E.L.A.*, 165 D.P.R. 280, 297 (2005).

[119] *Íd.*

[120] *Alicea v. Córdova*, 117 D.P.R. 676, 696 (1986); *Pueblo v. Matías Castro*, 90 D.P.R. 528, 531 (1964).

público legítimo.[121] Es decir, la desigualdad que infringe la Constitución es la que refleja una preferencia basada en prejuicio, no la que descansa en un interés público.[122]

De ahí, que el problema principal que plantea la aplicación de la igual protección de las leyes, es el de diseñar normas que permitan al gobierno establecer clasificaciones pero que a la vez protejan a las personas contra desigualdades indebidas, irrazonables u odiosas.[123] Por eso, para realizar esa tarea, se requiere hacer un análisis de la relación entre el propósito que se desea lograr y el medio o clasificación que se utiliza para alcanzarlo; también debe examinarse el efecto que esa relación tiene sobre el derecho o interés del cual se priva a las personas afectadas.[124]

Este Foro ha reiterado que bajo la igual protección de las leyes, cuando un tribunal en Puerto Rico se enfrenta a un análisis constitucional sobre la razonabilidad de una clasificación legislativa, el criterio o escrutinio a utilizarse por dicho foro deberá ser o el escrutinio tradicional mínimo o de nexo racional o el escrutinio estricto.[125]

---

[121] *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975).

[122] *Vda. De Miranda v. Srio. de Hacienda*, 114 D.P.R. 11, 14 (1983).

[123] R. Serrano Geyls, Op. cit., pág. 1081.

[124] *Íd.*

[125] *López v. E.L.A.*, *supra*, pág. 298; *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 537 (1983); *León Rosario v. Torres*, 109 D.P.R. 804, 813 (1980).

Como señalamos, el escrutinio racional es empleado en casos donde se impugne reglamentación de tipo económica y social. Al aplicarlo, se presume la constitucionalidad de la clasificación.[126] Además, el tribunal tiene que adoptar una actitud de gran deferencia hacia la actuación legislativa que se impugne; aunque la clasificación no parezca ser la manera más acertada, adecuada, sabia y eficiente de adelantar el propósito legislativo, el tribunal debe mantener su constitucionalidad una vez se demuestre que existe una relación racional entre ésta y el propósito esbozado; la intervención judicial será muy limitada.[127]

Sobre este análisis hemos expresado que por virtud del axioma de separación de poderes, es la legislatura y no la rama judicial, la que tiene la facultad de diseñar las clasificaciones de tipo socio-económica.[128] Por consiguiente, el tribunal no puede adjudicarse las funciones de la legislatura al examinar la constitucionalidad de un estatuto bajo la garantía de la igual protección de las leyes.[129]

Bajo este escrutinio le corresponde a la parte que sostiene la inconstitucionalidad de la clasificación

---

[126] *Rodríguez Pagán v. Depto. Servicios Sociales*, 130 D.P.R. 562, 582 (1992).

[127] *San Miguel Lorenzana v. E.L.A.*, *supra*, págs. 431-432.

[128] *Íd.*, pág. 432.

[129] *Íd.*

demostrar que no existe nexo racional alguno entre la clasificación impugnada y un interés legítimo del Estado. *Íd*. El tribunal solamente declarará inconstitucional la clasificación si ésta discrimina de forma arbitraria e irracional.[130] El discrimen arbitrario o irracional existe cuando la diferencia que la clasificación establece es totalmente irrelevante al propósito que se pretende alcanzar con ella.[131]

Como puede observarse, la enunciación del estándar de adjudicación de racionalidad mínima bajo esta cláusula es muy similar a la del debido proceso de ley en materia de reglamentación económica. La diferencia consiste en que bajo la igual protección de las leyes lo que se enjuicia es la razonabilidad de la clasificación discriminatoria a la luz del objetivo o propósitos que se desea alcanzar y bajo el debido proceso de ley la pregunta es si la medida gubernamental, con independencia de si contiene alguna clasificación, es razonable a la luz de su propósito.[132]

Por su parte, el escrutinio estricto se utiliza para analizar las clasificaciones que son sospechosas o cuando la clasificación afecta un derecho fundamental. *Íd.*, pág. 425. Las clasificaciones sospechosas son aquellas que se

---

[130] *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 83 (1988).

[131] *San Miguel Lorenzana v. E.L.A.*, *supra*, pág. 433.

[132] J. J. Álvarez, *op. cit.*, pág. 826.

establecen por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas o nacionalidad.[133] En torno a los derechos fundamentales se ha reconocido el derecho al voto, libertad de culto, libertad de expresión, a la vida, protección de ley contra ataques abusivos a la honra y el derecho a la intimidad.[134]

Bajo el palio de este escrutinio se presume la inconstitucionalidad de la disposición impugnada.[135] El Estado tiene el peso de la prueba para demostrar que la clasificación responde a un interés estatal apremiante y que la misma es necesaria para promover ese interés, es decir, que no existe un medio menos oneroso para adelantar o alcanzar tal interés.[136]

Considerando todo lo anterior, procedemos a resolver la controversia planteada sobre este asunto en el CT-2009-06.

**B.**

En el CT-2009-06 la parte recurrida alega que la Ley Núm. 7, *supra*, crea unas clasificaciones sospechosas entre empleados públicos sin justificación racional para

---

[133] Art. II Sec. 1 Const. E.L.A. L.P.R.A. Tomo I; *Defendini*, et al. *v. E.L.A.*, *supra*, 61.

[134] *San Miguel Lorenzana v. E.L.A.*, *supra*, pág. 425.

[135] *Soto Ortega v. Administración de Instituciones Juveniles*, 148 D.P.R. 810, 831 (1999); *San Miguel Lorenzana v. E.L.A.*, *supra,* pág. 425; *Berberena v. Echegoyen*, 128 D.P.R. 864, 879 (1991).

[136] *Calo Morales v. Cartagena Calo*, 129 D.P.R. 102, 133 (1991). Véase, además, R. Serrano Geyls, *op. cit.*, Vol. II, pág. 1086.

ello porque exime de su aplicación a los empleados de las ramas judicial y legislativa. No le asiste la razón.

Como ya mencionamos, en Puerto Rico las clasificaciones sospechosas están expresamente enumeradas en la Sección 1 del Artículo II de nuestra Constitución, *supra*. Es decir, deben ser clasificaciones por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas, ideas religiosas o nacionalidad. *Prima facie*, la clasificación que alega la parte recurrida no se fundamenta en ninguna de las prohibiciones comprendidas en la antedicha sección. Por ende, no estamos frente a una clasificación de tipo sospechosa. Ahora bien, debemos determinar si la clasificación impugnada soslaya algún derecho fundamental de la parte recurrida. En específico, el derecho a trabajar.

La parte recurrida acota e insiste en que el derecho a trabajar es uno fundamental y que éste le fue violado con la decisión del Estado de cesantearla. Es cierto e indubitado que los empleados afectados por la Ley Núm. 7, *supra*, tienen derecho a trabajar y que dicho derecho es uno muy importante en nuestra sociedad y jurisdicción. Así lo reconocimos en *Amy v. Admin. Deporte Hípico*, 116 D.P.R. 414, 421 (1985) cuando expresamos que:

> El derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas. El destino incierto de la frustrada Sec. 20 de nuestra

Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado.[137]

Ciertamente, tales expresiones demuestran la necesidad de prestarle cuidadosa atención a aquellas situaciones en las que esté de por medio el trabajo y las necesidades básicas de las personas. Empero, ello no connota, *per se*, que hayamos reconocido como derecho fundamental el derecho al trabajo.[138] De hecho, en *García Benavente v. Aljoma Lumber*, 162 D.P.R. 572, 596 (2004) este Tribunal, por voz del Juez Presidente señor Hernández Denton, sostuvo que la Sección 20 de la Constitución de Puerto Rico "sólo enumeraba aspiraciones que dependían para su cumplimiento del desarrollo económico del País. Se trata de una disposición que reconocía, aunque no garantizaba, ciertos derechos humanos y sugería el mayor esfuerzo del Estado para llevarlos al plano práctico". *Íd*. Esos derechos son de **naturaleza económica y social**.[139]

Con mayor razón, en *García Benavente v. Aljoma Lumber*, *supra*, este Tribunal declaró de forma tajante que:

En vista de un historial legislativo tan claro, no podemos avalar la determinación judicial del Tribunal de Apelaciones que instala un derecho

---

[137] Véase, además, *In re Colton Fontán*, 154 D.P.R. 466, 472-473 (Resolución, 2001).

[138] Véase, J. J. Álvarez, *Derecho Constitucional*, 74 Rev. Jur. U.P.R. 597, 615 (2005).

[139] R. Serrano Geyls, *op. cit.*, pág. 1192.

expresamente excluido del ámbito de las garantías constitucionales de la Carta de Derechos mediante la interpretación de otro derecho constitucional. La consecuencia del veto del Congreso de la Sección 20 del Artículo II de la Constitución, y de la correspondiente aceptación de la Convención Constituyente, fue **excluir el derecho a obtener un trabajo como garantía constitucional.** (Énfasis suplido).[140]

Asimismo, en *San Miguel Lorenzana v. E.L.A.*, *supra*, pág. 430, citando a los tratadistas de Derecho Constitucional, Rotunda, Nowak y Young, señalamos que no existe un derecho fundamental federal a adquirir o mantener un empleo en el sector público.

A la luz de lo esbozado, podemos colegir que el derecho al trabajo no es un derecho fundamental garantizado por nuestra Constitución. Claro está, eso no significa que las aspiraciones plasmadas en la aludida Sección 20 no puedan perseguirse por el pueblo puertorriqueño. No obstante, ese objetivo no es tarea de la Rama Judicial sino que le compete a la Asamblea Legislativa.[141]

Por otro lado, en *San Miguel Lorenzana v. E.L.A.*, *supra*, págs. 428-429, reconocimos que "el derecho a un empleo está estrechamente relacionado con la garantía de que ninguna persona será privada de su libertad o propiedad sin un debido proceso de ley". "[E]l derecho a un empleo va principalmente dirigido a garantizar que

---

[140] Véase, además, J. J. Álvarez, *op. cit.*, pág. 935.

[141] Véase, *Íd.*

ante la privación de éste se cumpla con los requisitos

del debido proceso de ley". *Íd.*, pág. 429. Allí también,

citando con aprobación al tratadista Lawrence H. Tribe,

expusimos, *ad verbatim*:

> Although we have argued ... that among the rights to bodily integrity are rights to at least minimal subsistence and that such rights give rise to affirmative governmental duties, we could not deduce from such duties a judicially cognizable remedy for every instance of unmet needs; as we saw, government's affirmative duties must ordinarily be translated into doctrine somewhat more obliquely--through a variety of procedural, structural, and other protections designed, in their cumulative effect, to minimize the risk that someone will in fact suffer extreme deprivation. Among those protections has been a revitalized concern to prevent at least procedurally unfair exclusions from the occupation or vocation of one's choice.
>
> [J]ust as we have seen that a claim of unmet needs does not automatically give rise to a judicially cognizable basis for insisting that government step in with specific services, so it must be the case that, even with respect to employment, not every frustrated wish creates a constitutional cause of action against the state. As Justice Douglas said in his Barsky dissent, '[c]ertainly a man has no affirmative right to any particular job or skill or occupation. The Bill of Rights does not say who shall be doctors or lawyers or policemen. But it does say that certain rights are protected, that certain things shall not be done. And so the question here is not what government must give, but rather what it may not take away.' What it may not take away without clear and focused justification is a fair opportunity for an individual to realize her identity in a chosen vocation. Íd., págs. 429-430.

Así pues, en dicho caso, reconocimos que el derecho

al trabajo, o sea, su privación, tanto en nuestra

jurisdicción como en la Federal, es un asunto que debe ser examinado bajo la cláusula del debido proceso de ley.

A la luz de la antepuesta discusión, y en relación a la cláusula de la igual protección de las leyes, concluimos que la clasificación creada por la aplicación de la Ley Núm. 7, *supra*, según alegada por la parte recurrida, no es sospechosa y tampoco infringe o interfiere con un derecho fundamental. Por consiguiente, el análisis de tal clasificación debe realizarse bajo el escrutinio de nexo racional y no del escrutinio estricto. Es decir, debemos determinar si el Estado tiene un interés legítimo en promover la clasificación impugnada y si ese interés se relaciona de manera racional con la clasificación.

Como ya hemos discutido previamente, es indudable que de la Ley Núm. 7, *supra*, surge que el Estado tiene un interés más que legítimo en corregir la crisis fiscal que atraviesa el Gobierno de Puerto Rico. En ese contexto, la clasificación establecida por el Estado y que objeta la parte recurrida, responde a la necesidad de atajar ese problema fiscal. Así, el gasto relacionado a la nómina es uno sustancial que hace necesaria la reducción en ese renglón para atacar el déficit presupuestario que se anuncia en la propia ley. Así surge claramente, y como ya hemos expuesto, de su Exposición de Motivos.[142]

---

[142] Cabe señalar que en *Vélez v. Srio. de Justicia*, *supra*, pág. 538, este Tribunal reconoció el valor intrínseco de la Exposición de

Es ostensible que de la Exposición de Motivos de la Ley Núm. 7, *supra*, surge la existencia de una relación racional entre la clasificación impugnada (cesantía de los empleados públicos de la rama ejecutiva) y el interés legítimo que persigue el Estado en aras de corregir la crisis fiscal descrita en dicha ley.

Igualmente debemos señalar, que la clasificación impugnada por la parte recurrida aplica a un grupo de personas similarmente situadas. Se limita a los empleados públicos que trabajan en distintas Agencias del Gobierno adscritas a la rama ejecutiva.[143] De hecho, el criterio predicado por la mencionada ley para cesantear a los empleados en cuestión, es el de antigüedad. Véase, Art. 37.04 (b)(2),(9),(13),(14). Es decir, la aplicación de la Ley Núm. 7, *supra*, es una general basada en un criterio neutro que es la antigüedad. En ese sentido, aunque la clasificación impugnada no se extiende a las Ramas Judicial y Legislativa, tampoco promueve un trato desigual e injustificado entre aquellos empleados a quienes sí aplica la Ley Núm. 7, *supra*.

*A fortiori*, la determinación de la Asamblea Legislativa de promulgar una ley que aplicara únicamente a la Rama Ejecutiva y no a la Legislativa ni Judicial,

Motivos de una ley a la hora de determinar el interés del Estado bajo el análisis de la igual protección de las leyes.

[143] Debemos señalar que el Art. 37.02 de la Ley Núm. 7, *supra*, establece ciertas exclusiones en su aplicación con el fin de evitar un impacto negativo en los servicios que brinda el Gobierno.

respeta el principio cardinal de separación de poderes que consagra nuestra Constitución. Cabe destacar que tanto la Rama Judicial como la legislativa poseen autonomía presupuestaria.[144] De ahí, que son estas ramas las que administran los fondos que se le asignan y las que determinan, de ser necesario, cuándo recortar los gastos, incluyendo la nómina. Permitir, por medio de legislación, que el Poder Ejecutivo pueda tomar decisiones sobre las otras ramas del Gobierno, definitivamente atentaría contra la separación de poderes.[145]

Por todo lo antes expuesto, sostenemos que la diferencia en tratamiento que promueve la aplicación de la Ley Núm. 7, *supra*, entre las tres ramas del Gobierno, no ofende ni viola la cláusula de la igual protección de las leyes. Por tal, la clasificación impugnada, según creada por la Ley Núm. 7, *supra*, no refleja una preferencia basada en prejuicio. Se trata de una clasificación razonable, fundamentada en un interés público legítimo. No debemos olvidar lo que el Tribunal Supremo Federal ha expresado sobre la igual protección de las leyes: "The Equal Protection Clause does not require that a State choose between attacking every aspect of a

---

[144] Véanse, la Ley Núm. 147 de 18 de junio de 1980, según enmendada, 23 L.P.R.A. sec. 104 y la Ley Núm. 258 de 30 de julio de 1974, según enmendada, 2 L.P.R.A. sec. 553.

[145] Véase, *Watkins v. New York State Ethics Com.*, 554 N.Y.S.2d 955, 965 (1990).

problem or not attacking the problem at all. It is enough that the State´s action be rationally based and free from invidious discrimination". *Dandridge v. Williams*, 397 U.S. 471, 486-487 (1970).[146]

## VIII

### *Menoscabo de Obligaciones Contractuales*

#### A.

La Constitución del Estado Libre Asociado de Puerto Rico prohíbe la promulgación de leyes que menoscaben las obligaciones contractuales.[147] De igual modo, la Constitución federal contiene una cláusula análoga que prohíbe a los estados promulgar leyes que menoscaben las obligaciones contractuales que surjan de contratos públicos o contratos privados.[148] Conforme con lo anterior, a la hora de interpretar nuestra disposición constitucional debemos referirnos a las decisiones del Tribunal Supremo federal que evalúan la referida cláusula

---

[146] Los recurridos en el CT-2009-06 alegan que la implantación de la Ley Núm. 7, *supra*, les viola sus derechos constitucionales porque establece un patrón de discrimen por razón de ideas políticas, así como por razón de edad y de sexo. Sin embargo, considerando, como hemos resuelto, que la Ley Núm. 7 utiliza como criterio para los despidos únicamente el de antigüedad, entendemos que tales alegaciones carecen totalmente de méritos. No obstante, si en la interpretación o implementación de ese criterio único de antigüedad existiera por parte de la agencia concernida algún discrimen que pudiera catalogarse dentro de las clasificaciones alegadas, es materia de prueba que en su día deberá ser aquilatada por un Tribunal de Primera Instancia.

[147] Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

[148] Artículo 1, Sec. 10, Const. E.E. U.U., id; véase, además, *United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977).

ya que constituyen la protección mínima que estamos obligados a reconocer en nuestro ordenamiento.[149]

La garantía contra el menoscabo de obligaciones contractuales limita el poder del gobierno para interferir con las obligaciones contractuales entre partes privadas, así como las obligaciones contractuales contraídas por el Estado.[150] Al considerar la validez de estatutos bajo la referida cláusula, el escrutinio aplicable depende del tipo de contrato en cuestión, ya sea un contrato privado o uno público. Esta diferencia responde a que cuando la modificación se da en el contexto de la contratación pública el escrutinio judicial tiene que ser más cuidadoso "para asegurar que la actuación del Estado no sólo sea en beneficio propio".[151]

Al evaluar la interferencia del gobierno en el contexto de la contratación privada lo primero que procede auscultar es si existe una relación contractual y si la modificación de la obligación constituye un menoscabo sustancial o severo.[152] Luego de determinar que existe un menoscabo sustancial o severo de una obligación

---

[149] *Bayrón Toro v. Serra*, 119 D.P.R. 605, 619 (1987).

[150] *Energy Reserves Group v. Kansas Power and Light*, 459 U.S. 400 (1983); *United States Trust Co. V. New Jersey, supra.*

[151] *Bayrón Toro v. Serra*, supra, pág. 620; *United States Trust Co. v. New Jersey*, supra, pág. 17.

[152] Véase, *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378 (1973); véase, además, *General Motors Corp. V. Romein*, 503 U.S. 181, 187 (1992) *Energy Reserves Group v. Kansas Power and Light*, supra, pág. 411.

contractual, hay que evaluar si la interferencia gubernamental responde a un propósito o interés legítimo del Estado y si está racionalmente relacionada con la consecución de dicho objetivo.[153] Como vemos, al auscultar la validez de una ley bajo la cláusula de menoscabo de obligaciones contractuales el criterio aplicable es el de razonabilidad.[154] La razonabilidad de la legislación se determinará tomando en consideración la sustancialidad del interés público promovido y la dimensión del menoscabo ocasionado.[155]

Ahora bien, cuando el Estado modifica sus propias obligaciones el escrutinio judicial es más cuidadoso.[156] Claro está, aun cuando el escrutinio en el contexto de la contratación pública es más severo, eso no significa que hay una prohibición absoluta que impida el poder de reglamentación del Estado en beneficio del interés público.[157] Por tanto, la función del foro judicial al evaluar la validez de una legislación bajo la cláusula del menoscabo de obligaciones contractuales consiste en

---

[153] Warner Lambert Co. v. Tribunal Superior, supra; General Motors v. Romein, supra; Nowak, J., Constitutional Law, 5 ed., West, 1995, p. 416-417.

[154] Warner Lambert Co. v. Tribunal Superior, id.

[155] Warner Lambert Co. v. Tribunal Superior, id.; Véase, Home Building & Loan Association v. Blaisdell, 290 U.S. 398 (1934).

[156] Bayron Toro v. Serra, id.

[157] Bayron Toro v. Serra, id.; Warner Lambert Co. v, Tribunal Superior, supra, pág. 394 (1973); véase, además, Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978); R. Epstein, Toward a Revitalization of the Contract Clause , 51 U. Chi. L. Rev. 703, 717 (1984).

establecer un balance entre el poder del Estado (*police power*) para salvaguardar el bienestar y la seguridad de la ciudadanía y el interés de proteger las relaciones contractuales.[158] A tales efectos, en *United States Trust Co . v. New Jersey, supra*, pág. 109, el Tribunal Supremo federal enunció lo siguiente:

> Although the Contract Clause appears literally to proscribe "any" impairment, this Court observed in <u>Blaisdell</u> [<u>Home Building & Loan Association v. Blaisdell</u>, <u>supra</u>] that "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula."[citas omitidas].Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution. In the instant case, as in <u>Blaisdell</u>, we must attempt to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power,"[citas omitidas], necessarily reserved by the States to safeguard the welfare of their citizens.

En atención a lo anterior, al ejercer la revisión judicial sobre la constitucionalidad de legislación bajo la cláusula del menoscabo de obligaciones contractuales del Estado, diversos tribunales federales de los circuitos apelativos han enfatizado la necesidad de evaluar si el propósito o interés del Estado en promulgar la legislación impugnada responde al ejercicio de su poder de razón de Estado para proteger y mantener el bienestar general, lo que incluye el bienestar económico

---

[158] *Warner Lambert v. Tribunal Superior, supra.*

de la sociedad. A tales efectos se ha señalado lo
siguiente:

> [T]he Supreme Court has defined "police power"
> for Contract Clause purposes, "as an excercise
> of the sovereign right of the Government to
> protect the lives, health, morals, comforts,
> and general welfare of the people…"[citas
> omitidas] The state´s paramount authority is
> not limited to health, morals and safety. It
> extends to economic needs as well". *Veix v.
> Sixth Ward Ass´n,*310 U.S. 32, 39, 60 S. Ct.
> 792, 795, 84 L. Ed. 1061 81940). **This doctrine
> reflects the importance of allowing states to
> legislate freely on social and economic matters
> of importance to their citizens, modifying the
> law to meet changing needs and conditions.**[159]
> (Énfasis nuestro)

Bajo este marco conceptual, en los casos de
contratación pública procede evaluar, como cuestión de
umbral, si existe una obligación contractual y si la
modificación de la obligación constituye un menoscabo
sustancial o severo. Respecto al análisis sobre la
sustancialidad o severidad del menoscabo de la
obligación, el Tribunal Supremo federal ha señalado lo
siguiente:

> The severity of the impairment measures the
> height of the hurdle the state legislation must
> clear. Minimal alteration of contractual
> obligations may end the inquiry at its first
> stage. Severe impairment, on the other hand,
> will push the inquiry to a careful examination
> of the nature and purpose of the state
> legislation. The severity of an impairment of
> contractual obligations can be measured by the
> factors that reflect the high value the Framers
> placed on the protection of private contracts.

---

[159] *Local Division 589, Amalgamated Transit Union, AFL-CLC v. Commonwealth of Massachusetts*, 666 F.2d 618, 639 (1st Cir., 1981). Véase, además, *Buffalo Teachers Fed. V. Tobe*, 464 F.3d. 362, 367 (2nd Cir. 2006); *Baltimore Teachers Union v. Mayor and City Council of Baltimore*, 6 F. 3d. 1012, 1018 (4th Cir., 1993).

> Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them. *Allied Structural Steel Co. v. Spannaus, supra,* 245.

Conforme con lo anterior, la garantía constitucional contra el menoscabo de obligaciones contractuales se activa cuando la modificación afecta adversamente los términos o condiciones esenciales del contrato que principalmente dieron motivo a la celebración del contrato de modo que se frustren las expectativas razonables de las partes.[160] A tono con esta definición, el Tribunal Federal de Apelaciones para el Cuarto Circuito ha señalado que: *"While the court has not refined the analysis for assessing the substantiality of an impairment, it has appeared to assume that an impairment is substantial at least where the right abridged was one that induced the parties to contract in the first place."*[161] Por su parte, el Tribunal Federal de Apelaciones para el Segundo Circuito ha señalado lo siguiente: *"To assess whether an impairment is substantial, we look at `the extent to which reasonable expectations under the contract have been disrupted´."*[162]

---

[160] *City of El Paso v. Simmons*, 379 U.S. 497 (1965); *Allied Structural Steel Co. v. Spannaus, supra*, págs. 245-246.

[161] *Baltimore Teachers Union v. Mayor and City Council of Baltimore, supra*, pág. 1071.

[162] *Buffalo Teachers Fed. v. Tobe, supra*, pág. 368.

Una vez se determina que el menoscabo es sustancial, procede auscultar si la modificación persigue adelantar un interés importante en beneficio del bienestar general. Por último, habrá que dirimir si la modificación, además de razonable, es necesaria para adelantar ese propósito gubernamental importante.[163] Si la modificación es razonable y necesaria para adelantar el interés público, sostendremos la validez de la ley impugnada.[164]

Cabe señalar que respecto al criterio de razonabilidad y necesidad, el Tribunal Supremo federal ha manifestado que no se sostendrá el menoscabo a la obligación contractual del Estado si existen medidas alternas que sean menos drásticas o severas que la ejercida por el Estado para lograr su objetivo.[165] A la hora de evaluar la razonabilidad y necesidad de la medida en el contexto de la contratación pública, el Tribunal Supremo federal señaló que, contrario a los casos sobre contratación privada, no es apropiado dar completa deferencia a la determinación legislativa sobre la necesidad o razonabilidad de la legislación. *United States Trust Co. v. New York, id.*, págs. 22-26 (*As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular*

---

[163] *Bayrón Toro v. Serra, id.; United States Trust Co. v. New Jersey, id.*

[164] *Bayrón Toro v. Serra, id.*

[165] *United States Trust Co. v. New York, id.* pág. 29-31.

*measure….But, as to public contracts, complete deference to a legislative assessment of reasonableness and necessity is not appropriate…*). Sin embargo, esto no significa que el foro judicial no deba dar alguna deferencia a la determinación de necesidad y razonabilidad que hizo el legislador en el ejercicio de su poder constitucional, especialmente cuando se trata de regulaciones socioeconómicas.

A modo ilustrativo es meritorio referirnos a la interpretación que se ha hecho en los circuitos apelativos respecto al grado de deferencia que se le debe dar a la determinación legislativa sobre la necesidad y razonabilidad de la medida. En *Local Division 589, Amalgamated Transit Union, AFL-CLC v. Commonwealth of Massachusetts, supra*, pág. 623, el Tribunal Federal de Apelaciones para el Primer Circuito señaló lo siguiente:

> [D]etermining the "reasonableness and necessity of a particular statute is a task far better suited to legislators than to judges. Thus, in the case before us, where economic or social legislation is at issue, some deference to the legislature´s judgment is surely called for.

De igual modo se manifestó el Tribunal Federal de Apelaciones para el Segundo Circuito, en *Buffalo Teachers Fed. V. Tobe, supra*, pág. 19, al enunciar lo siguiente:

> We hasten to point out that less deference does not imply no deference…. Relatedly, we agree with the First Circuit that *U.S. Trust Co.* does not require courts to reexamine all of the factors underlying the legislation at issue to make a *de novo* determination whether another

alternative would have constituted a better statutory solution to a given problem.

En síntesis, al enfrentarnos a la impugnación de la legislación bajo la cláusula del menoscabo de obligaciones contractuales del Estado, debemos dar alguna deferencia a la determinación del legislador respecto a la necesidad y razonabilidad de la medida. Al llevar a cabo dicha tarea, es relevante, y aporta a la determinación final de razonabilidad de la medida, el hecho de que la legislación sea en respuesta a una situación de emergencia y que su aplicación sea temporal o transitoria.[166] Conforme con lo anterior, en *Buffalo Teachers Fed. v. Tobe, supra*, págs. 373-372, el Tribunal Federal para el Segundo Circuito consideró la situación de emergencia fiscal de la ciudad de Buffalo y la duración limitada de la medida sobre congelación de salarios a empleados públicos para determinar el criterio de razonabilidad y sostuvo la constitucionalidad de la medida. En esa misma línea, el Tribunal Federal de Apelaciones para el Cuarto Circuito al sostener la constitucionalidad de una medida de reducción de salarios a empleados públicos unionados determinó que la actuación gubernamental era razonable en atención a la crisis

---

[166] *Building & Loan Association v. Blaisdell*, supra, pág. 447.

presupuestaria de la ciudad de Baltimore y a la duración limitada de la medida.[167]

Conforme con la doctrina expuesta, procedemos a dirimir si la legislación ante nuestra consideración contraviene la cláusula que prohíbe el menoscabo de las obligaciones contractuales en el contexto de la contratación pública.

B

Las recurridas en CT-2009-6, son empleadas públicas unionadas del Departamento de la Familia y la Administración del Sustento de Menores. Éstas alegan, escuetamente, que la Ley 7 del 9 de marzo de 2009 menoscaba las obligaciones contraídas por el Estado mediante el convenio colectivo vigente entre las partes a partir del 20 de julio de 2007. En específico señalan que la legislación impugnada "violenta el principio de mérito" reconocido en el convenio colectivo así como otros procedimientos para llevar a cabo las cesantías.[168]

Según discutimos anteriormente, en los casos de contratación pública procede evaluar, como cuestión de umbral, si existe una obligación contractual y si la modificación de la obligación constituye un menoscabo sustancial o severo. En efecto, existe una relación contractual entre el Estado y los empleados unionados

---

[167] *Baltimore Teachers Union v. Mayor and City Council of Baltimore, supra,* págs. 23-26.

[168] Véase, Alegato de la Parte Recurrida, págs.4-5.

cuyas obligaciones están especificadas en el convenio colectivo. En ese sentido, las partes contratantes establecieron los términos que regularían la manera en que el Estado podía disponer de los servicios de los empleados unionados.

Según surge del expediente, en la Declaración de Principios del Convenio Colectivo se estableció como uno de los fundamentos para llevar a cabo el acuerdo establecer un sistema de personal basado en el principio de mérito. En atención a lo anterior, el Artículo II establece lo siguiente: "Las partes intentamos en este convenio armonizar la práctica de la negociación colectiva con el sistema de personal basado en el mérito para dar cumplimiento a esta sabia política pública que reafirma la Ley de Relaciones del Trabajo para el Sector Público...". Véase, Apéndice del Recurso, Convenio Colectivo, pág. 8. Conforme con lo anterior, las partes se obligaron a seguir un procedimiento de cesantías basado en el principio de mérito dispuesto en el Artículo XXVII del Convenio Colectivo.[169] Conforme con lo anterior, en este caso hubo un menoscabo sustancial de la obligación contractual ya que se modificó el proceso de cesantías basado en el principio de mérito según establecido en el convenio colectivo. Dicha obligación

---

[169] Véase, Apéndice del recurso, Convenio Colectivo, pág. 30.

fue esencial para la celebración del acuerdo, según surge de la declaración de principios del Convenio Colectivo.

Ahora bien, el hecho de que exista un menoscabo sustancial a una obligación contractual no dispone de la controversia. Procede, entonces, evaluar si la modificación persigue adelantar un interés importante y si la modificación, además de razonable, es necesaria para adelantar ese propósito gubernamental importante.[170]

Conforme dispone la doctrina antes expuesta, se sostendrá la validez constitucional de una legislación que menoscabe sustancialmente una obligación contractual del Estado, si dicha medida responde a un interés público importante, y es razonable y necesaria para adelantar dicho propósito o interés gubernamental. Surge de la extensa Exposición de Motivos de la Ley Núm. 7, *supra*, que el Gobierno del Estado Libre Asociado de Puerto Rico se encuentra en una situación de emergencia debido a una grave crisis fiscal. Para atender dicha crisis, el Estado ejerció ciertas medidas para provocar un ahorro sustancial y real en las arcas del gobierno entre las que se encuentran las cesantías de las recurridas.

Conforme con este estado de emergencia, el legislador determinó que era necesario y razonable establecer un procedimiento alterno para llevar a cabo las cesantías y eliminar los procedimientos anteriores a éstas para así

---

[170] *Bayrón Toro v. Serra, supra; United States Trust Co. v. New Jersey, supra.*

poder alcanzar el propósito apremiante de la ley de manera expedita. Además, el legislador determinó utilizar exclusivamente el criterio de antigüedad para llevar a cabo las cesantías de modo que se garantizara una aplicación equitativa del criterio objetivo de antigüedad a través de todo el gobierno. Según dispone el Artículo 37.04 (b) (1) de la Ley 7, *supra*, existe urgencia en atender y corregir los problemas fiscales que enfrenta el Estado de manera expedita. A tales efectos, y como citamos anteriormente, la Exposición de Motivos explica lo siguiente:

> [t]odas las alternativas típicamente usadas como pasos previos a la reducción de personal [o sea] traslados, reubicaciones, readiestramientos, licencias sin sueldo y de reducción de jornada, entre otros no son viables dentro del contexto de la magnitud del déficit estructural del gobierno y la precariedad de la situación. Es necesario reducir dramáticamente y de forma expedita, el gasto gubernamental. En vista del tamaño de la nómina y del tamaño del déficit, ninguna de las demás alternativas es compatible con este objetivo o son viables ante su impacto sobre la operación del gobierno.

Como vemos, el Estado demostró tener un interés público importante en adoptar medidas correctivas de forma expedita para atender la crisis fiscal en protección del bienestar general de la sociedad. La legislación impugnada se adoptó como resultado del ejercicio del poder de razón de Estado para atender una

emergencia fiscal que atenta contra el bienestar socioeconómico de la sociedad puertorriqueña.

Al evaluar la necesidad o razonabilidad de la medida para efectos de la cláusula sobre el menoscabo de obligaciones contractuales, aunque no procede dar completa deferencia al legislador, sí debemos darle alguna deferencia a la determinación de necesidad que éste hizo, por lo que no nos corresponde hacer una determinación *de novo* sobre la existencia de otras alternativas para la solución del problema.[171]

El legislador entendió necesario y razonable, y así lo justificó extensamente en la Exposición de Motivos de la referida Ley Núm. 7, *supra*, suspender temporeramente aquellas disposiciones contractuales, reglamentarias o estatutarias que establecieran procedimientos y criterios para llevar a cabo las cesantías de empleados que contravinieran lo dispuesto por la Ley Núm. 7. La Asamblea Legislativa llegó a esta conclusión porque las alternativas típicamente usadas como pasos previos a la reducción de personal conllevan traslados, reubicaciones, readiestramientos, licencias sin sueldo y de reducción de jornada, entre otros, que no son viables dentro del contexto de la magnitud del déficit estructural del gobierno y la precariedad de la situación. Era necesario establecer un procedimiento de cesantías que lograra reducir el gasto gubernamental dramáticamente y de forma

---

[171] *Buffalo Teachers Fed v. Tobe, supra.*

expedita, para lograr la consecución del interés público del Estado de atender con premura la crisis fiscal.

De igual modo, es totalmente razonable y necesario que el legislador estableciera un criterio objetivo como lo es el de antigüedad en el empleo, de modo que se garantizara una aplicación equitativa del procedimiento de cesantías a través de todo el gobierno. Además, es meritorio señalar que la legislación impugnada es producto de una situación de emergencia y la suspensión de las disposiciones de los convenios que no sean conformes a la referida Ley Núm. 7, *supra*, es temporera. Véase, Artículo 37.04(a) y 38.02(b) de la Ley Núm. 7, *supra*. Estos factores abonan a la determinación de razonabilidad de la medida.

Por último y como ya hemos determinado, debemos recordar que las recurridas no quedaron desprovistas de un procedimiento de cesantías que les garantizara un debido proceso de ley. Aunque, en efecto hubo una modificación de la obligación, el Estado les proveyó un procedimiento de cesantías y de revisión, garantizándoles así un debido proceso de ley.

Conforme con lo anterior, resolvemos que las cesantías y el procedimiento establecido por la Ley Núm. 7, supra, no infringen la cláusula que prohíbe el menoscabo de las obligaciones contractuales.

## IX

### *Delegación Indebida de Poder*

**A.**

Como señalamos en el recurso CT-2009-09, la parte recurrida argumenta que el Art. 37.04 (b)(5),(6) y (7) de la Ley Núm. 7, *supra*, delega a la JREF unos poderes sin guías claras que ocasionan una concentración indebida de poderes en dicho organismo. Sostiene que la Ley Núm. 7, *supra*, confiere a la JREF la facultad de tomar todas las acciones necesarias para que se de cumplimiento a la ley sin establecer normas que limiten esa facultad. También aduce, que el Art. 41 y 42 de la antedicha ley le concede a la JREF la autoridad para realizar traslados y subcontratación de labores sin unas guías que orienten la utilización de ese poder delegado. A su vez, la parte recurrida apunta que el Art. 68 de la Ley Núm. 7, *supra*, hace una delegación de poder indebida al Gobernador que viola la separación de poderes. No le asiste la razón.

En Puerto Rico existe un sistema republicano de gobierno que está compuesto por tres ramas de gobierno: la Legislativa, la Judicial y la Ejecutiva.[172] Así, los poderes delegados por el pueblo al Gobierno, a través de la Constitución, se distribuyen de manera tripartita. Esa separación de poderes es la salvaguarda que nuestra Constitución consagra para preservar las libertades del

---

[172] Véase, Art. I Sec. 2 Const. E.L.A., L.P.R.A, Tomo 1.

Pueblo y un sistema democrático de Gobierno.[173] Sin embargo, cada uno de estos poderes, aunque soberano e independiente respecto al ejercicio del poder conferido, interrelaciona con los otros manteniendo integra la autoridad de cada cual.[174]

La doctrina de separación de poderes se asienta sobre el principio de que el poder se delega en las tres ramas de gobierno para evitar la concentración de poderes en una sola rama, o el abuso de poder de parte de otra.[175] Así, una rama de gobierno no puede usurpar o apropiarse de facultades de otra rama sin ocasionar daño.[176] "La existencia de tres poderes co-iguales genera necesariamente tensión y fricción entre las ramas que se aminora mediante un sistema de pesos y contrapesos, que permite calibrar el fino equilibrio en el ejercicio del poder, según lo ordena la Constitución.[177]

El principio axiomático de separación de poderes representa el andamiaje de la concepción purista constitucional, que predica que el poder que la Constitución les reconoce a las Ramas del Gobierno es uno exclusivo de éstas y por lo tanto no puede ser delegado a

---

[173] *Colón Cortés v. Pesquera*, 150 D.P.R. 724, 752 (2000).

[174] *Pueblo v. Santiago Feliciano*, 139 D.P.R. 361, 420 (1995).

[175] *Santana v. Gobernadora*, 165 D.P.R. 28, 45 (2005).

[176] *Colón Cortés v. Pesquera*, *supra*; *Sinking Fund Cases*, 99 U.S. 700, 718 (1878).

[177] *Santana v. Gobernadora*, *supra*; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982).

otras entidades administrativas. "Lo fundamental de esta postura es el carácter exclusivo que se le adscribe a los poderes conferidos a cada rama de gobierno".[178] Bajo esta filosofía, la doctrina de la separación de poderes le niega validez constitucional a las agencias o entes administrativos toda vez que éstas ejercen poderes exclusivos de las Ramas del Gobierno.[179] En fin, esta visión no refrenda la delegación de poderes legislativos, judiciales o ejecutivos a un organismo administrativo.

Ese fundamentalismo constitucional fue el que imperó en Estados Unidos durante sus inicios históricos.[180] Así, ante el interés de delegar poderes a las agencias administrativas, la primera reacción judicial fue denegar la posibilidad de que el Congreso Federal pudiera delegar su poder legislativo.[181] No obstante, el desarrollo de la moderna economía industrial y el período de la crisis de la Gran Depresión Económica, pusieron de manifiesto la necesidad de delegar poder a las agencias administrativas --cuya creación se hizo cada vez más necesaria-- para combatir la crisis económica que aquejaba a los Estados Unidos de América.[182] Esa coyuntura requirió utilizar una

---

[178] D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., Colombia, Ed. Forum, 2001, sec. 2.2, pág. 35.

[179] *Íd.*

[180] Véase, *Field v. Clark*, 143 U.S. 649, 692 (1892).

[181] J. A. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, 1ra ed. revisada, San Juan, Ed. Situm, Inc., 2009, pág. 8.

[182] *Íd.*, pág. 9.

forma más ágil de establecer parámetros y normas suficientes. De esa manera, ya para el 1928, afloraba la nueva postura judicial en torno a la doctrina de delegación de poderes en los Estados Unidos. Así, en el caso de *J.W. Hampton* v. U.S., 276 U.S. 394 (1928), ocurrió una transmutación en la concepción puritana constitucional, al sostenerse por el máximo Foro Federal, que la delegación de poderes es permisible si la misma se hace a través de un principio inteligible que guíe la autoridad de la agencia.[183]

En la actualidad, tanto en la jurisdicción federal como en nuestra jurisdicción estatal, es incuestionable la validez de la delegación siempre y cuando la ley habilitadora que crea la agencia u organismo administrativo, establezca normas adecuadas, pautas, estándares, criterios, o principios inteligibles o aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus facultades, para evitar que las actuaciones de los entes administrativos resulten arbitrarias o caprichosas.[184] Dichos criterios no tienen que ser expresos, pueden surgir, inclusive, del historial legislativo y pueden ser amplios y generales; **si tiene un fin o interés público**, por lo general es suficiente

---

[183] *Íd.*, pág. 9.

[184] *Rodríguez Román v. Banco Gubernamental de Fomento de P.R.*, 151 D.P.R. 383, 400 (2000).

justificación para que se sostenga la delegación.[185] Desde *Luce & Co. v. Junta de Salario Mínimo, supra,* "se desprende [...] la necesidad de que se delegue a funcionarios y juntas administrativas gran parte del poder que la legislatura podría ejercitar...".[186] Sobre esa necesidad de delegar este Tribunal ha expresado:

> [E]l mundo moderno se caracteriza por la gran complejidad en las relaciones sociales y económicas de las personas, conjuntamente con la progresiva supervisión gubernativa sobre la conducta individual, y ello implica que la legislatura está imposibilitada de anticipar legislativamente, en forma detallada, minuciosa o específica, la multiplicidad de situaciones que puedan surgir de esas relaciones complejas, siendo suficiente en que la ley en cuestión señale o establezca normas amplias y generales que sirvan de guía o dirección a entidades administrativas expertas, para que éstas, con sus experiencia y conocimientos especiales, apliquen esas normas concretamente a los hechos que puedan surgir y ultimen los detalles que implementen la política general legislativa.[187]

De esta manera, nada impide que la Legislatura establezca normas generales que sean amplias y que dejen al administrador un adecuado margen de libertad para complementar las normas legislativas mediante la utilización de un juicio especializado, que se pueda desarrollar conforme un análisis, apreciación y

---

[185] *Viajes Gallardo v. Clavell,* 131 D.P.R. 275 (1992); *M. & B.S., Inc. v. Depto. de Agricultura,* 118 D.P.R. 319 (1987); *Hernández v. Montero Cuevas,* 88 D.P.R. 785 (1963); *López Salas v. Junta de Planificación,* 80 D.P.R. 646 (1958); *Hilton Hotels International, Inc. v. Junta de Salario Mínimo,* 74 D.P.R. 670 (1953); *Luce & Co. v. Junta de Salario Mínimo,* 62 D.P.R. 452 (1944).

[186] D. Fernández Quiñones, *op. cit.,* sec. 2.3, pág. 48.

[187] *Hilton Hotel v. Junta de Salario Mínimo, supra,* págs. 692-693.

discreción administrativa que tenga una base de razonabilidad.[188]

Con el marco normativo esbozado, procedemos a resolver los planteamientos sobre delegación de poderes expuestos por la parte recurrida en el recurso CT-2009-9.

**B.**

La JREF está definida en el Art. 33(f) de la Ley Núm. 7, *supra*, como la Junta de Restructuración y Estabilización Fiscal. Esta fue creada al amparo del Art. 37.04(b)(5) de la consabida ley para hacer cumplir los objetivos del Capítulo 3 de la propia ley.[189] Además, a dicha junta se le encomienda tomar todas las acciones necesarias para el cumplimiento de la susodicha ley.[190] Se desprende pues de la Ley Núm. 7, *supra*, que la JREF es una junta que fue creada para facilitar el cumplimiento de dicha ley. En ese sentido, se le delegó por la Legislatura parte del poder más elemental que la Constitución de Puerto Rico le reconoce a la Rama Ejecutiva: hacer cumplir la ley.[191]

Por su parte, el Art. 37.04(b), antes citado, establece claramente que las facultades que se le delegan a la JREF y que están relacionadas a las cesantías de los empleados públicos, deben guiarse y regirse por el

---

[188] *Debién v. Junta de Contabilidad*, 76 D.P.R. 96, 104 (1954).

[189] Art. 33(f) de la Ley Núm. 7, *supra*.

[190] *Íd.*

[191] Véase, Art. IV Sec. 4 Const. E.L.A., L.P.R.A., Tomo 1.

criterio de antigüedad. Es decir, la JREF tendrá todas las facultades necesarias y convenientes encaminadas al cumplimiento de la Ley Núm. 7, *supra*, pero en materia de cesantías, siempre estará obligada a respetar el criterio de antigüedad. En ese sentido, la propia ley establece una limitación a las potestades que pueda tener la JREF al descargar sus funciones.

A su vez, la Ley Núm. 7, *supra*, provee unas guías ilustrativas que enmarcan las prerrogativas de dicha junta. Así por ejemplo, el inciso sexto del Art. 37.04(b) establece que la JREF podrá realizar estudios necesarios o encomendarlos a las agencias que estén a su cargo, requerir información necesaria para llevar a cabo su encomienda, asesorar al Gobernador y a las agencias con relación a los empleados cesanteados, aprobar, rechazar y evaluar peticiones de los empleados para reducir la jornada de estos, reunirse con los jefes de agencias, etc. Aún si concluyéramos que los criterios que la Ley Núm. 7, *supra*, le reconoce a la JREF son amplios y generales, no cabe duda de que tales criterios tienen un fin o interés público bien delimitado.[192] Como ya señalamos, ese interés público es suficiente para sostener la delegación.[193]

---

[192] Véanse, Arts. 33(g), 37.04(b)(1).

[193] *Viajes Gallardo v. Clavell*, *supra*, págs. 284, 285, 286.

Igualmente y como ya hemos dicho, la Ley no deja desprovisto al empleado público pues éste tiene un procedimiento a su haber para impugnar la determinación de la JREF o de la agencia pertinente. Por tal razón, las decisiones que tome la JREF no son infalibles y pueden ser objeto de impugnación por parte de un empleado que entienda que su despido no fue conforme al criterio de antigüedad. Esa facultad que se le reconoce al empleado, correlativamente, guía la discreción de la JREF ya que le impone como deber ejercer propiamente las facultades que la ley le delega para evitar que sus acciones sean impugnadas e invalidadas por un tribunal.

Por otro lado, los Arts. 41 y 42 de la Ley Núm. 7, *supra*, le conceden a la JREF la facultad de realizar traslados y subcontratación de empleados de manera flexible:

**Artículo 41 – Traslados**

Durante las Fases I, II y III de este Capítulo III, y **con el fin de asegurar la continuidad y calidad de los servicios gubernamentales**, la JREF podrá autorizar traslados de empleados entre puestos, clases y niveles de puestos, grupos de empleados, unidades apropiadas, de unidades sindicales a no sindicales y viceversa, en una misma Agencia o entre Agencias; disponiéndose, que el empleado trasladado **deberá cumplir con los requisitos mínimos de preparación académica y experiencia necesaria para ocupar el puesto**. El empleado trasladado estará sujeto al período probatorio requerido para el puesto. Quedará en suspenso, durante la vigencia de las Fases I, II y III, toda aquella disposición de ley, reglamento, convenio, acuerdo o precepto que sea contrario a lo indicado en este Capítulo III;

disponiéndose, que existirá total flexibilidad para realizar los traslados.

**Artículo 42 – Subcontratación.**

Durante las Fases I, II y III de este Capítulo III, y **con el fin de asegurar la continuidad y calidad de los servicios gubernamentales**, la JREF podrá autorizar la transferencia y subcontratación de labores realizadas por empleados, unidades apropiadas o unidades sindicales.

Quedará en suspenso, durante la vigencia de las Fases I, II y III, toda aquella disposición de ley, reglamento, convenio o precepto contrario a lo indicado en este Capítulo III.
En todo contrato otorgado por las Agencias conforme a este Artículo se le requerirá al contratista que, en la prestación de los servicios contratados, emplee empleados cesanteados disponibles, **que tengan la preparación y experiencia necesaria para prestar el servicio contratado**, conforme a la lista de candidatos a reempleo que habrá de preparar la ORHELA a tenor con lo dispuesto en el Artículo 43 de este Capítulo III. (Énfasis suplido).

Se desprende de ambos articulados que los empleados deberán tener la preparación y experiencia necesaria para ocupar el puesto, si es un traslado, o para prestar el servicio contratado en casos de subcontratación. Además, ambas disposiciones establecen como parámetros, que la facultad que se le delega a la JREF está subordinada al objetivo de asegurar la continuidad y calidad de los servicios gubernamentales. De esa manera, la JREF siempre tendrá que justificar el traslado o la subcontratación. Es decir, la JREF está limitada a subcontratar o trasladar aquel empleado que tenga la preparación y experiencia necesaria para ocupar el puesto o para

prestar el servicio requerido, y que además, ayude a evitar una interrupción o paralización en los servicios.

Nuevamente, la discreción de la JREF tiene que guiarse por el propósito e interés público primordial de la Ley Núm. 7, *supra*, que es atender la emergencia y crisis fiscal que impera sobre el Gobierno de Puerto Rico. Así, la encomienda principal de la JREF es buscar la manera de reducir el déficit estructural, y a la vez, velar porque la prestación de los servicios gubernamentales no se afecte. Para lograr ese objetivo la Ley Núm. 7, *supra*, le permite trasladar empleados públicos y subcontratar.

**Por todo lo anterior colegimos, que la delegación de poder que la Legislatura le hace a la JREF --en cuanto a subcontratación y traslado es constitucionalmente válida y no viola el principio de separación de poderes al proveer unas guías adecuadas que orientan la utilización de ese poder.**

Finalmente, la parte recurrida alega que el Art. 68 de la Ley Núm. 7, *supra*, le delega indebidamente poder al Gobernador de Puerto Rico en violación al principio de separación de poderes. Dicho artículo dispone:

> Se faculta al Gobernador para tomar toda medida que sea necesaria y conveniente, además de aquellas provistas por esta Ley, para que mediante Orden Ejecutiva reduzca los gastos; promueva la economía de la Rama Ejecutiva hasta el máximo compatible con el funcionamiento eficiente del Gobierno; mantenga la eficiencia de las operaciones de la Rama Ejecutiva en el mayor grado posible; y agrupe, coordine y

consolide funciones en cada Agencia; todo ello
de acuerdo con los objetivos de esta Ley.
Disponiéndose, no obstante, que el Gobernador
no podrá crear, consolidar o reorganizar
departamentos ejecutivos, ni suprimir
organismos creados por Ley. Aquellas
reorganizaciones que requieran legislación o
enmiendas a estatutos vigentes, deberán ser
presentadas ante la Asamblea Legislativa para
su consideración.

Las facultades concedidas bajo esta Ley no
limitan toda aquella otra que el Gobernador
pueda tener y tomar, de no lograrse el objetivo
fijado por el Artículo 33(g). Art. 68 de la Ley
Núm. 7, *supra*.

En primer lugar, debemos señalar que la Constitución de Puerto Rico establece que entre los deberes, atribuciones y funciones del Gobernador se encuentran: "[c]umplir y hacer cumplir la ley; [e]jercer las otras facultades y atribuciones y cumplir los demás deberes que se le señalen por esta Constitución o por ley".[194] Como corolario de lo anterior, se ha interpretado que una orden ejecutiva encuentra apoyo legal en la facultad general del Primer Ejecutivo de cumplir y hacer cumplir las leyes.[195] Así, la facultad del Gobernador de emitir órdenes ejecutivas emana de los poderes que le confieren las leyes o de los poderes inherentes a su cargo.[196] Asimismo, toda orden ejecutiva enmarca un mandato que va dirigido a los organismos gubernamentales de la Rama Ejecutiva.

---

[194] Art. V Sec. 4 Const. E.L.A., *supra*.

[195] Op. Sec. Just. Núm. 5 de 1985.

[196] Op. Sec. Just. Núm. 24 1986; Op. Sec. Just. Núm. 31 1984.

Por eso, al permitirle al Gobernador emitir órdenes ejecutivas, el Art. 68 de la Ley Núm. 7, *supra*, no hace sino conferirle la prerrogativa de ejercitar un poder constitucionalmente válido. Cabe apuntar, que el Gobernador de Puerto Rico tiene la facultad para ejercer la dirección general de la administración pública con el claro entendimiento de que comprende la supervisión e inspección de los departamentos y agencias de gobierno de la Rama Ejecutiva así como de las corporaciones públicas y de ciertas entidades autónomas creadas por ley.[197] Además, "[n]uestra Constitución… adoptó un Poder Ejecutivo unitario al investir a un sólo funcionario… con la autoridad suprema en la Rama Ejecutiva sin limitaciones de ninguna clase"[198], que no sean las que dispone la propia Constitución y las leyes que a su amparo se aprueben.

De otra parte, el Art. 68 de la Ley Núm. 7, *supra*, le permite al Primer Mandatario emitir órdenes ejecutivas conducentes a: reducir gastos, promover hasta al máximo posible la economía de la Rama Ejecutiva **sin que se afecte el funcionamiento eficiente del Gobierno**, mantener la eficiencia de las operaciones de la Rama Ejecutiva en el mayor grado posible, y agrupar, coordinar y consolidar funciones en cada Agencia **de acuerdo a los objetivos de la ley**. Surge claramente del susodicho artículo, que las

---

[197] Tomo 4, Diario de Sesiones, pág. 2606 (1962).

[198] *Santana v. Gobernadora*, *supra*, pág. 47.

facultades del Primer Mandatario se deben gobernar bajo dos principios esenciales: 1) deben promover los objetivos de la Ley Núm. 7, *supra*; 2) y en consonancia con ese parámetro, no puede afectar el funcionamiento eficiente del Gobierno. Es decir, la delegación de poder que se le despliega al Ejecutivo se regenta por principios diáfanamente establecidos. A su vez, el propio Art. 68 de la Ley Núm. 7, *supra*, reconoce una limitación adicional al poder del Gobernador. Éste no podrá crear, consolidar o reorganizar departamentos ejecutivos, ni suprimir organismos creados por Ley; las reorganizaciones que requieran legislación o enmiendas a estatutos vigentes, deberán ser presentadas ante la Asamblea Legislativa para su consideración.[199] Lo anterior es un claro ejemplo de que las facultades del Primer Ejecutivo bajo la antedicha ley, encuentren sus límites ante las prerrogativas de la Asamblea Legislativa de formular y crear las leyes.

**En conclusión, las facultades que les reconoce el Art. 68 de la Ley Núm. 7, *supra*, al Gobernador, no son una delegación impermisible o indebida de poder. Tales facultades se circunscriben a la Rama Ejecutiva y en ningún momento develan la intención legislativa de claudicar a sus poderes constitucionales de legislar.** Por tanto, no podemos refrendar los argumentos de la parte

---

[199] Art. 68 de la Ley Núm. 7, *supra*.

recurrida a los efectos de que la Ley Núm. 7, *supra*, delega indebidamente poder al Gobernador.

**X**

**Por todo lo anterior, resolvemos que la Ley Núm. 7 de 9 de marzo de 2009, conocida como *Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico*, es constitucional, en todos los aspectos cubiertos por esta Opinión. Como consecuencia, y en vista de que las partes recurridas no ostentan un derecho en ley que requiera hacerse efectivo,[200] se declara No Ha Lugar la solicitud de *injction* permanente.**

**Se devuelve el recurso CT-2009-09 al Tribunal de Primera Instancia, Sala de San Juan, para la continuación de los procedimientos de forma consistente con esta Opinión.**

Se dictará Sentencia de conformidad.


Erick V. Kolthoff Caraballo
Juez Asociado

---

[200] *Abella v. Fernández, et al.,* 17 D.P.R. 1063 (1911).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Olga Domínguez Castro,<br>Sandra J. Guzmán Hernández,<br>Militza López Mateo,<br>Carlos Rivera Figueroa<br><br>     Recurridos<br><br>        v.<br><br>Gobierno del Estado Libre Asociado de Puerto Rico, Secretario de Justicia, Honorable Luis Fortuño, Gobernador del Estado Libre Asociado de Puerto Rico, Departamento de Justicia, Departamento de la Familia y Junta de Reestructuración y Estabilización Fiscal<br><br>     Peticionarios | CT-2009-4<br>CT-2009-5<br>CT-2009-6<br>CT-2009-9 | Certificación |

**SENTENCIA**

San Juan, Puerto Rico, a 2 de febrero de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, resolvemos que la Ley Núm. 7 de 9 de marzo de 2009, conocida como *Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico*, es constitucional, en todos los aspectos cubiertos por esta Opinión. Como consecuencia, y en vista de que las partes recurridas no ostentan un derecho en ley que requiera hacerse efectivo, se declara No Ha Lugar la solicitud de *injuction* permanente.

Se devuelve el recurso CT-2009-09 al Tribunal de Primera Instancia, Sala de San Juan, para la continuación de los procedimientos de forma consistente con esta Opinión.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez emitió voto particular. El Juez Asociado señor Martínez Torres y la Jueza Asociada señora Pabón Charneco se acogen al término reglamentario de diez días que se dispone en la Regla 5 de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A R.5, para reservarse el derecho de emitir una opinión de conformidad, luego de examinar las ponencias disidentes que no se circularon, en violación de nuestro Reglamento. El Juez Presidente señor Hernández Denton, la Jueza Asociada señora Fiol Matta y la Juez Asociada señora Rodríguez Rodríguez emitieron Opiniones disidentes.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Olga Domínguez Castro, Sandra J. Guzmán Hernández, Militza López Mateo, Carlos Rivera Figueroa<br><br>Recurridos<br><br>v.<br><br>Gobierno del Estado Libre Asociado de Puerto Rico, Secretario de Justicia, Hon. Luis Fortuño, Gobernador del Estado Libre Asociado de Puerto Rico, Departamento de Justicia, Departamento de la Familia y Junta de Reestructuración y Estabilización Fiscal<br><br>Peticionarios | CT-2009-4<br>CT-2009-5<br>CT-2009-6<br>CT-2009-9 |

Voto Particular del Juez Asociado señor Rivera Pérez.


San Juan, Puerto Rico, a 2 de febrero de 2010.


La Jueza Asociada señora Fiol Matta señala en su Opinión Disidente que "… la mayoría también decidió acortar el término de treinta (30) días que provee nuestro Reglamento para que cada juez considere de forma sosegada todas las opiniones circuladas. Incluso, la mayoría no permitió que los jueces y juezas que interesaran escribir opiniones propias utilizaran la facultad que les provee el Reglamento de acogerse a un término adicional para ese propósito". La distinguida compañera Jueza Asociada señora Fiol Matta omite señalar que el Juez Asociado, señor Kolthoff Caraballo, circuló su ponencia como Opinión del

Tribunal el 4 de enero de 2010, o sea hace veinte y nueve (29) días. Se acortó el término para que cada uno de los jueces pudieran expresar su criterio por el alto interés público del que está revestida la presente controversia y la urgencia que la resolución de este asunto amerita. No obstante, todos los jueces han contado con (1) un mes para considerar y evaluar la Opinión circulada como mayoritaria.

Con mucho respeto tengo que recordarles a mis compañeros de funciones que para el 20 de noviembre de 2004, en el caso de Suarez v. C.E.E. I, 163 D.P.R. 347 (2004), la mayoría de entonces decidió acortar el mismo término a que hace alusión la Jueza Asociada señora Fiol Matta no a veinte y nueve (29) días sino a tres (3) horas, para que cada juez **"considerara de forma sosegada las opiniones circuladas y vertiera su criterio"**. No tomaron en consideración en forma alguna que los entonces Jueces Asociados señores Rebollo López y Corrada del Rio se encontraban fuera de Puerto Rico. Al que suscribe, que estaba presente en el Tribunal, se le concedió tres (3) horas para **"considerar de forma sosegada la opinión circulada como de mayoría**, **que ya contaba con la mayoría requerida antes de ser circulada a todos los jueces"**. Redujeron el término reglamentario de treinta (30) días para ello a tres (3) horas y el término adicional de treinta (30) días para escribir nuestra opinión a cero (0) días o horas. No obstante, en este caso el término de veinte y nueve (29) días concedido por acuerdo del Tribunal

Supremo de Puerto Rico no es suficiente.

Similar criterio emite el Juez Presidente, señor Hernández Denton, quien expresara que la mayoría del Tribunal "… luego de un tramite judicial apresurado que resulta contrario el debido proceso de ley, elimina los derechos adquiridos sobre sus empleos de miles de servidores públicos". No obstante, no fue violatorio al debido proceso de ley reducir los mismos términos no a veinte y nueve (29) días sino a tres (3) horas. Tal curso de acción, de acuerdo al Juez Presidente, señor Hernández Denton, no fue apresurado cuando se estaba discutiendo el efecto práctico sobre la elección general del derecho al voto de cientos de miles de electores.

Por las razones antes expuestas el presente caso debe certificarse el día de hoy. No obstante, la Jueza Asociada señora Fiol Matta nos ha circulado su Opinión Disidente hoy a las 2:45 p.m. y el Juez Presidente, señor Hernández Denton, nos circuló la suya a las 3:00 p.m. La Juez Asociada señora Rodríguez Rodríguez circuló la suya a las 4:18 p.m. Hemos contado con apenas unos minutos para escribir estos pensamientos sobre algunas de las inconsistencias plasmadas en nuestro registro histórico. No se nos ha permitido considerar en forma sosegada las Opiniones Disidentes circuladas, por ello nos acogemos al termino de diez (10) días dispuesto en la Regla 5 de nuestro Reglamento, 4 L.P.R.A. Ap.XXI A, R. 15 para considerar y evaluar todas las Opiniones Disidentes y

determinar si es necesaria una expresión adicional de nuestra parte.


                        Efraín E. Rivera Pérez
                           Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Olga Domínguez Castro y otros    *
     Recurridos                  *
                                 *
          v.                     *    CT-2009-4
                                 *
Gobierno del Estado Libre        *
Asociado de P.R. y Otros         *
     Peticionarios               *
*******************************
Kristy J. González Bou y otros   *
     Recurridos                  *
                                 *
          v.                     *    CT-2009-5
                                 *
Estado Libre Asociado de P.R.    *
y Otros                          *
     Peticionarios en            *
     Certificación               *
*******************************
Zoraida Martínez Román y otros   *
     Recurridos                  *
                                 *
          v.                     *    CT-2009-6
                                 *
Estado Libre Asociado de P.R.    *
y Otros                          *
     Peticionarios               *
*********************************
Erika Vispo Figueroa             *
     Recurrida                   *
                                 *
          v.                     *    CT-2009-9
                                 *
Estado Libre Asociado de P.R.    *
y Otros                          *
     Peticionarios               *
*******************************

Opinión Disidente emitida por el Juez Presidente SEÑOR
HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 2 de febrero de 2010.

     Disentimos del curso de acción seguido por una mayoría
del Tribunal en el día de hoy, pues éste, luego de un
trámite judicial apresurado que resulta contrario al debido
proceso de ley, elimina los derechos adquiridos sobre sus
empleos de miles de servidores públicos, en violación de la

prohibición constitucional contra el menoscabo de obligaciones contractuales establecida tanto en la Constitución del Estado Libre Asociado de Puerto Rico como en la Constitución de los Estados Unidos. Art. II, Sec. 7, Const. E.L.A., L.P.R.A. Tomo 1; Art. 1, Sec. 10. Const. E.E.U.U., L.P.R.A. Tomo 1. Específicamente, la Opinión que emite el Tribunal para declarar la constitucionalidad de la Ley Núm. 7 de 9 de marzo de 2009 se basa en un expediente judicial desprovisto de la prueba necesaria para resolver de forma adecuada y fundamentada la controversia.

Peor aún, ésta ni siquiera cumple con el ámbito mínimo de protección establecido por la Constitución Federal, colocándonos al margen de la normativa que formuló el Tribunal Supremo de Estados Unidos sobre la referida prohibición constitucional en United States Trust Co. v. New Jersey, 431 U.S. 1 (1977), y que adoptó este Tribunal en Bayrón Toro v. Serra, 119 D.P.R. 605 (1987). La necesidad de un expediente judicial completo que contenga prueba que permita evaluar adecuadamente los criterios establecidos en dicha jurisprudencia resulta aún más imperiosa al considerar la magnitud del impacto de la Ley Núm. 7, *supra*, sobre los empleados públicos afectados y el efecto que la decisión del Tribunal tendrá en el país.

A nuestro juicio, la decisión que el Tribunal emite en el caso de autos se toma únicamente basada en el propio texto de la Ley Núm. 7, *supra*, y su Exposición de Motivos, sin que se haya presentado en los tribunales la prueba necesaria para establecer que el plan de cesantías

decretado era la alternativa menos onerosa a la luz de la situación fiscal, según lo requerido por la doctrina establecida por el Tribunal Supremo de Estados Unidos, y sin permitir a los empleados cesanteados refutarla. Con la Opinión emitida en este caso por el Tribunal, nos colocamos al margen de la Constitución Federal y correspondería entonces al Tribunal Supremo de Estados Unidos rectificar esta decisión. Por ello, nos vemos obligados a disentir.

I.

A.

Como se desprende de la Opinión del Tribunal, cada uno de los recursos de epígrafe llegó ante la consideración de este Foro pocos días luego de presentarse las demandas correspondientes ante el Tribunal de Primera Instancia y diligenciarse los emplazamientos. En todos los recursos el Estado compareció ante nos mediante sus respectivas peticiones de certificación, sin que se dilucidara la controversia en el foro de instancia. En éstas, el Estado nos solicitó obviar el trámite ordinario bajo el fundamento de que esta Curia debía adjudicar la controversia en primera instancia, a tenor de lo dispuesto en el Artículo 69 de la Ley Núm. 7, *supra*. Dicho artículo dispone que, a solicitud de una parte, este Tribunal "expedirá un auto de certificación … para traer inmediatamente ante sí y resolver cualquier asunto pendiente ante el Tribunal de Primera Instancia o ante el Tribunal de Apelaciones cuando se plantee la validez o constitucionalidad" de la Ley o

"cualquier impugnación a la misma de cualquier naturaleza".
Art. 69, Ley Núm. 7, *supra*.

A pesar de la naturaleza discrecional y excepcional que caracteriza al recurso de certificación, este Tribunal no vaciló en expedir dichos recursos. Al circunvalar el trámite ordinario en los casos de epígrafe, el Tribunal no contó con un expediente para dilucidar las alegaciones de las partes. En esencia, cada uno de los autos ante nuestra consideración solamente consiste de la petición de certificación, la demanda y los alegatos de las partes. Aún así, el Tribunal no requirió escritos adicionales ni, mucho menos, celebró una vista oral para ofrecerles a las partes su día en corte y para que, a modo de excepción, este Foro recibiera la prueba que ninguna de éstas tuvo la oportunidad de presentar ante el foro de instancia, en una controversia muy compleja, que involucra diversos planteamientos, y que, sin duda, es de gran trascendencia pública.

Como resultado de la intervención a destiempo por parte de este Tribunal, en su Opinión éste descansó exclusivamente en el texto de la propia Ley Núm. 7, *supra*, y en su Exposición de Motivos para dilucidar y declarar la constitucionalidad del estatuto. En otras palabras, **ante la ausencia de un expediente judicial completo en el cual las partes hubiesen fundamentado sus posiciones, el Tribunal optó por tomar como hechos las alegaciones del Estado y los datos contenidos en la Exposición de Motivos**

**de la Ley Núm. 7,** *supra***, para dirimir la validez de ésta. Ello, sin que los empleados cesanteados hubiesen tenido la oportunidad de presentar prueba en contrario.** Tal proceder, además de dar lugar a un razonamiento circular, resulta contrario a lo establecido por el Tribunal Supremo de los Estados Unidos en United States Trust Co. v. New Jersey, *supra*.

En United States Trust Co. v. New Jersey, *supra*, dicho foro formuló el escrutinio de adjudicación a seguir en casos donde se alega un menoscabo de obligaciones contractuales del Estado. En esencia, para que el Estado prevalezca en estos casos se requiere que el menoscabo de la obligación contractual responda a un interés gubernamental importante y que sea **razonable y necesario** para alcanzar el interés gubernamental involucrado. United States Trust Co. v. New Jersey, *supra*, pág. 25.

A tales efectos, en Bayrón Toro v. Serra, *supra*, págs. 620-21, atendimos un reclamo al amparo de la cláusula contra el menoscabo de obligaciones contractuales establecida en el Art. II, Sec. 7 de nuestra Constitución, *supra*, y adoptamos el escrutinio de adjudicación formulado por el Tribunal Supremo de Estados Unidos en United States Trust Co. v. New Jersey, *supra*. De hecho, en esa ocasión sostuvimos la actuación del Estado por entender que ésta había sido razonable y necesaria. Bayrón Toro v. Serra, *supra*, pág. 623.

Claro está, en ese caso se dilucidó la validez de la actuación cuestionada ante el foro de instancia, el cual

contó con un expediente completo que incluía, entre otras cosas, estipulaciones de hechos, memorandos de derecho y un informe actuarial. *Íd.*, págs. 609, 622. Con ello, el Estado cumplió con su obligación de demostrar que no hubo un menoscabo de obligaciones contractuales que infringiera nuestra Constitución. *Íd.* Véase, además, Voto particular del Juez Alonso Alonso.

En cuanto a la valoración de los elementos de razonabilidad y necesidad de una medida impugnada en casos como el de autos, **el máximo foro federal resolvió que no procede otorgarle deferencia absoluta al juicio legislativo cuando el propio interés del Estado está en juego**. United States Trust Co. v. New Jersey, *supra*, pág. 26; Bayrón Toro v. Serra, *supra*, pág. 620. **Lo contrario, razonó el Tribunal Supremo Federal, implicaría que la cláusula constitucional contra el menoscabo de obligaciones contractuales no proveería protección alguna y, en esencia, sería letra muerta**. United States Trust Co. v. New Jersey, *supra*, pág. 26. **Por tanto, el Estado debe probar en los tribunales que la medida es razonable y necesaria**. *Íd.,* pág. 30.

En este sentido, en el referido precedente, el Tribunal Supremo de Estados Unidos dejó claro que: "Un estado no es completamente libre para considerar menoscabar las obligaciones de sus propios contratos a la par con otras alternativas. Similarmente, **un estado no es libre para imponer un menoscabo drástico cuando una medida evidente y más moderada serviría sus propósitos de la**

**misma forma.**" (Traducción y énfasis nuestro.) *Íd.* Es decir, en estos casos se requiere que el Estado demuestre que no existen medidas menos drásticas. *Íd.* Al así resolver, el Tribunal Supremo Federal descartó la alegación del Estado de que la selección de las alternativas disponibles es un asunto de absoluta discreción legislativa. *Íd.*

Somos del criterio que esta norma cobra mayor relevancia cuando la medida adoptada por el Estado tiene el propósito de resolver una crisis fiscal relacionada con la administración de sus finanzas y su efecto equivale a menoscabar severamente los derechos adquiridos por miles de empleados nombrados a tenor con el ordenamiento establecido por la Ley para la Administración de los Recursos Humanos en el Servicio Público, Ley Núm. 184 de 3 de agosto de 2004, 3 L.P.R.A. sec. 1461 *et seq,* y sus leyes predecesoras. **En momentos de crisis fiscal, el Estado tiene la facultad y el deber de diseñar y adoptar mecanismos para solventar sus problemas económicos. Dicha facultad, sin embargo, no es ilimitada. Justamente, la cláusula constitucional contra el menoscabo de las obligaciones contractuales impone un límite a dicho poder.**

En el presente caso, el Estado, como parte de las medidas adoptadas en la Ley Núm. 7, *supra*, optó por implantar un plan de cesantías de miles de empleados públicos que tienen derechos adquiridos sobre sus puestos. No está en controversia el hecho de que éstos, como empleados del Gobierno, tienen una relación contractual

con su patrono, el Estado, establecida al amparo de la legislación aplicable, y que ésta fue menoscabada severamente. Igual ocurre con los empleados públicos unionados, pues éstos, representados por sus sindicatos, establecieron una relación contractual con el Estado plasmada en los convenios colectivos suscritos al amparo de la Ley de Relaciones del Trabajo para el Servicio Público, Ley Núm. 45 de 25 de febrero de 1998, 3 L.P.R.A. secs. 1451 *et seq.*

No obstante, el trámite judicial expedito solicitado por el Estado y autorizado por este Tribunal redundó en los parcos expedientes ante nuestra consideración, lo que nos impide evaluar adecuadamente la constitucionalidad del referido plan de cesantías de la Ley Núm. 7, *supra,* a la luz de los criterios pautados por el Tribunal Supremo Federal y por este Foro.

El impedimento es más grave aún al considerar el hecho de que nunca se celebró una vista evidenciaria ante un foro judicial que permitiera al Estado demostrar, según lo requiere United States Trust Co. v. New Jersey, *supra*, que su actuación es necesaria y cumple con los parámetros requeridos para validar este tipo de legislación. Es por tal razón, precisamente, que la mayoría del Tribunal se ve obligada a descansar únicamente en la Exposición de Motivos de la Ley Núm. 7 y da por hechos los datos allí contenidos que, a fin de cuentas, sólo constituyen las alegaciones del Estado. De esta manera, el Tribunal realmente otorga completa deferencia al texto de la ley,

abdica a su función judicial y, por tanto, priva a las partes de un debido proceso de ley, en clara contravención a lo resuelto en United States Trust Co. v. New Jersey, *supra*.

De acuerdo con nuestra función como máximo foro judicial de Puerto Rico, debemos velar por que se respete, al menos, el ámbito mínimo de protección que otorga la cláusula contra el menoscabo de obligaciones contractuales de la Constitución de Estados Unidos, según delimitado en United States Trust Co. v. New Jersey, *supra*. **Contrario a ello, este Tribunal se aparta de esos criterios mínimos e incurre, justamente, en lo que dicha jurisprudencia persigue evitar: descansar ciegamente en la Exposición de Motivos de la ley cuando el propio interés del Estado está en juego.**

A nuestro juicio, la Opinión del Tribunal constituye una invitación al Tribunal Supremo de Estados Unidos para que corrija los errores de este Foro, al igual que lo hizo en El Vocero v. Puerto Rico, 508 U.S. 147 (1993). En esa ocasión, el Tribunal Supremo Federal revocó el dictamen mayoritario emitido en dicho caso y llegó a las mismas conclusiones que sostuvimos tanto el Juez Asociado señor Negrón García como este servidor, quienes disentimos entonces. Véase El Vocero de P.R. v. E.L.A, 131 D.P.R. 356, 436, 440 (1992). El tracto procesal seguido en este caso abre las puertas para que el único foro ahora disponible para los empleados cesanteados intervenga en la

controversia y siga un curso de acción igual al de <u>El Vocero v. Puerto Rico</u>, *supra*.

B.

De otra parte, nos parece incomprensible la distinción que intenta hacer la mayoría en el día de hoy de su decisión de otorgar escoltas policiacas vitalicias a los ex gobernadores en <u>Hernández Colón, Romero Barceló v. Policía de P.R.</u>, res. el 13 de octubre de 2009, 2009 T.S.P.R. 154. En esa ocasión, los ex gobernadores reclamaron tener un derecho adquirido vitalicio al servicio de escoltas policiacas, del cual alegaron no se les podía privar sin la celebración de una vista que cumpliera con las garantías del debido proceso de ley. Este Tribunal les dio la razón y determinó que los ex gobernadores tienen un derecho adquirido que goza de la misma protección que un derecho constitucional.  Más importante aún, resolvió que un derecho adquirido **"está protegido constitucionalmente frente a cualquier gestión gubernamental que pretenda intervenirlo"**. (Énfasis nuestro.) <u>Hernández Colón, Romero Barceló v. Policía de P.R.</u>, *supra*, pág. 28.

En el caso de autos, sin embargo, este Tribunal resuelve que los empleados públicos de carrera no tienen un derecho adquirido sobre sus empleos.  La razón que esboza para llegar a dicha conclusión nos resulta, como poco, sorprendente: "se encuentra ausente el elemento del **amparo de una ley anterior** que hubiere concedido tal derecho". (Énfasis en el original). Op. del Tribunal, pág.

76.    Desafortunadamente, al así proceder el Tribunal soslaya las disposiciones de la Ley para la Administración de los Recursos Humanos en el Servicio Público, *supra*, las leyes anteriores a ésta y la normativa elaborada en la jurisprudencia de este Foro.  El ordenamiento relacionado con el personal de servicio público reconoce, desde hace más de medio siglo, el principio de mérito como el pilar fundamental que rige el sistema de los empleados públicos de carrera en asuntos como su retención en el empleo.  No obstante, el Tribunal pasa por alto lo anterior, así como los derechos contenidos en los convenios colectivos suscritos al amparo de la Ley Núm. 45, *supra*.

Por el contrario, en el caso de las escoltas de los ex gobernadores **no existía disposición legal alguna que expresamente les reconociera el derecho que reclamaban. Precisamente, por esa razón, éstos solicitaron que se les permitiera demostrar, mediante una vista, que a través de los años habían adquirido ese derecho por la costumbre de la Policía de proveerle el servicio en controversia.**  Ante esa realidad, este Tribunal, sin recibir prueba alguna de las partes, se amparó únicamente en las alegaciones de los ex gobernadores y en la cuestionada doctrina de "re-enactment" para reconocer la existencia del derecho vitalicio a escoltas como un derecho adquirido.  Es decir, aún ante el silencio legislativo, la misma mayoría que hoy emite la Opinión del Tribunal concluyó que los ex gobernadores tenían un derecho adquirido.

Ciertamente, la decisión del caso de las escoltas contrasta drásticamente con el curso de acción que adopta el Tribunal en el caso de autos. Contrario al reclamo de los ex gobernadores, el de los empleados públicos cesanteados se basa en las disposiciones expresas de un ordenamiento que les garantiza el principio de mérito en el servicio público y les otorga derechos propietarios. No podemos avalar que ante el reclamo de sus derechos, no sólo adquiridos, sino expresamente conferidos por ley, se adopte un criterio distinto al pautado en el caso de las escoltas de los ex gobernadores.

Consistente con lo que sostuvimos en dicho caso, este Tribunal debió haber denegado expedir los recursos de certificación solicitados por el Estado y haber permitido que las partes tuvieran una oportunidad de probar sus alegaciones en el foro judicial. Al igual que señalamos entonces, el hecho de que se dilucide la controversia ante el foro de instancia no impediría que ésta se atienda con la premura y el carácter prioritario que requiere un asunto de tan alto interés público, como lo es el de autos. Adviértase, además, que dicho trámite ordinario no hubiese afectado el interés del Gobierno en validar los despidos, pues éstos nunca fueron paralizados. No obstante, este Tribunal escogió un curso de acción precipitado que eliminó los derechos adquiridos de los servidores públicos que tocaron las puertas del foro judicial en busca de nuestra protección.

III.

En fin, aunque somos conscientes de la crisis fiscal que afecta las arcas del Estado y de los esfuerzos que están realizando los poderes constitucionales para atender esta situación, la Opinión que emite el Tribunal en los casos de epígrafe se aparta de las pautas mínimas reconocidas por el Tribunal Supremo de Estados Unidos en cuanto a la cláusula constitucional contra el menoscabo de obligaciones contractuales. Debido al trámite procesal seguido en el presente caso, -donde no se celebró tan siquiera una vista evidenciaria-, las partes no contaron con un foro donde, mediante informes económicos, testimonios o aportaciones de peritos o especialistas en la materia, o cualquier otro mecanismo de prueba, pudiesen exponer sus posiciones. De esa manera se hubiese formado, ante un tercero imparcial, un panorama claro de la situación fiscal que atraviesa el país y se hubiese podido evaluar adecuadamente si, de cara a ésta, la decisión tomada por el Estado es la alternativa menos onerosa, a tenor de los parámetros establecidos en la jurisprudencia federal y estatal.

No haberles provisto a las partes una oportunidad adecuada de probar sus puntos de vista y disponer del caso sin el rigor que nos exige una controversia como la de autos, es a todas luces contrario al principio de equidad procesal que debe regir todo proceso judicial. Así pues, el dictamen de este Tribunal priva a los empleados públicos afectados de sus derechos adquiridos sin tan

siquiera haberles provisto un proceso judicial completo y transparente, lo que lamentablemente tendrá el efecto de socavar la legitimidad de la decisión de este Tribunal y contribuirá a crear aún más desconfianza sobre la sabiduría y la validez de la acción tomada por el Estado para resolver sus problemas fiscales.

**La magnitud del impacto de la Ley Núm. 7, *supra*, sobre los empleados públicos, la economía y la situación social de Puerto Rico nos requiere ser en extremo rigurosos y cuidadosos al adjudicar la controversia ante nos. La decisión de la mayoría del Tribunal en el día de hoy no sólo echa a un lado los derechos de los empleados públicos, sino que al hacerlo, obvia el procedimiento adecuado y la normativa aplicable establecida tanto por el Tribunal Supremo Federal como por este Tribunal. Tratándose del sustento de miles de familias puertorriqueñas y habiéndole dedicado gran parte de nuestra vida profesional al servicio público, no podemos tomar tan livianamente nuestra responsabilidad de vindicar los derechos constitucionales de la ciudadanía. Por lo tanto, disentimos.**

Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Coordinadora Unitaria de Olga
Domínguez Castro, Sandra J.
Guzmán Hernández, Militza
López Mateo, Carlos Rivera
Figueroa

        Recurridos

        v.

Gobierno del Estado Libre
Asociado de Puerto Rico,
Secretario de Justicia,
Honorable Luis Fortuño,
Gobernador del Estado Libre
Asociado de Puerto Rico,
Departamento de Justicia,
Departamento de la Familia y
Junta de Reestructuración y
Estabilización Fiscal

        Peticionarios

Certificación

CT-2009-4
cons. con
CT-2009-5
CT-2009-6
CT-2009-9

---

Opinión Disidente emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 2 de febrero de 2010.

> *No hay duda que los intereses propietarios de un empleado público se ven sustancialmente afectados por una destitución.* **El salario de un empleado público constituye, en la mayoría de las situaciones, su única fuente de ingreso. De ello depende para el sostenimiento, techo y sustento de su familia. La privación del ingreso del empleado público desarticula de manera significa-tiva la estabilidad económica y emocional de aquellas familias que se ven privadas de esa fuente de ingresos.** *J.J. Álvarez González,* Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, *Bogotá, Temis, 2009, pág. 598. Énfasis nuestro.*

En la Opinión que hoy se certifica, la mayoría de este Tribunal se esfuerza en elaborar un razonamiento jurídico lógico capaz de sostener la constitucionalidad de

la Ley Núm. 7 de 9 de marzo de 2009, según emendada.[201] Sin embargo, su metodología, hermenéutica y premisas constitucionales son, según mi criterio, totalmente inaceptables y el resultado de su esfuerzo es un edificio defectuoso en sus cimientos, tan frágil como un castillo de naipes.

La mayoría ha decidido abordar el asunto de la constitucionalidad del Capítulo III de la Ley Núm. 7 de 2009 consolidando casos disímiles y certificándolos prematuramente para apresurarse a resolver el asunto constitucional. Sin tener prueba en el expediente, se ha inclinado por afectar los puestos de trabajo de los empleados públicos que constituyen un derecho adquirido constitucionalmente protegido. Esto lo hace fundamentándose exclusivamente en la exposición de motivos de la ley o lo que es lo mismo, en las alegaciones del Estado. Tal actuación provoca que este Tribunal no cumpla en este caso con su función judicial constitucional de adjudicar controversias de forma mesurada y con justificación jurídica.

La mayoría se equivoca. El Capítulo III de la Ley Núm. 7 de 2009 es inconstitucional, no tan solo en su faz sino también en su aplicación. Viola la cláusula constitucional de debido proceso de ley y la de menoscabo de obligaciones

---

[201] Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico.

contractuales.  En definitiva, no sólo afecta el derecho adquirido a su puesto que tienen los empleados públicos, sino que da al traste con nuestra legislación laboral y medio siglo de interpretación constitucional.  Por eso, respetuosamente, disiento.


I.

**Errores de Método en la Adjudicación**

**La génesis del problema fue la decisión de certificar estos casos antes de que se recibiera prueba o se desarrollaran las teorías de las partes a nivel de primera instancia**. El Artículo 69 de la Ley Núm. 7 de 2009 pretende obligar a este foro a sustraer de los tribunales de primera instancia o del tribunal apelativo cualquier caso en el que se cuestione la constitucionalidad de este estatuto, sin importar la etapa en que se encuentre, con la mera presentación de una solicitud a esos efectos por una de las partes.[202]  La mayoría del Tribunal parece haber entendido que con ello se impide o anula el ejercicio de nuestra

---

[202] El Artículo 69 de la Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico, Ley Núm. 7 de 2009, dispone lo siguiente:

> El Tribunal Supremo del Estado Libre Asociado de Puerto Rico expedirá un auto de certificación a solicitud de parte para traer inmediatamente ante sí y resolver cualquier asunto pendiente ante el Tribunal de Primera Instancia o ante el Tribunal de Apelaciones cuando se plantee la validez o constitucionalidad de esta Ley especial o cualquier impugnación a la misma de cualquier naturaleza.

discreción para evaluar la solicitud. **La realidad es que este precepto afecta el balance de poderes e incide en nuestra función judicial y por esa razón no lo podemos interpretar abstrayéndonos de la naturaleza discrecional del recurso de certificación.** Al sopesar si se expide un recurso de esta índole es necesario que se considere la complejidad de la controversia, su urgencia, la necesidad de recibir y dirimir la prueba y la etapa procesal en la cual se encuentra el caso.[203]

Igualmente, antes de tomar la determinación de consolidar varios casos, se debe evaluar si los hechos de los casos y las controversias que requieren adjudicación son comunes.[204] La Opinión no indica si estos factores fueron ponderados antes de consolidarse los casos que tenemos ante nuestra consideración, lo cual hubiéramos esperado, máxime cuando en dos de los casos consolidados, CT-2009-5 y CT-2009-6, ya se habían emitido sendas resoluciones denegando la consolidación. Incluso, estos casos estaban asignados a distintos jueces y no consta cuándo se tomó, ni quién tomó, la decisión de consolidarlos y asignarlos todos al Juez ponente, el compañero Juez Asociado señor Kolthoff

---

[203] Regla 23 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A, R. 23. Véase, además, J.A. Cuevas Segarra, <u>Tratado de Derecho Procesal Civil</u>, San Juan, JTS, 2000, T. II, págs. 836-838, 890-892.

[204] Regla 38 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 38.

Caraballo.[205] La consolidación tan accidentada, por así decirlo, de estos casos, es el segundo factor que provoca que el método y los fundamentos de derecho de la opinión mayoritaria resulten inconsistentes e ilógicos.[206]

Un análisis somero de los expedientes de los recursos consolidados nos permite percibir que las controversias que se presentan no tan solo son complejas, sino múltiples y diversas. Entre éstas, en algunos casos se alega discrimen por afiliación política, en otros discrimen por embarazo; también hay alegaciones de discrimen por razón de edad, incumplimiento en la aplicación de la ley respecto a la antigüedad y al principio de mérito, así como alegaciones de exclusión de la aplicación de la ley, fundamentado en el artículo 37.02, entre otros. Además, se argumenta la inconstitucionalidad de la Ley Núm. 7 de 2009 por la

---

[205] De acuerdo al Reglamento del Tribunal Supremo, la asignación de los casos es facultad del Juez Presidente del Tribunal y, en su defecto, del Juez Asociado de mayor antigüedad. Regla 5 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A, R. 5.

[206] Por ejemplo, en uno de los casos consolidados, CT-2009-5, la representación legal de los empleados presentó, el 16 de noviembre de 2009, una moción de desistimiento parcial sin perjuicio porque la JREF había pospuesto los despidos de un grupo de empleados. Oportunamente, el Estado se opuso porque entendió que la posposición de los despidos no hacía académica la controversia debido a que la determinación del Estado no tenía visos de permanencia. Estas mociones nunca fueron resueltas por este Tribunal y en la opinión mayoritaria se declara con lugar el desistimiento. Sin embargo, no se hizo lo mismo respecto al CT-2009-06. En este último los despidos de las demandantes también fueron pospuestos e, inexplicablemente, la mayoría no desestimó la reclamación. Entiendo que la posición del Estado es correcta porque se configuró la excepción mencionada a la doctrina de academicidad. Por consiguiente, no debió desestimarse la demanda de los empleados que lo solicitaron.

violación del debido proceso de ley en su vertiente procesal y sustantiva, el menoscabo de las obligaciones contractuales y la delegación inconstitucional de poderes por parte de la Asamblea Legislativa al Poder Ejecutivo.

**Cada uno de estos asuntos pudo requerir la intervención inicial del foro administrativo o del Tribunal de Primera Instancia para dirimir prueba y crear un expediente que permitiera la labor efectiva de los foros apelativos, incluyendo la de este Tribunal Supremo. Es axiomático que el derecho no se aplica en el vacío, requiere de hechos que sirvan de base para aplicar las normas.** Sobre el particular, el autor Casimiro A. Varela advierte sobre lo siguiente:

> **…[L]os fallos judiciales no deben auto-sustentarse… no basta que un fallo tenga fundamentos, es menester que éstos estén, a su vez, fundados… [E]l correspondiente al derecho y el que requieran las circunstancias comprobadas de la causa.[207]**

En esa misma línea de análisis, Varela explica que la ausencia de prueba en la cual fundamentar un fallo:

> …puede dar lugar también al fundamento aparente de hecho o de derecho. En tales casos… los jueces se consideraron dispensados de fundar razonablemente su decisión, **sustituyendo las razones por afirmaciones dogmáticas o fundamentos sólo aparentes.[208]**

**A pesar de todas estas consideraciones, estos recursos se certificaron de forma apresurada y a destiempo. Ello provocó (1) que no se le proveyera a las partes un foro en el cual se plantearan y se pudieran dirimir sus**

---

[207] C.A. Varela, <u>Valoración de la Prueba</u>, 2da ed., Buenos Aires, Astrea, 1999, pág. 53. Énfasis nuestro.

[208] <u>Íd.</u>. Énfasis nuestro.

**discrepancias respecto a la prueba, (2) que los expedientes con los que debíamos trabajar en esta etapa apelativa carecieran de prueba y determinaciones de hechos, (3) que la determinación de este Tribunal se basara, por tanto, en meras alegaciones y, en resumidas cuentas, (4) que este Tribunal no haya podido ejercer adecuadamente su función adjudicativa. En definitiva, lo anterior ha provocado que se violenten los derechos constitucionales y laborales de estos empleados públicos del gobierno central.**

**Como lo único que hay en los expedientes de los casos es la demanda, el recurso de certificación y las mociones interlocutorias, la opinión mayoritaria utiliza, exclusivamente, el texto de la Ley Núm. 7 de 2009 y, particularmente, los hechos expuestos en su exposición de motivos, para justificar la acción legislativa.** Para efectos adjudicativos, pues, se dieron por ciertos y suficientes hechos tales como (1) la ausencia de alternativas de acciones que pudieron haber evitado los despidos; (2) el alegado déficit estructural de $3,200 millones; (3) el plan de cesantía diseñado por la JREF bajo los parámetros de la Ley Núm. 7 de 2009; (4) la lista por antigüedad de todos los empleados del gobierno central; (5) estudios e informes que justificaran el optar por un nuevo plan de cesantías en lugar del plan que dispone la Ley Núm. 184 del 3 de agosto de 2004, según enmendada, conocida como la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico;

(6) los ahorros obtenidos como resultado de los despidos, esto con relación al número y el costo de las subcontrataciones y (7) el alegado gigantismo gubernamental. Todo ello sin posibilidad de cuestionamiento por los que impugnaron la acción del Estado ni de ofrecer prueba en contrario. De esa forma, la certificación prematura de los recursos propició un método adjudicativo estructuralmente defectuoso. En fin, **el procedimiento que se siguió para adjudicar la controversia que está ante nuestra consideración resultó en una determinación que carece de justificación válida.**[209] Para el escritor Varela, esta situación es problemática porque:

> …dentro de un concepto racional de la justicia, la condición que motiva la decisión ha de ser la conclusión lógica de un examen analítico de los hechos y de una apreciación crítica de los elementos de prueba. La existencia de un método posibilita que la simple creencia subjetiva adquiera un carácter impersonal que se imponga a todos, no solamente en las cuestiones de derecho, sino también en las de hecho.[210]

Ciertamente, la clave para impartir justicia es la congruencia entre las normas y principios de derecho reconocidos y los hechos concretos del caso. Al respecto, nos dice la tratadista Redondo:

> Los jueces deben resolver los conflictos mediante decisiones justificadas. Se entiende que una sentencia judicial tiene que ser una decisión fundamentada en normas generales. Eso significa que tiene que poder reconstruirse conforme a la estructura de un argumento válido. Los enunciados generales de deber jurídico

---

[209] Véase: R. Badenes Gasset, Metodología del Derecho, Barcelona, Bosch, 1959, pág. 17.

[210] C.A. Varela, op. cit, pág. 86.

> (normas o principios) constituyen la premisa mayor, la descripción de los hechos acaecidos constituye la premisa menor y el contenido de la decisión individual del juez configura la conclusión.[211]

Esta autora añade lo siguiente:

> El argumento judicial debe apoyarse en premisas garantizadas. A su vez, esta idea constituye el corolario de un principio de racionalidad más general, según el cual toda justificación tiene que estar basada en razones a su vez justificadas… El argumento práctico, en el sentido lógico, sólo sirve a un concepto formal de justificación y no garantiza que las premisas constituyan razones sustantivas para la acción… **Por definición, la conclusión sólo estará justificada si las premisas también lo están**[212]

En definitiva, todo nuestro esfuerzo analítico debe dirigirnos a cernir las premisas de nuestros razonamientos de manera que, nutridos por el conocimiento adquirido, podamos honestamente descartar aquellas que no se fundamenten en razones sustantivas. Esto no fue lo que ocurrió al confeccionarse la opinión mayoritaria. Por el contrario, al analizarla a la luz de los elementos enumerados por Redondo encontramos que **la opinión se equivoca al elaborar las premisas mayores de su razonamiento, es decir, las normas de derecho aplicables, según abundaremos más adelante, pero más peligrosamente, se equivoca en cuanto a la función judicial se refiere pues carece de una premisa menor válida, por cuanto descansa en los hechos expuestos en la exposición de motivos de la ley que son, en fin, los hechos alegados por el Estado.** La

---

[211] M.C. Redondo, <u>La noción de razón para la acción en el análisis jurídico</u>, Madrid, Centro de Estudios Constitucionales, 1996, pág. 118.

[212] <u>Íd.</u>, págs. 230-231. Énfasis nuestro.

unión de ambos errores de método tan solo puede llevarnos al error en la decisión. Veamos algunas instancias específicas.

Primero, como ya explicamos, para determinar los hechos relevantes la opinión mayoritaria se sustenta exclusivamente en la exposición de motivos y acepta, sin prueba, que existe una crisis fiscal y un problema de gigantismo gubernamental, así como que no existe otra opción para corregir el déficit estructural del gobierno central, que no sea el despido de empleados públicos y la suspensión de los derechos laborales. Esto, a pesar de que existen diversos informes o documentos que cuestionan estas hipótesis. **En otras palabras, la mayoría de este Tribunal no tomó en consideración posiciones distintas a la adoptada por la Legislatura, porque no hubo oportunidad para recibir y dirimir prueba en un foro de primera instancia o administrativo.**

En concreto, en la parte IV (B) de su opinión, **la mayoría resume y parafrasea las partes de la exposición de motivos de la Ley Núm. 7 de 2009, que aluden a la crisis fiscal.** Específicamente, desglosa los datos sobre el alegado déficit estructural en cuatro subtemas, a saber: las razones para la crisis, consecuencias de la crisis, las alternativas ante la crisis y la solución implantada por la Asamblea Legislativa. **Finalmente, aplica dichos datos, cuya única fuente es la exposición de motivos, y que resultan ser también las alegaciones del Estado, sin examinar prueba que**

**las sustente o las contradiga.**  Este proceso de análisis y razonamiento le lleva a expresiones como las siguientes:

> Las cesantías de los recurridos, junto a las cesantías de miles de empleados, aunque lamentables, provocarán, sin duda alguna, un ahorro real y sustancial en las arcas del gobierno.[213]

> Además, la ley en cuestión presenta un cuadro fiscal de un Gobierno que se encuentra al borde del caos.[214]

> Por otro lado, la eliminación por parte de la Ley Núm. 7 de todos los procesos anteriores a una cesantía que establece la Ley Núm. 184, supra, responde a la necesidad de que el propósito de la ley se alcance de manera apremiante.  Como expresa el Art. 37.04 (b) (1) de la propia ley, existe urgencia en corregir los problemas fiscales que enfrentamos.  El trámite de cesantías que establece la Ley Núm. 184, supra, es uno basado en el principio de méritos, el cual es incompatible con el propósito del Art. 2 de la Ley Núm. 7.[215]

> Ante el cuadro que presenta la propia ley, **y nuestra obligación de adoptar una actitud de gran deferencia hacia la actuación legislativa**, debemos concluir que el Estado actuó razonablemente.[216]

> Por otro lado, y como también se explica en la Exposición de Motivos de la Ley, el establecer medidas impositivas únicamente, tampoco es una alternativa viable.[217]

Segundo, en demasiadas ocasiones la opinión recurre a generalidades para apuntalar su razonamiento. Por ejemplo, expresiones tales como:

---

[213] Opinión del Tribunal, pág. 61.

[214] Íd., pág. 62.

[215] Íd., págs. 61-62.

[216] Íd., pág. 64.  Énfasis nuestro.

[217] Íd., págs. 64-65.

> Nuestro país, y **podríamos afirmar** que el resto del mundo, vive momentos muy convulsos en el aspecto económico y financiero.[218]
> …
> Lamentablemente, **tales despidos se suman a los aproximadamente más de 120,000 empleados en la empresa privada que en los pasados tres años también han perdido sus empleos** en la Isla.[219]
>
> La Ley Núm. 7 declara reiteradamente un "estado de emergencia" en Puerto Rico. **Ésta constituye la primera vez en la historia que nuestra Asamblea Legislativa utiliza el término "estado de emergencia"**, en el contexto de una situación económica a nivel de todo el País.[220]

Debo señalar que también se citan fuera de contexto unas expresiones mías en una opinión disidente en el caso de Asociación de Maestros v. Departamento de Educación, para sostener la conclusión de que tener un interés propietario en un puesto no conlleva el tener un derecho adquirido.[221]

---

[218] Íd., pág. 1. Énfasis nuestro.

[219] Íd., pág. 2. Énfasis nuestro.

[220] Íd., pág. 46. Énfasis nuestro. En ocasiones, se pasa por alto que algunos artículos de la Ley Núm. 7 de 2009 a los que la opinión hace referencia, fueron enmendados. Por ejemplo, el artículo 37.02, que en su versión enmendada excluye de su aplicación a numerosos empleados además de los mencionados en la nota 13, pág. 9 de la Opinión, en virtud de la Ley Núm. 37 de 10 de julio de 2009. Por otro lado, se menciona en el texto de la opinión el artículo 40 de la Ley Núm. 7 de 2009 para establecer que éste dispone que "los convenios expirados a la fecha de vigencia de la ley o que expiren durante la vigencia de ésta, no podrán ser extendidos ni negociados" y que "[e]sta prohibición se extenderá por un término de dos (2) años, a partir de la vigencia de la propia ley". Íd., pág. 23. Este artículo también fue enmendado por la Ley Núm. 37 de 2009, a los efectos de extender los convenios colectivos vencidos, o que vencieran durante la vigencia de la Ley Núm. 7 de 2009, hasta el 9 de marzo del 2011 y prohibir la organización sindical durante ese mismo periodo. **No hay duda de que estos errores son producto de la prisa en decidir el recurso.**

[221] Asociación Maestros v. Educación, 2007 T.S.P.R. 123.

Específicamente, se cita que "no toda situación jurídica que surge al amparo de una ley anterior es un derecho adquirido cobijado por el principio de irretroactividad frente a otra ley posterior".[222]   La Opinión pasa por alto que un interés propietario en un puesto de empleo es algo muy distinto a lo considerado en ese caso, que era una exención del pago de cargos por servicios que disfrutaban unos empleados no afiliados a una unión, al amparo de una legislación posteriormente derogada.[223]

**Tercero, y más preocupante aún, la opinión mayoritaria saca fuera de contexto toda una sección de nuestra Constitución al fundamentar el ejercicio del poder de razón de estado en este caso en la disposición del Artículo II, Sección 18.   Esta sección se refiere, concretamente, al derecho de los trabajadores a la huelga, establecer piquetes y llevar a cabo actividades concertadas y no tiene que ver**

---

[222] Íd..

[223] La controversia de este caso era si la Ley Núm. 96 de 7 de agosto del 2001, que autorizó el cobro por servicio a los empleados que optaran por no afiliarse a la organización sindical, se debía aplicar retroactivamente a estos trabajadores que no se afiliaron cuando estaba vigente la sección 4.2 de la Ley Núm. 45 del 25 de febrero de 1998, conocida como Ley de Relaciones del Trabajo para el Servicio Público, y, que por ejercer tal derecho, no tenían que pagar los cargos por servicios.   Concluí que no constituía un derecho adquirido el que la Ley Núm. 45 de 1998 eximiera del pago de cargos por servicios a los empleados que no se afiliaron a la unión antes de la aprobación de la Ley Núm. 96 de 2001, máxime cuando esos empleados también disfrutan de los beneficios que se pueden obtener mediante la negociación colectiva.   Por lo tanto, se podía aplicar retroactivamente la Ley Núm. 96 de 2001 a estos trabajadores.

**con la facultad de la Asamblea Legislativa para aprobar leyes para atender una crisis fiscal.** Es con relación a la posibilidad de limitar estos derechos laborales que nuestra Constitución reconoce la facultad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia. Esta sección, de la cual la opinión mayoritaria cita tan sólo la última oración, dice lo siguiente:

Sección 18: Derecho a Huelga

A fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales.

Nada de lo contenido en esta sección menoscabará la facultad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad pública, o los servicios públicos esenciales. [224]

Evidentemente, la intención de los constituyentes al aprobar esta sección era, en primer lugar, reconocer el derecho a la negociación colectiva y, en segundo lugar, reconocerle a la Asamblea Legislativa la facultad de aprobar las leyes que fueran necesarias para la protección de la

---

[224] Art. II, sección 18, 1 L.P.R.A. sec. 18.

salud, la seguridad y el bienestar público, cuando se suscitara una emergencia producto de una huelga.[225] En específico, las situaciones de emergencias que preocupaban a los constituyentes eran la privación de alimentos, medicinas y servicios hospitalarios adecuados, la suspensión de luz eléctrica y la transportación y otros perjuicios serios que pudieran ser consecuencia de un estado huelgario.[226]

**Cuarto, la mayoría optó por atender el planteamiento constitucional de estos casos, en contra de los criterios de autolimitación que el Tribunal Supremo de los Estados Unidos estableció en el caso de <u>Ashwander v. Tennessee</u>[227] y que este Tribunal adoptó en el caso de <u>E.L.A. v. Aguayo</u>.[228]** En lo pertinente, esta doctrina de autolimitación dispone:

> …La Corte no se anticipará a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo.
> …La Corte no formulará una regla de derechos constitucional más amplia que la que requieran los hechos precisos a los cuales ha de aplicarse.
> …La Corte no juzgará una cuestión constitucional aunque haya sido sometida propiamente en los autos, si también se somete un fundamento de otra índole que permita disponer del caso.
> …Cuando se cuestione la validez de una ley del Congreso, y aun cuando se suscite una duda seria sobre su constitucionalidad, es un principio cardinal que esta Corte primero se asegurará de si existe una

---

[225] Diario de Sesiones de la Convención Constituyente de Puerto Rico, Puerto Rico, Lexis Nexis, 2003, T. III, pág. 2265. Véase, además, <u>A.A.A v. Unión de Empleados A.A.A.</u>, 105 D.P.R. 437, 452-454 (1976).

[226] Diario de Sesiones de la Convención Constituyente de Puerto Rico, <u>op. cit.</u>, pág. 2266.

[227] <u>Ashwander v. Tennessee</u>, 297 U.S. 288, 346 (1936).

[228] <u>E.L.A. v. Aguayo</u>, 80 D.P.R. 552, 566 (1958).

interpretación razonable de la ley, que le permita soslayar la cuestión constitucional.[229]

Además, tanto el Tribunal Supremo federal como este Tribunal han resuelto enfáticamente que **"la Corte no entenderá en una cuestión constitucional si los autos no son adecuados para hacer una determinación de esa índole"**.[230]

Por último, **la mayoría también decidió acortar el término de 30 días que provee nuestro Reglamento para que cada juez considere de forma sosegada las opiniones circuladas. Incluso, la mayoría no permitió que los jueces y juezas que interesaran escribir opiniones propias utilizaran la facultad que les provee el reglamento de acogerse a un término adicional para ese propósito.**[231]

Discrepo de este curso de acción. Al hacerlo, no pretendo negar la importancia que tiene este recurso y la bondad para el país de que se resuelva prioritariamente. Sin embargo, precisamente por ser un caso de alto interés público que incide de manera trascendental en los derechos laborales y constitucionales de los empleados afectados, era necesario evaluarlo con cuidado y analizarlo desde

---

[229] Sánchez et. al. v. Srio. de Justicia et. al., 157 D.P.R. 360, 386-387 (2002); E.L.A. v. Aguayo, supra, pág. 596, citando Ashwander v. Tennessee, supra, 346.

[230] Sánchez et. al. v. Srio. de Justicia et. al., supra, pág. 387; E.L.A. v. Aguayo, supra, pág. 596, citando Rescue Army v. Municipal Court, 331 U.S. 549, 575 (1946), International Brotherhood v. Denver Milk Producers 334 U.S. 809 (1948); Parker v. Los Angeles, 338 U.S. 327, 329 (1949). Énfasis nuestro.

[231] Cabe señalar que la Regla 5 del Reglamento permite acortar los términos. 4 L.P.R.A. Ap. XXI-A, R. 23.

diferentes perspectivas. El hacerlo no hubiera afectado en nada la situación existente puesto que los empleados recurridos ya fueron despedidos de sus empleos.[232] No obstante, como la mayoría de este Tribunal decidió certificar y consolidar estos casos para atender el asunto constitucional, a pesar de las consideraciones que hemos expuesto y de la ausencia de prueba en el legajo, nos vemos en la obligación de discutir los aspectos constitucionales de esta controversia.

## I.

**Ley Núm. 7 de 9 de marzo de 2009, inconstitucional en su aplicación**

**A. El Interés Propietario es una forma de Derecho Adquirido:**

Los empleados públicos de carrera del gobierno central tienen un interés propietario sobre su puesto, como

---

[232] Distinto a la última vez en que se acortaron los términos, al decidir los casos de Suárez v. C.E.E. I, 163 D.P.R. 347 (2004) y Suárez v. C.E.E. II, 163 D.P.R. 374 (2004), cuando urgía resolver el caso para que se pudiera certificar al gobernador que prevaleció en las elecciones generales y que juramentaría su cargo en poco más de un mes. En aquella ocasión, al igual que ahora, se trataba de una controversia de alto interés público. Sin embargo, la controversia planteada en Suárez era solamente de derecho y no de hechos. Además, en *Suárez* la Comisión Estatal de Elecciones era parte en el caso. También, este caso trataba sobre el derecho fundamental al voto que le otorga nuestra Constitución a todos los puertorriqueños y, por consiguiente, era este Tribunal el llamado a entender inicialmente en esta controversia. Por último, al dictar la sentencia *Per Curiam* de *Suárez* tuvimos el beneficio de una decisión que el tribunal de instancia había tomado en corte abierta.

resultado de las diversas leyes que la Asamblea Legislativa ha aprobado para regir el sistema de administración de recursos humanos de Puerto Rico.[233]   Usualmente, los trabajadores adquieren este interés propietario cuando cumplen con el principio de mérito al momento de su reclutamiento, es decir, al ser elegidos como las personas más idóneas para el puesto y cuando una vez reclutados, concluyen favorablemente el periodo probatorio.[234]

---

[233] En un periodo de 103 años se han aprobado cinco leyes de personal hasta llegar al estatuto que la Ley Núm. 7 de 2009 pretende suspender, la Ley del Sistema de Administración de los Recursos Humanos, Ley Núm. 184 del 3 de agosto de 2004, 2004 (Parte 1) Leyes de Puerto Rico 1122, 3 L.P.R.A. sec. 1462(e)(9)(a).    Véase, además, D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Bogotá, Forum, 2001, págs. 375-376.

[234] Sección 5.6(4) de la Ley del Sistema de Administración de los Recursos Humanos de 2004; 3 L.P.R.A. sec. 1350 (1992 y Supl. 1999).    Véase, además, D. Fernández Quiñones, op. cit., págs. 388-389; M.A. Velázquez Rivera, Derecho Administrativo, 70 Rev. Jur. U.P.R. 271, 279 (2001).

Otra forma de adquirir un interés propietario sobre un puesto, que no sea a través de un estatuto, es cuando las circunstancias del empleo crean una expectativa razonable de continuidad de manera que el trabajador tiene una reclamación legítima, no unilateral, de titularidad sobre el beneficio. S.L.G. Giovanetti v. E.L.A., 161 D.P.R. 492, 506 (2004); Lebrón Bonilla v. E.L.A., 155 D.P.R. 475, 489-490 (2001); Orta v. Padilla, 131 D.P.R. 227, 241 (1992); Pierson Muller I v. Feijoó, 106 D.P.R. 838, 846 (1978); Lupiañez v. Srio de Instrucción, 105 D.P.R. 696, 700-701 (1977).    Sobre el concepto jurídico de expectativa razonable de continuidad, como modalidad de interés propietario, el Tribunal Supremo Federal ha establecido la norma de que no es necesario tener un contrato escrito, o una permanencia basada en un estatuto, para tener un interés propietario sobre el puesto.    Ese derecho propietario puede ser el resultado de un contrato implícito.    No obstante, debe existir un reclamo legítimo de titularidad y no una mera expectativa unilateral a mantenerse en el puesto. Bd. Regents v. Roth, 408 U.S. 564, 577 (1972); Perry v.

Una vez el empleado público de carrera obtiene un interés propietario sobre su puesto "goza de seguridad en el empleo y sólo puede ser destituido por justa causa y previo a ciertos trámites de rigor".[235] Por lo cual, cualquier acción gubernamental que intervenga con este interés propietario tendrá que cumplir con los parámetros establecidos por la cláusula de debido proceso de nuestra Constitución, que tiene sus homólogas en la Constitución de los Estados Unidos.[236]

Atendido lo anterior, la opinión mayoritaria plantea que "no todo derecho o interés propietario es a su vez un derecho adquirido."[237] Sustenta estas expresiones en un caso que es totalmente distinguible de la controversia que está ante nuestra consideración por la naturaleza de los derechos infringidos. Me refiero al caso, citado por la mayoría del Tribunal, de Vélez Reboyras v. Srio de Justicia.[238]

En ese caso, el Sr. José Vélez Reboyras tenía en el pueblo de Utuado un negocio dedicado exclusivamente a las máquinas electrónicas de video-juegos. La Asamblea Legislativa aprobó la Ley Núm. 45 de 4 de junio de 1982, que

---

Sindermann, 408 U.S. 593, 601 (1972). Véase: D. Fernández Quiñones, op. cit., pág. 528.

[235] Camacho v. AAFET, 168 D.P.R. 81, 81 (2006); S.L.G. Giovanetti v. E.L.A., supra, pág. 507.

[236] Orta v. Padilla, supra, pág. 241; Torres Solano v. P.R.T.C., 127 D.P.R. 499, 520, 523 (1990).

[237] Opinión del Tribunal, pág. 74.

[238] 115 D.P.R. 533 (1984).

dispuso que todo establecimiento que se dedicara exclusivamente a las máquinas electrónicas de juegos o máquinas de "Pin Ball" tendría que ubicarse a 200 metros de distancia de las escuelas públicas o privadas. También, dispuso que aquellos negocios de esta naturaleza que ya estuvieran ubicados a menos de 200 metros de las escuelas tendrían que mantenerse cerrados durante el horario escolar. El propósito de la medida era velar por la seguridad y aprovechamiento académico de los niños y jóvenes.

Al evaluar la controversia, este Tribunal determinó que la nueva ley no le quitaba al Sr. Vélez Reboyras su interés propietario o derecho adquirido sobre la propiedad, sino que sólo se le limitaba el horario en el cual podía operar su negocio. Además, la opinión hizo énfasis en que, antes de la aprobación de la Ley Núm. 45 de 1982, no existía legislación específica que confiriera el "derecho" a operar ilimitadamente un establecimiento dedicado exclusivamente a la operación de máquinas de "pin balls".

Este Tribunal reiteró recientemente que "un derecho adquirido es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior."[239] Como señala Albaladejo, no se trata de "meras facultades, expectativas, intereses o

---

[239] Hernández Colón, Romero Barceló v. Policía de Puerto Rico, 2009 T.S.P.R. 154; Consejo de Titulares v. Williams Hospitality, 168 D.P.R. 101, 109 (2006).

esperanzas."[240] Tampoco son facultades que la legislación anterior consentía que fueran ejercidas por los ciudadanos, porque éstas pueden ser alteradas o cambiadas por la legislación posterior.[241]

El término jurídico "derecho adquirido", según definido por el tratadista Suárez Collía, significa:

> …aquellos que son **consecuencia de un hecho idóneo**, al **producirlos en virtud de la ley vigente en el tiempo en que el hecho ha sido realizado, y que se han incorporado al patrimonio de la persona** aun cuando la ocasión de ejercerlos se presente únicamente bajo la ley nueva.[242]

Más concretamente, el autor Santos Briz explica cuáles actos o negocios jurídicos originan un derecho adquirido. Al respecto, expone que:

> …para que pueda hablarse de derechos adquiridos, propiamente tales, es necesario que se trate de situaciones subjetivas, cuya extensión y alcance son determinados por un acto o negocio jurídico, no directamente por ley, que se limita a hacer posible la conclusión de ese acto o negocio (un contrato, por ejemplo). En cambio, las situaciones jurídicas objetivas (por ejemplo, el régimen de la propiedad) pueden ser modificadas por leyes posteriores.[243]

---

[240] M. Albaladejo, Derecho Civil: I. Introducción y Parte General, 11ma ed., Barcelona, Bosh, 1989, Vol. I, pág. 204.

[241] Consejo de Titulares v. Williams Hospitality, supra, pág. 109.

[242] J.M. Suárez Collía, El principio de la irretroactividad de las normas jurídicas, 2da ed., Madrid, Actas, 1994, pág. 55. Énfasis nuestro. Véase, además, L. Diez-Picazo y A. Gullón Ballesteros, Sistema de Derecho Civil, 9na ed., Madrid, Tecnos, 1997, Vol. I, pág. 108; J. Castán Tobeñas, Derecho Civil Español, Común y Foral, 12ma ed., Madrid, Reus, 1982, T. I, Vol. I, pág. 616.

[243] J. Santos Briz, Tratado de Derecho Civil; Teoría y Práctica, T. I, Barcelona, Bosch, 2004, pág. 294. Véase, además, Hernández Colón, Romero Barceló v. Policía de Puerto Rico, supra; Consejo de Titulares v. Williams

Además, este tratadista enfatiza en que una vez se adquiere un derecho, éste no se pierde nunca.  Tan sólo pueden ser sometidos a la nueva ley "los poderes y facultades que de él dimanen, así como la forma y modo de su ejercicio".[244]  **Eso, y no la supuesta distinción entre interés propietario y derecho adquirido, fue lo que sucedió en <u>Vélez Reboyras v. Secretario de Justicia</u>.**[245]

En el caso particular de los empleados públicos de carrera, su interés propietario sobre su puesto fue concedido, en principio, por alguna ley de personal del servicio público vigente al momento de comenzar a laborar para el gobierno.  Sin embargo, este interés propietario fue concretado mediante un contrato de trabajo individual cuando el empleado cumplió con el principio de mérito y terminó el periodo probatorio, porque una vez el empleado cumple con estos dos requisitos se convierte en un trabajador de carrera regular en el servicio público.  Es en ese momento que toda la legislación laboral, reglamentos y manuales se hacen parte del contrato de trabajo que es el negocio jurídico existente entre el Estado, que es el patrono, y el empleado.

Como el interés propietario que un trabajador de carrera regular tiene en su puesto surge de una ley que

Hospitality Group, Inc., supra, pág. 109, donde se hace referencia a esta misma cita.

[244] J. Santos Briz, <u>op. cit.</u>, pág. 294.

[245] <u>Vélez Reboyras v. Secretario de Justicia</u>, supra.

forma parte del contrato laboral, puede establecerse que dicho interés cumple con los requisitos necesarios para ser un derecho adquirido. En efecto, **el interés propietario sobre el puesto es una modalidad de derecho adquirido.**[246] El profesor Miguel Velázquez, citado a otros efectos en la Opinión mayoritaria, expone este principio de la siguiente manera:

> **En términos generales, la diferencia entre el empleado de carrera y el de confianza es que el primero tiene un derecho adquirido. Es decir, un interés propietario en el desempeño permanente de su cargo.** No se le puede despedir, excepto por las causas señaladas por ley, y luego de probarse cargos en su contra.[247]

A pesar de todas estas consideraciones jurídicas, la mayoría se ha mantenido en la posición de que el interés propietario al puesto que tienen los empleados de carrera no es un derecho adquirido. **Esta interpretación se da de bruces con lo resuelto por este tribunal en el caso de Hernández Colón, Romero Barceló v. Policía de Puerto Rico.**[248] En esa ocasión, se estableció que el derecho adquirido de los ex

---

[246] **El análisis que se hace en esta sección de la opinión también aplica a los convenios colectivos. Los miembros de un sindicato tienen un interés propietario o derecho adquirido sobre sus puestos como resultado dual de su contrato de trabajo individual y del convenio colectivo.**

[247] M.A. Velázquez Rivera, supra, pág. 279. Énfasis nuestro. Algunos ejemplos de la jurisprudencia que ha reconocido derechos adquiridos de los trabajadores y retirados del servicio público son: Rodríguez v. Retiro, 159 D.P.R. 467, 475 (2003); Lebrón Bonilla v. E.L.A., supra, pág. 490; Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252, 285 (2000); Rodríguez Díaz v. Autoridad de Puertos, 145 D.P.R. 595, 599 (1998).

[248] Hernández Colón, Romero Barceló v. Policía de Puerto Rico, supra.

gobernadores Hernández Colón y Romero Barceló a tener escoltas en forma vitalicia se produjo porque la interpretación que durante años hizo la Policía de Puerto Rico del artículo 3 de la Ley Núm. 77 de 22 de junio de 1956, conocida como Ley de la Policía, fue avalada por la Legislatura al ésta no enmendar dicho precepto en forma material. Para sostener ese resultado, la mayoría distinguió entre una expectativa y un derecho adquirido. La primera es una facultad que no fue ejercida antes de que se enmendara o derogara la legislación, es más bien una esperanza o probabilidad que puede modificarse. Mientras que el derecho adquirido es aquella facultad que se ejerció antes del cambio de estatuto y a través de ese ejercicio se convirtió en un derecho que se incorporó en el patrimonio del titular, por lo cual está protegido constitucionalmente de cualquier acción gubernamental, incluyendo órdenes ejecutivas.

Argumenta entonces la opinión mayoritaria que como el derecho del empleado sobre su puesto está sujeto a la posibilidad de ser cesanteado, "si se dan unas condiciones y se cumple con unos procesos", no se trata de un derecho adquirido. Este argumento no tiene fundamento jurídico alguno. Es más, contradice todo lo que hemos explicado sobre la figura del derecho adquirido. **¿Cómo es posible que de la interpretación de un artículo de la Ley de la Policía surja un derecho adquirido a escoltas, mientras que ante la existencia de toda nuestra legislación laboral y el contrato de trabajo individual se argumenta que sólo surge un interés**

**propietario, pero no un derecho adquirido?** Hemos explicado que una ley puede limitar la forma y el modo del ejercicio de un derecho adquirido. Lo que no permite nuestro ordenamiento jurídico es eliminarlo sin un debido proceso de ley. Por consiguiente, **el fundamento de la mayoría es equivocado y los empleados públicos de carrera poseen un derecho adquirido sobre sus puestos.**

El cuestionamiento que resta por dilucidar es si la Ley Núm. 7 de 2009, que resulta ser una ley posterior a la legislación laboral y a los contratos de trabajo individual y colectivo, puede aplicarse en forma retroactiva para socavar el derecho adquirido que los empleados de carrera tienen en su puesto.

Como regla general, en nuestro ordenamiento prevalece el principio de la irretroactividad de las leyes. Éste es de origen civilista y se rige por los siguientes parámetros:

> **Las leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario.**
> **En ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior.**[249]

De acuerdo a Suárez Collía, la retroactividad implica la "aplicación de la norma jurídica a supuestos de hechos, actos, relaciones jurídicas y/o situaciones constituidas con anterioridad al inicio de su vigencia formal".[250] La finalidad de este principio es proveer, primero, seguridad

---

[249] Artículo 3 del Código Civil, 31 L.P.R.A. sec. 3. Énfasis nuestro.

[250] J.M. Suárez Collia, op.cit., pág. 10.

jurídica y confianza en la efectividad de las leyes vigentes y,[251] segundo, reconocer una justificación de moral humana basada en los principios de libertad individual que garantizan a los ciudadanos el poder actuar sin obstáculos dentro del margen de la ley.[252] Por último, el principio de irretroactividad de las leyes responde a la psicología colectiva que proclama que las leyes deben mirar al porvenir y no al pasado.[253]

A pesar de lo señalado, esta regla de irretroactividad no es absoluta.[254] Así se puede percibir del propio precepto, cuando dispone que para que una legislación posterior aplique retroactivamente tiene que el legislador haberlo establecido expresamente en su texto. No obstante, además de la excepción que provee la cláusula, se ha establecido que la retroactividad de una ley también puede surgir de forma implícita, a través del estudio de la intención legislativa.[255] Claro está, siempre que esta intención surja

---

[251] Vázquez v. Morales, 114 D.P.R. 822, 826 (1983), citando a M. Albaladejo, Comentarios al Código Civil y compilaciones forales, Madrid, Ed. Rev. de Derecho Privado, 1978, T. I, pág. 75; Véase, además, J.M. Suárez Collia, op.cit., págs. 42-57.

[252] Vázquez v. Morales, supra, pág. 826, citando a F. Puig Peña, Compendio de Derecho Civil Español, 3ra ed., Madrid, Pirámide, 1976, T. I, Parte General, pág. 125.

[253] Íd..

[254] Warner Lamber v. Tribunal Superior, 101 D.P.R. 378, 386 (1973).

[255] Consejo de Titulares v. Williams Hospitality, supra, pág. 168; Rodríguez v. Retiro, supra, 476; Nieves Cruz v. U.P.R., 151 D.P.R. 150, 158-159 (2000); Vélez Reboyras v. Srio. de

en forma clara y definitiva del texto y el historial legislativo del estatuto.[256]

Sin embargo, una limitación específica y significativa al efecto retroactivo de una ley, se origine éste de manera expresa o tácita, es que la retroactividad no podrá afectar los derechos que las partes adquirieron como resultado de un estatuto anterior.[257] En otras palabras, **ante un derecho adquirido no puede activarse la excepción de la retroactividad de las leyes.**

**Como se ha establecido que los empleados tienen un derecho adquirido sobre su puesto, la Ley Núm. 7 de 2009 no puede aplicarse en forma retroactiva. Sus efectos sólo pueden ser prospectivos. Resolver lo contrario sería eliminar súbitamente todos los derechos adquiridos que los empleados públicos de carrera han obtenido mediante la ley, el contrato de trabajo individual y los convenios colectivos.**

## B. Menoscabo de Obligaciones Contractuales

Nuestra ley suprema contiene una cláusula que limita la facultad de la Asamblea Legislativa para aprobar estatutos que menoscaben las obligaciones contractuales existentes. El

---

*Justicia*, supra, 542; <u>Warner Lambert v. Tribunal Superior</u>, supra, pág. 386.

[256] <u>Asociación Maestros v. Educación</u>, supra; <u>Vargas v. Retiro</u>, 159 D.P.R. 248, 263-264 (2003).

[257] <u>Consejo de Titulares v. Williams Hospitality</u>, supra, págs. 108-109.

texto de ese precepto dispone que "no se aprobarán leyes que menoscaben las obligaciones contractuales".[258] También la Constitución de los Estados Unidos contiene una disposición análoga que establece lo siguiente: "No state shall... pass any... law impairing the obligations of contracts...".[259]

El origen de nuestra cláusula fue el artículo 2 de la Ley Jones de 1917, específicamente sus párrafos primero y quinto.[260] Se decidió incorporar a nuestra Constitución esta norma, sin enmiendas, porque los asesores de la Convención Constituyente lo recomendaron para evitar que se originaran malas interpretaciones que perjudicaran "las medidas encaminadas a traer inversiones y fomentar la producción en todos sus aspectos."[261]

**El propósito de esta disposición es asegurar la estabilidad en las relaciones contractuales porque se consideran un valor social importante que requiere la protección de nuestro ordenamiento.** Menoscabar las obligaciones contractuales implicaría modificar las consecuencias legales de lo pactado, en perjuicio de una de las partes contratantes. En otras palabras, no existiría

---

[258] Artículo II, sección 7, Const. E.L.A., 1 L.P.R.A. sec. 7.

[259] Artículo I, sección 10, Const. E.U., 1 L.P.R.A. sec. 10.

[260] J. Trías Monge, Historia Constitucional de Puerto Rico, 1ra ed., Río Piedras, Editorial de la Universidad de Puerto Rico, 1982, Vol. III, págs. 187; R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, Lillington, Edward Brothers, 1988, Vol. II, págs. 858-859.

[261] Raúl Serrano Geyls, op. cit., págs. 858-859.

certeza de lo pactado; no habría fundamento racional para los actos o negocios jurídicos. Tal situación, provocada por la acción legislativa, resultaría en la desconfianza de las partes contratantes y en la desestabilización de la sociedad.[262]

Sin embargo, este principio de protección de las obligaciones contractuales no es absoluto porque tiene que ser balanceado con el poder de reglamentación del Estado.[263] Es decir, debe existir una relación consistente entre la búsqueda de certeza en las contrataciones que persigue la limitación constitucional y la excepción a la norma, fundamentada en el poder que tiene el Estado para reglamentar medidas que salvaguarden el bienestar de la

---

[262] *Warner Lambert v. Tribunal Superior*, supra, pág. 395. Similar finalidad tenía la cláusula homóloga en la Constitución federal:

> In the construction of the contract clause the debates in the Constitutional convention are of little aid. But the reasons which led to the adoption of the clause, and of the other provision of section 10 of article 1, are not left in doubt…The widespread distress following the revolutionary period and the plight of debtors had called forth in the States an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations. Legislative interferences had been so numerous and extreme that the confidence essential to prosperous trade had been undermined and the utter destruction of credit was threatened… It was necessary to interpose the restraining power of a central authority in order to secure the foundations even of "private faith"… *Home Building & Loan Assn. Blaisdell*, 290 U.S. 398, 423 (1934).

[263] Véase: *Beer Co. v. Massachusetts*, 97 U.S. 25 (1878), *Louisville Gas, Co. v. Citizen's Gas Co.*, 115 U.S. 685 (1883), *Contributors to Pennsylvania Hospital v. Philadelphia*, 245 U.S. 20 (1917), *Treigle v. Acme Homestead Asso.*, 297 U.S. 189 (1936).

sociedad.[264] De lo contrario, se perdería el objetivo de las garantías constitucionales de proteger al ciudadano en contra de las actuaciones arbitrarias e irrazonables sostenidas bajo el palio del poder soberano del Estado.

Es imperativo reconocer que no todo menoscabo contractual viola la garantía constitucional.[265] Al analizar si un estatuto viola la cláusula de menoscabo de obligaciones contractuales es necesario referirnos a la interpretación que el Tribunal Supremo de Estados Unidos ha realizado de este precepto, puesto que ésta representa el mínimo de protección que nuestro ordenamiento le puede proveer a los ciudadanos.[266] Claro está, siempre considerando que "nuestra Constitución tiene una factura más ancha que la Constitución federal con respecto a derechos tales como la prohibición del menoscabo de obligaciones contractuales".[267]

La jurisprudencia ha elaborado un análisis para determinar si una legislación es inconstitucional, a la luz de la cláusula de menoscabo de las obligaciones contractuales. El primer paso en este análisis conlleva identificar el tipo de relación contractual afectado, en

---

[264] United States Trust Co. v. New Jersey, 431 U.S. 1, 21 (1977); Home Building & Loan Assn. Blaisdell, supra, pág. 439.

[265] Bayrón Toro v. Serra, 119 D.P.R. 605, 619 (1987); United States Trust Co. v. New Jersey, supra, pág. 16; El Paso v. Simmons, 379 U.S. 497, 506-507 (1965).

[266] Bayrón Toro v. Serra, supra.

[267] Emp. Pur. Des. Inc. v. HIETEL, 150 D.P.R. 924, 948 (2000).

términos de si el contrato es estrictamente entre partes privadas o si el Estado es una de las partes contratantes.[268] El segundo paso es evaluar si la modificación que la medida legislativa provocó en el contrato es sustancial o severa.[269]

En el caso de los contratos privados, el tercer paso requiere examinar si el interés que persigue el gobierno con el estatuto es legítimo, como lo sería si la medida tuviera la finalidad de resolver un problema económico o social general.[270]  Finalmente, se utiliza un criterio de razonabilidad para evaluar si existe una relación razonable entre el interés del Estado y el medio seleccionado para lograrlo. Se trata de "un balance razonable entre el interés social de promover el bien común y el interés, también social, de proteger las transacciones contractuales contra la aplicación arbitraria e irrazonable de las leyes".[271] Respecto a la evaluación de razonabilidad de una ley, el Tribunal Supremo federal le ha conferido deferencia al

---

[268] Bayrón Toro v. Serra, supra, pág. 620; United States Trust Co. v. New Jersey, supra, pág. 17.

[269] Energy Reserves Group, Inc. v. Kansas Power Light Co., 459 U.S. 400, 411 (1983); Warner Lambert v. Tribunal Superior , supra, pág. 401.

[270] United States Trust Co. v. New Jersey, supra, pág. 22; Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 247, 249 (1978).

[271] Bayrón Toro v. Serra, supra, pág. 620; Warner Lambert v. Tribunal Superior, supra, pág. 395.

juicio legislativo.[272] Como se puede observar, el rigor analítico en los contratos privados es similar al escrutinio racional de debido proceso de ley e igual protección de las leyes.[273]

**Sin embargo, el escrutinio adoptado por nuestra jurisprudencia, siguiendo las pautas de la jurisprudencia federal, para verificar la constitucionalidad del estatuto que modifica un contrato público, en el cual el Estado es una de las partes contratantes, es de otro tipo.** En esos casos, en Estados Unidos se utiliza un criterio de análisis intermedio que nuestra jurisprudencia ha denominado "cuidadoso".[274] **La idea es que en estos casos no es suficiente descansar en el criterio de la razonabilidad pues hay que evitar que la actuación del Estado sea en su propio beneficio.[275]** Una vez identificado el tipo de relación contractual como gubernamental, el segundo paso es evaluar la severidad del menoscabo. Cuando el daño producido por el menoscabo de las relaciones contractuales es severo, se aumenta el nivel de escrutinio a un examen cuidadoso de la

---

[272] East New York Savings Bank v. Hahn, 326 U.S. 230, 232 (1945), citado en United States Trust Co. v. New Jersey, supra, págs. 22-23.

[273] Warner Lambert v. Tribunal Superior, supra, pág. 395.

[274] Este análisis es similar al escrutinio intermedio utilizado en la jurisprudencia federal para clasificaciones semi sospechosas como lo es discrimen por género. Véase: Craig v. Boren, 429 U.S. 190 (1976).

[275] Bayrón Toro v. Serra, supra, pág. 620; United States Trust Co. v. New Jersey, supra, págs. 25- 26.

naturaleza y propósito de la legislación estatal.[276] El tercer paso es determinar si existe un interés gubernamental importante.[277] Se ha establecido que esta determinación no pueden tomarla los estados, porque si éstos pudieran justificar el menoscabo de sus obligaciones contractuales a partir de su propia determinación de lo que es importante, entonces la cláusula constitucional no tendría valor alguno.[278]

A diferencia de los contratos privados, **la modificación en los contratos públicos debe ser necesaria, además de razonable**.[279] Para determinar la razonabilidad de una ley se considera "la sustancialidad del interés público promovido por el mismo, y la dimensión del menoscabo ocasionado por su aplicación retroactiva".[280] Un factor para determinar esta razonabilidad es la extensión del menoscabo y la existencia de una emergencia declarada.[281] Por otro lado, la necesidad se establece tomando en consideración dos criterios: (1) si la medida legislativa era esencial y (2) si no existían

---

[276] Energy Reserves Group, Inc. v. Kansas Power & Light, Co., supra, pág. 411; Allied Structural Steel Co. v. Spannaus, supra, pág. 261.

[277] Bayrón Toro v. Serra, supra, pág. 621; United States Trust Co. v. New Jersey, supra, pág. 21.

[278] United States Trust Co . v. New Jersey, supra, pág. 26.

[279] Bayrón Toro v. Serra, supra, pág. 620.

[280] Warner Lambert v. Tribunal Superior, supra, pág. 396.

[281] United States Trust Co . v. New Jersey, supra, págs. 15, 23.

otras alternativas menos onerosas y dañinas para lograr el objetivo del estatuto.   Utilizando este análisis, **la jurisprudencia federal ha determinado que el Estado no puede imponer medidas drásticas cuando existe evidencia de otros cursos de acción más moderados y que, igualmente, pueden satisfacer el interés del Estado.** Específicamente, en el caso medular sobre este asunto el Tribunal Supremo federal concluyó:

> The determination of necessity can be considered on two levels. First, it cannot be said that total repeal of the covenant was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the covenant's limitations on the use of Port Authority revenues and reserves to subsidize commuter railroads.   Second, without modifying the covenant at all, the States could have adopted alternative means of achieving their twin goals of discouraging automobile use and improving mass transit. Appellees contend, however, that choosing among these alternatives is a matter for legislative discretion. **But a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives.  Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.**[282]

También ha señalado el Tribunal Supremo federal que, a diferencia del menoscabo de los contratos privados, **cuando se quebranta un acuerdo público no se otorga completa deferencia al análisis de razonabilidad y necesidad que pueda haber realizado la Legislatura.** La razón es evidente: existe un conflicto de interés, **pues si se otorga deferencia**

---

[282] United States Trust Co . v. New Jersey, supra, págs. 30-31. Énfasis nuestro.

**a la legislatura en este contexto el Estado terminaría siendo juez y parte.**[283]

A pesar de esta clara directriz del más alto foro federal, la opinión mayoritaria trata de justificar lo contrario, fundamentándose en jurisprudencia de los tribunales federales apelativos. Esto, sin duda, es un error metodológico, porque las decisiones de esos tribunales son meramente persuasivas, mientras que las interpretaciones de la Constitución federal que hace el Tribunal Supremo de Estados Unidos nos obligan.

Además, las decisiones de los tribunales federales de circuito que utiliza la mayoría no sostienen sus conclusiones. Estos casos afirman que se le debe conceder al Estado "alguna deferencia", mientras la opinión mayoritaria le concede una deferencia completa y obvia totalmente el posible conflicto de interés. Ya explicamos que la opinión de este Tribunal fundamenta su determinación, exclusivamente, en la exposición de motivos de la Ley Núm. 7 de 2009, sin que haya en el expediente alguna evidencia que pruebe lo contenido en ésta. Este Tribunal ha tenido ocasión de expresarse anteriormente sobre esto:

> Nos merecen profundo respeto las declaraciones legislativas sobre los males sociales que el legislador intenta remediar. **Pero tales expresiones deben estar**

---

[283] Energy Reserves Group, Inc. v. Kansas Power & Light, Co., supra, págs. 412-413; United States Trust Co . v. New Jersey, supra, pág. 26.

**fundadas en hechos de conocimiento general y no constituir un mero fíat legislativo.[284]**

Ciertamente, el Estado debe tener libertad para ejercer su poder de reglamentación y de esta forma, proteger los intereses de los ciudadanos y salvaguardar el bien común. **Dicho poder, sin embargo, no es absoluto. Tampoco puede ser arbitrario ni irrazonable. La cláusula de menoscabo de obligaciones contractuales limita ese legítimo ejercicio del poder legislativo, especialmente en los contratos públicos.** El poder inherente del Estado de proteger el bienestar público le permite al gobierno quebrantar una obligación contractual pública, siempre y cuando no la destruya o la afecte de forma severa.[285] Cuando esto último ocurre, y no se pueda establecer la razonabilidad y necesidad del estatuto, la limitación constitucional de la cláusula de menoscabo de obligaciones contractuales puede superar la facultad de legislar que tiene la Asamblea Legislativa, irrespectivamente de que se persiga proteger un interés público que el Estado ha determinado importante.[286]

Una de las controversias planteadas ante este Tribunal es que la Ley Núm. 7 de 2009 es inconstitucional porque

---

[284] Warner Lambert v. Tribunal Superior, supra, pág. 398. Énfasis nuestro.

[285] United States Trust Co . v. New Jersey, supra, pág. 22.

[286] "Yet the *Contract Clause* limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation." United States Trust Co. v. New Jersey, supra, págs. 21-22; Home Building & Loan Assn. Blaisdell, supra, pág. 439.

viola la cláusula de menoscabo de las obligaciones contractuales. De entrada hay que establecer que el escrutinio que se debe utilizar para evaluar este planteamiento es el más cuidadoso, porque se trata de contratos donde el gobierno es parte. **Contrario a la mayoría, que evalúa esta controversia desde la óptica de los contratos colectivos, es decir, los convenios, entiendo que el análisis sobre el menoscabo debe incluir, también, a los contratos individuales.**

Sin duda, **existe una obligación contractual entre las respectivas agencias del gobierno central y sus empleados.** Sólo es necesario repasar la definición del contrato de trabajo para llegar a esta conclusión. Así lo expone Caballenas de Torres al referirse al contrato de trabajo como aquel "que tiene por objeto la prestación continuada de servicios privados y con carácter económico, y por el cual una de las partes-el patrono, empresario o empleador-da remuneración o compensa a cambio de disfrutar o servirse, bajo su dependencia o dirección, de la actividad profesional de otra, denominada el trabajador".[287] **También hay un contrato público entre las agencias y los sindicatos que representan a los trabajadores.** En ambos casos existen contratos firmados, ya sean individuales o colectivos, donde se establecen las condiciones de trabajo, los salarios y los

---

[287] G. Caballenas de Torres, Diccionario de Derecho Laboral, Argentina, Heliasta S. R. L., 2001, págs. 139-140; Véase, además, Soc. de Gananciales v. Vélez & Asoc., 145 D.P.R. 508, 517 (1998).

derechos y obligaciones de cada parte. Antes de la aprobación de la Ley Núm. 7 de 2009 estos contratos estaban cobijados por las leyes de personal del servicio público, Ley Núm. 184 de 2004, y la ley de relaciones del trabajo, Ley Núm. 45 de 1998, entre otra legislación laboral del país.

**En el caso de los contratos individuales de trabajo, el menoscabo que provocó la Ley Núm. 7 de 2009 fue severo. En concreto, esta legislación terminó totalmente y por tiempo indefinido la obligación contractual existente con los empleados. Como resultado de las cesantías masivas, miles de empleados se quedaron sin sus empleos.** Además, la ley limitó la jurisdicción apelativa de la Comisión de Apelaciones para el Sistema de Administración de Recursos Humanos (CASARH), de manera que ésta sólo pudiera revisar casos que plantearan asuntos de antigüedad.[288] Más concretamente, **se dejó inoperante el principio de mérito y se afectó el funcionamiento del Sistema de Administración de Personal del Servicio Público.**[289]

**Respecto al menoscabo que causa esta legislación en los convenios colectivos, se puede establecer que también es severo** porque:[290] (1) afecta la integridad del convenio

---

[288] Ley Núm. 7 de 9 de marzo de 2009, Artículos 37.04 (b) y 46.

[289] Ley Núm. 7 de 9 de marzo de 2009, Artículo 37.04.

[290] Ley Núm. 7 de 9 de marzo de 2009, Artículo 37.04 (a)(2)(5)(6)(8)(9)(10)(11). El impacto de este artículo, en términos de la legislación laboral, es sumamente amplio

colectivo; (2) limita los mecanismos para proteger a los miembros y solucionar las controversias, de manera que se pueda proveer la justa representación a la que están obligados los sindicatos; (3) no se reconoce lo que está negociado colectivamente; (4) no se puede negociar colectivamente; (5) no se puede organizar sindicalmente;[291] (6) la jurisdicción de los foros administrativos encargados de tramitar las querellas de los trabajadores se limita a

porque dispone que "… se suspenderá toda cláusula, **precepto** y/o disposición aplicable a los empleados y/o puestos sujetos a las disposiciones de este Capítulo III, contenidas en las leyes, convenios colectivos,…". En cuanto al concepto "precepto", esta misma ley lo define, en su artículo 33, como:

> **"Precepto"** significa leyes, artículo o sección de ley; convenio colectivo o disposiciones contenidas en convenios colectivos, acuerdos, acuerdos suplementarios, políticas, manuales de empleo, cartas circulares, cartas contractuales, certificaciones, addenda, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación y/o planes de retribución. Ley Núm. 7 de 9 de marzo de 2009, Artículo 33(k).

Para ver un ejemplo concreto del impacto que tiene la Ley Núm. 7 de 2009, detallamos algunas de las secciones del Convenio Colectivo Departamento de la Familia y Servidores Públicos Unidos de Puerto Rico, Unidad A, 2007-2010, que han quedado suspendidas: Artículo II: Declaración de Principios, Artículo III: Exposición de Motivos, Artículo VII: Mantenimiento de las Condiciones de Empleo, Artículo VIII: Subcontratación, Artículo IX: Acuerdo de no discrimen, Artículo XII: Procedimiento de Quejas y Agravios, Artículo XIX: Clasificación y Retribución de Puestos, Artículo XX: Reclutamiento y Selección, Artículo XXII: Ascensos, Artículo XXIV: Traslados, Artículo XXVII: Cesantías. Convenio Colectivo Departamento de la Familia y Servidores Públicos Unidos de Puerto Rico, Unidad A, 2007-2010, Autos de Instancia CT-2009-6, Anejo 4, págs. 5-6, 9-10, 12-16, 22-24, 26, 28-33.

[291] Sección 44 de la Ley Núm. 37 de 2009 que enmienda el Artículo 40 de la Ley Núm. 7 de 2009.

resolver controversias de antigüedad;[292] (7) se limita el alcance de la Ley de Relaciones del Trabajo para el Sector Público, Ley Núm. 45 del 1998, lo que afecta el Sistema de Relaciones Laborales en el Gobierno Central; (8) suspende los controles legales y normativos sobre las cesantías que establece la Ley Núm. 184 de 2004 y se sustituye por el desarrollado en la Ley Núm. 7 de 2009[293] y (9) permite y promueve que se alteren las condiciones de empleo y los beneficios económicos sin negociar, incluyendo el traslado de los empleados y la subcontratación de los servicios.[294]

La administración gubernamental ha justificado la aprobación de la Ley Núm. 7 de 2009, que incluye medidas tan drásticas como el despido masivo de empleados públicos con contratos vigentes, basándose en que la economía de Puerto Rico atraviesa una grave crisis fiscal. De acuerdo con la administración existe un déficit estructural recurrente de $3,200 millones en las finanzas del gobierno, que no le permite cubrir sus gastos operacionales y que, a su vez, mantiene el crédito de Puerto Rico en condición de chatarra.[295] Ante ese panorama, el gobierno optó por aprobar un plan de estabilización, la denominada Ley Núm. 7 de 2009, en el cual se incorporan y justifican medidas de ingresos y

---

[292] Ley Núm. 7 de 9 de marzo de 2009, Artículos 37.04 b (13)(14) y Artículo 46 a y b.

[293] Ley Núm. 7 de 9 de marzo de 2009, Artículo 38.02 a (16).

[294] Ley Núm. 7 de 9 de marzo de 2009, Artículo 38.02 a (16).

[295] Exposición de Motivos de la Ley Núm. 7 de 2009, pág. 3.

mejor fiscalización, control y reducción de gastos y otros mecanismos fiscales.

El interés del gobierno en restablecer las finanzas es importante porque posibilita el proveer los servicios públicos necesarios a toda la sociedad. Sin embargo, al aplicar el análisis que nuestra jurisprudencia ha denominado "cuidadoso" no podemos menos que cuestionar la razonabilidad de la medida de despidos masivos adoptada por la ley. **Salta a la vista que el Estado no ha probado la situación de emergencia en la cual sustenta la aprobación de la Ley Núm. 7 de 2009, más allá de la información que se incluye en su exposición de motivos, y no se ha permitido la presentación de prueba en contrario. Segundo, tampoco es razonable que la alegada crisis fiscal se trate de atender en el corto período de un año. Tercero, no es razonable pensar que, en términos de los cesanteados, el daño no es permanente, cuando también se alega y hay estudios que recomiendan otras opciones más moderadas.[296]**

---

[296] Véanse, por ejemplo, J. E. Rivera Santana, <u>Análisis de la situación económica fiscal</u>, Sindicato Puertorriqueño de Trabajadores (SPT), 2009; Presentación: <u>Ante la Crisis Presupuestaria</u>, Central Puertorriqueña de Trabajadores, 2 de enero de 2009; Presentación: <u>Propuestas Sector Sindical: Medidas ante la crisis fiscal</u>, 7 de enero de 2009; <u>Propuesta al Departamento de Educación</u>, Sindicato Puertorriqueño de Trabajadores-Local 1996, febrero de 2007; <u>Nuevo Modelo Organizativo para la Rama Ejecutiva: Proyecto de Reforma Gubernamental</u> Escuela Graduada de Administración Pública de la Universidad de Puerto Rico, julio de 2009; <u>Sindicatos 2009. Estrategias frente a la Crisis Mundial, el Multilateralismo y los Acuerdos Comerciales y de Inversión</u>, Brasil, Museo Amano, 2009.

**A pesar de lo señalado, la mayoría pretende justificar el despido masivo de empleados públicos y la duración del impacto de la Ley Núm. 7 de 2009, aludiendo a casos del segundo y cuarto circuito federal que resultan ser poco persuasivos, porque atienden hechos distintos a los que suscitan la controversia que está ante nuestra consideración.** Primero, en el caso Buffalo Teachers Fed. v. Tobe,[297] la emergencia fiscal de la ciudad fue atendida congelando puestos y no concediendo aumentos. Esto significa que no se modificó severamente y, ciertamente, no se eliminó del todo, la relación contractual existente entre los empleados públicos y el patrono. Los salarios de los trabajadores no se afectaron con las medidas fiscales. Tampoco se quedaron sin trabajo, o sea, sin su único medio de subsistencia. Además, las acciones tomadas fueron **temporeras** y **prospectivas.**[298]

El otro caso que cita la mayoría para validar su apreciación de que la Ley Núm. 7 de 2009 es razonable, es el caso de Baltimore Teachers Union v. Mayor and City Council.[299] La controversia que resuelve el tribunal apelativo del 4to Circuito también es distinta a nuestro caso. En Baltimore el déficit fiscal de la ciudad se enfrentó reduciendo en 1% el salario de policías y maestros.

---

[297] Buffalo Teachers Fed. v. Tobe, 464 F. 3d. 362 (2nd Cir. 2006).

[298] Íd., pág. 371.

[299] Baltimore Teachers Union v. Mayor and City Council, 6 F. 3d 1012 (4th Cir. 1993).

El resultado de esta acción administrativa fue reducir la jornada laboral en 2.5 días. Claramente, esta actuación es menos onerosa que la que tomó el gobierno de Puerto Rico. En su ponderación de los hechos, el tribunal del circuito apelativo tuvo ante su consideración un expediente con prueba suficiente para poder evaluar la correlación de razonabilidad entre las medidas tomadas y la necesidad fiscal. Esto para efecto de determinar si hubo una violación a la cláusula de menoscabo de las

obligaciones contractuales. Concretamente, el tribunal apelativo expresó:

> Nor…can we conclude that the City chose a drastic impairment over an equally acceptable, more moderate course. First, the amount of the reduction was no greater than that necessary to meet the anticipated shortfall… Second, the city discontinued the plan immediately upon recognition that the budgetary shortfall would not be so great as anticipated… Finally, the plan did not alter pay-dependent benefits, overtime pay, hourly rates of pay, or the orientation of pay scales… Indeed, the plan was less drastic than at least one alternative, additional layoffs, which could have been more detrimental to appellees… In short, the City clearly sought to tailor the plan as narrowly as possible to meet its unforeseen shortfalls.[300]

**Al aplicar los criterios del escrutinio "cuidadoso" o intermedio que es el correcto en este caso, es evidente que, en efecto, la Ley Núm. 7 de 2009 menoscabó los contratos individuales de los trabajadores y los convenios colectivos acordados con el representante exclusivo.** Este estatuto suspendió todo el sistema de administración de personal del servicio público, que establece la Ley Núm. 184 de 2004 y sus predecesoras, y la normativa de relaciones laborales del sector público, cobijada por la Ley Núm. 45 del 1998.

No se puede llegar a otra determinación porque el Estado no evidenció la existencia de la crisis ni la razonabilidad de la medida, a pesar de que la mayoría trata de hacerlo a través de su extensa referencia a la exposición de motivos. Tampoco el gobierno validó la necesidad de la medida con relación a otras opciones menos drásticas. **En fin, todo esto es la consecuencia inevitable y directa de**

---

[300] Íd., supra, págs. 1020-1021.

**certificar los casos sin que se hubiera presentado prueba ante el tribunal de instancia, o los foros administrativos, para sustentar las alegaciones de las partes.**

## C. Debido Proceso de Ley Procesal

Como quedó establecido en la Parte III (A) de esta opinión, los empleados regulares de carrera del sector público tienen un interés propietario, es decir, un derecho adquirido, sobre sus puestos. Ante ese hecho, y ante la acción del ente gubernamental para afectar ese derecho propietario, se activa la cláusula de debido proceso de ley. Concretamente, este Tribunal ha establecido que "[e]l debido proceso de ley procesal tiene vigencia en las situaciones en que el empleado goza de un interés propietario o tiene una expectativa razonable de titularidad de propiedad".[301] **Por tanto, visualizando la cesantía como una modalidad de despido, si a un empleado se le deja cesante sin dársele la oportunidad de ser oído, se le viola el derecho a un debido proceso de ley.[302]**

Esta garantía a un debido proceso de ley cuando se priva a una persona de su propiedad o libertad, está incluida en la Carta de Derechos de nuestra Constitución y es parte integral de nuestro sistema de gobierno. Al respecto, el precepto constitucional establece:

---

[301] Villanueva v. Mun. de San Juan, 2009 T.S.P.R. 103; D. Fernández Quiñones, op. cit., pág. 375.

[302] Lupiañez de González v. Srio. de Instrucción, 105 D.P.R. 696, 701 (1977).

> Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. No existirá la pena de muerte. **Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley**, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. No se aprobarán leyes que menoscaben las obligaciones contractuales. Las leyes determinarán un mínimo de propiedad y pertenencias no sujetas a embargo.[303]

Esta cláusula incluye el principio más importante del derecho constitucional norteamericano, un principio que ha formado parte de la historia del derecho humano desde su incorporación inicial en la Magna Carta. Su objetivo, desde siempre, ha sido velar porque se respeten los procedimientos y se provean las "garantías básicas de los derechos personales en su forma más amplia y general."[304] En fin, esta norma constitucional simboliza la esencia de nuestro sistema de justicia y refleja nuestra vida en sociedad y el grado de civilización alcanzado.[305]

La garantía constitucional a un debido proceso de ley tiene dos consideraciones en su análisis y en su aplicación. Estas se han caracterizado como dos vertientes, por un lado, la procesal y, por el otro, la sustantiva.[306] La primera tiene la finalidad de garantizar un proceso justo y

---

[303] Artículo II, sección 7, Const. E.L.A., 1 L.P.R.A. sec. 2. Esta cláusula tiene su homóloga en la Constitución de los Estados Unidos, específicamente en las Enmiendas V y XIV. Énfasis nuestro.

[304] Diario de Sesiones de la Convención Constituyente de Puerto Rico, op. cit., T. 2, pág. 1104.

[305] López y otros v. Asoc. de Taxis de Cayey, 142 D.P.R. 109, 113 (1996).

[306] Rivera v. Lee Stowell, 133 D.P.R. 881, 888 (1993).

equitativo ante acciones estatales que interfieran con intereses privados. Es decir, se refiere a las "pautas procesales que la entidad pública debe reconocer a las personas, independientemente de si por ley o reglamento esas pautas se reconocen".[307]  Mientras, la segunda se refiere a la validez de las leyes que implementa el Estado en cuanto a su protección de los derechos de los ciudadanos.[308] Esto significa que el Estado no puede afectar arbitraria, irrazonable o caprichosamente, mediante estatutos o actuaciones administrativas, los intereses de propiedad o libertad de las personas.[309]  Ninguna de estas modalidades de la cláusula de debido proceso de ley pueden ser invocadas sino se cumple con el requisito de acción estatal.[310]

Bajo la vertiente procesal del debido proceso de ley, que es la pertinente en este caso, son tres las consideraciones que se examinan para determinar si en efecto se ha violentado esta cláusula constitucional. Éstas pueden resumirse en tres interrogantes: (1) ¿qué intereses de libertad o propiedad están protegidos por el precepto?

---

[307]  Bd. Regents v. Roth, supra, pág. 576; J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos: Casos y Materiales, Bogotá, Temis, 2009, pág. 608.

[308]  Villanueva v. Mun. de San Juan, supra; Almonte et. al. v. Brito, 156 D.P.R. 475, 481 (2002); U. Ind. Emp. A.E.P. v. A.E.P., 146 D.P.R. 611, 616 (1998).

[309]  Hernández v. Secretario, 164 D.P.R. 390, 394-395 (2005); McConell v. Palua, 161 D.P.R. 734, 757-758 (2004); Rivera v. Lee Stowell, supra, pág. 887; Rivera v. Srio. de Hacienda, 119 D.P.R. 265, 273-274 (1987).

[310]  D. Fernández Quiñones, op. cit., pág. 315.

(2)¿en qué etapa se debe conceder el debido proceso? y (3) ¿cuáles características debe tener el procedimiento que se utilice para afectar, de algún modo, ese interés, de manera que éste pueda ser el adecuado?[311] Si no se logra superar el primer cuestionamiento entonces el Estado no tiene la obligación de garantizar el debido proceso de ley.[312]

Como regla general, el debido proceso de ley debe concederse antes de que la determinación administrativa sea efectiva. No obstante, hay circunstancias particulares, como las situaciones de emergencia en las que están en juego la salud y la seguridad de la comunidad, que justifican el que la entidad gubernamental tome primero la determinación administrativa y conceda el debido proceso dentro de un término razonable de tiempo.[313]

El procedimiento que debe ser concedido depende de la controversia y los hechos que la rodean, ya que el debido proceso de ley procesal no es técnico ni inflexible, sino más bien circunstancial y pragmático. Lo que se requiere, a fin de cuentas, es que sea coherente con el principio de que todo proceso debe ser justo, imparcial y no arbitrario.[314]

---

[311] Rivera v. Lee Stowell, supra, págs. 888-899; Morales v. Gobernador, 112 D.P.R. 761, 766-768 (1982); Vélez v. Romero Barceló, 112 D.P.R. 716, 730-731 (1982); Lupiañez v. Cruz, supra, pág. 700-701; J.J. Álvarez González, op.cit., pág. 591; D. Fernández Quiñones, op.cit., pág. 317.

[312] Rivera v. Srio. de Hacienda, supra, pág. 273-274; D. Fernández Quiñones, op.cit., pág. 316.

[313] D. Fernández Quiñones, op. cit., pág. 317.

[314] Almonte et. al. v. Brito, supra, pág. 481; P.A.C. v. E.L.A., 150 D.P.R. 359, 376 (2000); Fac. C. Soc. Aplicadas,

Esta ponderación se logra al sopesar tres criterios medulares:

> (1) se debe determinar cuáles son los intereses individuales afectados por la acción oficial; (2) el riesgo de una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas; y (3) el interés gubernamental protegido con la acción sumaria y la posibilidad de usar métodos alternos.[315]

Es a base de estas consideraciones que este Tribunal ha reconocido unos requisitos básicos que deben formar parte del procedimiento adversativo. Éstos son: (1) notificación adecuada del proceso, (2) que el proceso institucional se realice ante un adjudicador imparcial; (3) oportunidad de ser oído; (4)derecho a contrainterrogar testigos y a presentar prueba oral y escrita a su favor; (5) asistencia de un abogado o una abogada; (6) que la decisión se base en el récord y (7) que la decisión sea fundamentada o explicada.[316]

En el área del empleo público, hemos resuelto que los trabajadores que son destituidos de sus puestos tienen derecho a una vista informal antes del despido.[317] Claro

---

Inc. v. C.E.S., 133 D.P.R. 521, 542 (1993); Domíguez v. Tribunal Superior, 102 D.P.R. 423, 428 (1974).

[315] P.A.C. v. E.L.A., supra, 376-377; Rivera v. Lee Stowell, supra, pág. 888-889; Vélez v. Romero Barceló, supra, 723-724; Mathews v. Eldridge, 424 U.S. 319, 334-335 (1976).

[316] Almonte et. al. v. Brito, supra, pág. 482; Rivera v. Lee Stowell, supra, págs. 888-889; Rivera v. Srio. de Hacienda, supra, págs. 277-278; Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985).

[317] A.E.E. v. UTIER, 153 D.P.R. 623, 630 (2000); U. Ind. Emp. v. A.E.P., supra, pág. 617; Marrero Caratini v. Rodríguez,

está, antes de esa vista informal previa, la Autoridad Nominadora debe enviarle al empleado una notificación donde le informe, de manera adecuada, los cargos administrativos y la hora, fecha y lugar en el cual se realizará la audiencia y le describa la prueba que tiene el patrono.[318] Sin esa notificación adecuada, la vista informal no cumple con los requisitos del debido proceso de ley.[319]  Además, sin esa notificación el trabajador será despojado de su empleo sin estar preparado para rebatir los argumentos del patrono.

Cuando lo que ocurre es la cesantía, que no es otra cosa que una modalidad de despido, hemos determinado que, previo a esa acción, se le debe notificar al empleado el plan de cesantías e informarle el método en el que está basado.  Esto, antes de que sea separado de su puesto.[320] Más aun, **hemos concluido que el hecho de que exista una crisis fiscal no es suficiente**, **por sí solo**, **para concluir que la cesantía se realizó siguiendo los estatutos o normas vigentes.**[321] Más concretamente, hemos expresado lo siguiente:

> Independientemente de cuan justificadas pudieran haber estado unas cesantías desde el punto de vista

---

138 D.P.R. 215, 220 (1995); Torres Solano v. P.R.T.C., supra, pág. 520.

[318] Villanueva v. Mun. de San Juan, supra; Torres Solano v. P.R.T.C., supra, págs. 520-521, 523. Véase, además, U. Ind. Emp. A.E.P. v. A.E.P, supra.

[319] U.Ind. Emp. v. A.E.P., supra, pág. 622.

[320] Olivieri Morales y otros v. Pierluisi y otros, 113 D.P.R. 790, 796 (1983); Pizarro y otros v. Municipio de Carolina, 112 D.P.R. 822, 828-829 (1982).

[321] Calzada Quiñones v. D.A.C. O, 114 D.P.R. 757, 760 (1983).

económico, la política pública a favor de la implementación del sistema de mérito exige que haya constancia de que al eliminarse uno o más puestos en una clase se dejarán cesantes y serán retenidas las personas indicadas de acuerdo con los criterios objetivos que el sistema de mérito encarna. **Es igualmente vital que todos los empleados públicos posean conocimiento previo del método a seguirse para que puedan defender adecuadamente sus derechos, los cuales son relativos a los derechos de los demás. La ausencia de constancia clara, objetiva y difundida de los criterios para determinar quiénes habrán de quedar cesantes crea inseguridades y siembra dudas no sólo sobre la legitimidad de cada cesantía particular, sino sobre la validez y necesidad de la decisión de decretar cesantías en general.**[322]

Es cierto que esta interpretación se fundamentó, no en la Constitución, sino en las disposiciones de la Ley de Personal del Servicio Público, Ley Núm. 5 de 1975, sustituida por la Ley Núm. 184 de 2004. Pero es que esa ley incorporaba el debido proceso de ley constitucional en lo que respecta a la retención de los trabajadores; por eso, en aquel momento no era necesario recurrir a la Constitución para sustentar nuestra decisión. Sin embargo, ello no significa que debamos aceptar que otro estatuto socave impunemente el debido proceso de ley constitucional vigente en la actual Ley para la Administración de los Recursos Humanos en el Servicio Público y contenido en los convenios colectivos según el mandato de la Ley de Relaciones del Trabajo del Servicio Público.

**La mayoría argumenta que la Ley Núm. 7 de 2009 le concede a los empleados cesanteados un debido proceso de ley "bastante similar al que establece la Ley Núm. 184 de**

---

[322] Olivieri Morales y otros v. Pierluisi y otros, supra, pág. 796. Énfasis nuestro.

**2004".**[323] En fin, expresa la mayoría que lo que hace la Ley Núm. 7 de 2009 es recoger los "procedimientos que rigen bajo la Ley Núm. 184, supra, y los adapta…".[324] **Nada más lejos de la realidad. Para confirmarlo, es suficiente cuestionarnos por qué, si ambos procedimientos de retención son similares, no se utiliza el procedimiento de la Ley Núm. 184 de 2004.** Esta interrogante la contesta la opinión mayoritaria planteando que era necesario hacer más expedito el procedimiento de despidos para "decretar cesantías mediante un mecanismo más ágil".[325] Sin embargo, no existe prueba en el expediente que demuestre esta afirmación. Lo que sí ha sido evidente es que el proceso de cesantías de la Ley Núm. 7 de 2009 se ha complicado y alargado debido a las violaciones al debido proceso ínsitas en el mismo, derrotando la sensibilidad construida en el procedimiento de retención establecido en la Ley Núm. 184 de 2004, **que siempre entendió las cesantías como el último recurso y no como la política pública.**

¿Cómo afectaba en términos de tiempo el aplicar el plan de retención contenido en la Ley Núm. 184 de 2004? Este plan dispone que se podrán eliminar puestos por falta de trabajo o de fondos, sujeto a lo siguiente:

> En estos casos, las cesantías se decretarán dentro de los grupos de empleados cuyos puestos tengan el mismo título de clasificación y considerando dentro

---

[323] Opinión del Tribunal, pág. 67. Énfasis nuestro.

[324] Íd..

[325] Íd., pág. 67.

de cada grupo el estatus de los empleados, su productividad, hábitos y actitudes reflejadas en sus evaluaciones y su antigüedad en el servicio. A los fines de determinar antigüedad, se considerará todo servicio prestado en puestos de las agencias comprendidas en el Sistema. La autoridad nominadora de cada agencia notificará por escrito a todo empleado a quien haya de cesantear con no menos de treinta (30) días de antelación a la fecha en que habrá de quedar cesante. Ninguna cesantía de empleados será efectiva a menos que se cumpla con el requisito de notificación. Cada agencia procederá a establecer un procedimiento escrito a los efectos de decretar cesantías en caso de estas ser necesarias, el mismo será divulgado a [sic] estará disponible para conocimiento de cualquier empleado interesado.

**Antes de decretar la cesantía debido a la eliminación de puestos por falta de trabajo o fondos, se agotarán todos los recursos al alcance para evitar dicha cesantías con acciones tales como:**

(A) Reubicación de personal en puestos de igual o similar clasificación en departamentos, oficinas o programas en que haya necesidad de personal.

**(B)** Readiestramiento del empleado para reubicarlo en otro puesto, **cuando esto pueda hacerse razonablemente antes de la fecha límite para decretar tales cesantías.**

(C) Disfrute de vacaciones acumuladas.

(D) Licencia sin sueldo hasta tanto cese la crisis presupuestaria, cuando la agencia tome la decisión por la insuficiencia presupuestaria temporera que no requiera la eliminación permanente del puesto. En tales casos, deberá observarse el orden de prelación previamente establecido en el método de decretar cesantías.

(E) Reducción en la jornada de trabajo.

(F) **Descenso de los empleados como último recurso para evitar cesantías.**[326]

Evidentemente, este plan no afecta el objetivo de atender la alegada crisis fiscal del gobierno. Al contrario, crea un procedimiento justo y fundamentado en el

---

[326] Sección 1462(e)(9(a) de la Ley Núm. 184 de 2004, supra. Énfasis nuestro.

principio de mérito, el cual evita no tan solo las dudas sobre la legitimidad de las cesantías y la inseguridad en los afectados, sino también potenciales disputas legales.

**El plan de cesantías bajo la Ley Núm. 184 de 2004 proveía un debido proceso de ley constitucional porque permitía que los empleados estuviesen informados del proceso de las cesantías, de manera que pudieran defenderse apropiadamente si no estaban de acuerdo con la determinación administrativa. Distintamente, el plan de retención de la Ley Núm. 7 de 2009 es contrario al debido proceso de ley porque no les provee a los empleados cesanteados la oportunidad de ser oídos ni una vista informal previa.**

Respecto a la ausencia de oportunidad de ser oído, salta a la vista, como consideración inicial, que **la notificación de cesantía enviada a los trabajadores fue defectuosa**. Observemos un modelo de las cartas en las cuales se notificó la cesantía a los trabajadores:

> **De conformidad con las disposiciones de la Ley Núm. 7 de 9 de marzo de 2009, conocida como *Ley Especial Declarando Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico* (en adelante Ley 7),** y al orden de antigüedad establecido por la Junta de Reestructuración y Estabilización Fiscal (JREF), le informo que efectivo el *6 de noviembre de 2009* queda cesante del puesto clasificado…[327]

Sin duda, **esta notificación no informa la causa o justificación de la cesantía.** Sólo hace referencia a que el despido se basa en la Ley Núm. 7 de 2009 y al orden de antigüedad diseñado por la JREF. **Tampoco se describe la**

---

[327] Autos de Instancia CT-2009-6, Anejo 6. Énfasis nuestro.

**prueba que tenía el patrono**; específicamente, **no se describe el plan de cesantía ni el método en el que se basó**, como **tampoco la antigüedad que corresponde al empleado cesanteado en relación a otros**. Es decir, **en la notificación no se alude a la lista de antigüedad de todo el servicio público**. Por consiguiente, **los empleados que la recibieron no estaban en posición para defenderse e impugnar las alegaciones del Estado**. Como hemos expresado, **en dichas circunstancias una vista previa es fútil**.

Aun cuando se incluyera como parte de la notificación adecuada la descripción de la prueba del patrono antes mencionada, la vista previa a la que se refiere la mayoría es insuficiente. Esta vista se limita a cuestionar la antigüedad del empleado, según lo afirma la opinión mayoritaria cuando expresa que "… la controversia, por meritoria que sea, siempre será relativamente sencilla: si el empleado cuenta con la evidencia de los años trabajados".[328] Es decir, la controversia se limita a que el empleado demuestre, por ejemplo, que en vez de 12 años de servicio realmente sirvió 13 años y medio. Sin embargo, **el empleado no puede impugnar su cesantía con relación a la de otros empleados no cesanteados, ni la puede cuestionar por razón de otros asuntos, como discrimen político, embarazo, o edad, entre otros.  Por esto, esta vista informal previa constituye un procedimiento totalmente pro-forma.**

---

[328] Opinión del Tribunal, pág. 69.

Ante este panorama, **se puede afirmar que la Ley Núm. 7 de 2009 violenta el debido proceso de ley procesal constitucional.** Limitada la controversia al aspecto de antigüedad y sin que se le notificase siquiera lo pertinente a ese criterio respecto a los demás empleados, la vista informal previa era una mera formalidad. **Aun conociendo que tenían fundamentos distintos al de antigüedad para demostrar que se estaba violando la ley, para los empleados públicos el foro administrativo estaba vedado. Mayor violación al debido proceso de ley procesal constitucional no vamos a encontrar.**

## II.

**Ley Núm. 7 de 9 de marzo de 2009, inconstitucional de su faz**

La Constitución del Estado Libre Asociado, aprobada el 25 de julio de 1952, incluye una disposición que le prohíbe a la Asamblea Legislativa aprobar estatutos que incorporen más de un asunto o que no lo expongan en el título de la medida. Sobre este particular, la ley suprema establece:

> …**No se aprobará ningún proyecto de ley,** con excepción de los de presupuesto general, **que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula**…[329]

Tal limitación al proceso legislativo fue adoptada, por primera vez, en la Ley Jones del 2 de marzo de 1917 y fue

---

[329] Artículo III, sección 17, Const. E.L.A., 1 L.P.R.A. sec. 17. Énfasis nuestro.

mantenida por los constituyentes al aprobar nuestra constitución.[330]

Esta disposición es clara. Requiere, por un lado, que toda ley, salvo la de presupuesto, esté dirigida a un solo objetivo o asunto. Además, toda ley debe incluir en su título el asunto o propósito que pretende atender la Asamblea Legislativa y si se incluye alguna materia en el cuerpo de la ley, pero no en su título, esta porción de la medida será nula.

Desde sus orígenes en la Ley Jones, hemos tenido varias oportunidades de interpretar este precepto. Hemos expresado la necesidad de que el título de una legislación refleje, en forma general, su contenido. Aclaramos que no se tiene que incluir en el título una descripción minuciosa o un índice del contenido de la ley.[331] **Claro está, la generalidad del**

---

[330] El precepto contenía el siguiente mandato:

> No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título; pero si algún asunto que no esté expresado en el título fuere incluido en cualquier ley, esa ley será nula solamente en aquella parte de ella que no haya sido expresada en su título. Documentos Históricos, Carta Orgánica de 1917, 1 L.P.R.A. sec. 34.

La Carta Orgánica del 12 de abril de 1900, conocida como la Ley Foraker, no incluyó esta prohibición. R. E. Bernier y J. A. Cuevas Segarra, Aprobación e Interpretación de las Leyes de Puerto Rico, 2da ed., San Juan, JTS, 1987, pág. 79; Véase, además, J. Trías Monge, op. cit., págs. 159-160.

[331] Dorante v. Wrangler of P.R., 145 D.P.R. 408, 428 (1998); Cervecería Corona, Inc. v. JSM, 98 D.P.R. 801, 812 (1970); Pueblo v. Vázquez, 93 D.P.R. 540, 542-543 (1966); Pueblo v. Díaz Torres, 89 D.P.R. 720, 724-725 (1963); Rodríguez v. Power, 30 D.P.R. 931, 932 (1922).

**título no puede inducir a error a las partes afectadas por la ley ni a los legisladores que tienen la función de evaluarla, estudiarla y aprobarla.[332] Siempre hay que asegurarse de que el único asunto o materia del que trate la ley aparezca claramente en su título.[333]**

Este principio constitucional persigue tres propósitos principales: (1) impedir que se incluyan en el estatuto "materias incongruentes y extrañas";[334] (2) evitar "la inadvertencia, la ocultación y el fraude en la legislación";[335] y (3) informar a la sociedad y a los legisladores la finalidad de la medida, de manera que "el primero pueda oponerse a su aprobación si la considera lesiva a sus intereses y los segundos estén en condiciones de emitir su voto conscientes del asunto que es objeto de legislación".[336] En fin, el objetivo es que la legislatura y el público puedan deducir que se aprobarán únicamente

---

[332] _Laboy v. Sauri_, 65 D.P.R. 422, 426 (1945); _Rodríguez v. Corte_, 60 D.P.R. 919, 922 (1942); _Pueblo v. Arocho_, 34 D.P.R. 847, 855-856 (1926).

[333] _Pueblo v. Vázquez_, 93 D.P.R. 540, 542-543 (1966); _Pueblo v. Díaz Torres_, 89 D.P.R. 720, 724-725 (1963).

[334] _Dorante v. Wrangler of P.R._, supra, pág. 428; _Cervecería Corona, Inc. v. JSM_, supra, pág. 812; _Laboy v. Sauri_, supra, pág. 426, citando el caso _Posados v. Warner, B. & Co._, 279 U.S. 340 (1929); _Rodríguez v. Corte_, supra, pág. 922.

[335] _Dorante v. Wrangler_, supra, pág. 428; _Laboy v. Sauri_, pág. 426, citando el caso _Posados v. Warner, B. & Co._, supra; _Rodríguez v. Corte_, supra, pág. 922.

[336] _Dorante v. Wrangler_, supra, pág. 428; _Laboy v. Sauri_, supra, pág. 425; _Rodríguez v. Corte_, supra, pág. 922-923.

materias germanas a las expresadas en el título.[337] Todas estas consideraciones fueron analizadas y dilucidadas por los constituyentes.[338]

En este momento, la pregunta obligada es, si el título de la Ley Núm. 7 de 2009 cumple con los requisitos que establece nuestra Constitución.  Veamos.

---

[337] <u>Cervecería Corona, Inc. v. JSM</u>, supra, pág. 812.

[338]  A esos efectos, se consignaron las siguientes expresiones:

> **Sr. Negrón López:** Esta oración "no se aprobará ningún proyecto de ley con excepción de los de presupuesto general que contenga más de un asunto, el cual deberá ser claramente expresado en su título" es una disposición encaminada a evitar los riders, a evitar que se hagan enmiendas extrañas al propósito de los proyectos y que se adultere el fin de un proyecto aprobando subrepticiamente algo que la Asamblea Legislativa no dejaba aprobar, no debió haber permitido que se aprobara de haber conocido la intención.  Diario de Sesiones de la Convención Constituyente de Puerto Rico, <u>op. cit.</u>, T. 2, pág. 896.
> …
>
> Las disposiciones sobre título y asunto "impiden prácticas fraudulentas, facilitan la labor legislativa y hacen imposible que grupos minoritarios incorporen sus proposiciones favoritas en una sola pieza de legislación y se unan para obtener una mayoría artificial, la cual no existiría si las distintas proposiciones se consideraran separadamente".  <u>Íd.</u>, T. 4, pág. 2584.

Una somera lectura de la Ley Núm. 7 de 2009, confirma que ésta regula más de un asunto. Dicho estatuto impone nuevos arbitrios, como en el caso de las motocicletas y aumenta otros, como el de los cigarrillos y bebidas alcohólicas. Además, permite que la Autoridad de Edificios Públicos y la Corporación del Fondo de Interés Apremiante puedan emitir bonos y utilizar otros mecanismos de financiamiento y que los municipios puedan tomar dinero a préstamo del Banco Gubernamental de Fomento. Como podemos observar, se trata de crear estos mecanismos para allegar dinero a las arcas del Estado. Estas medidas, evidentemente, comprenden, entre ellas, un solo asunto. Sin embargo, **en el Capítulo III del mismo estatuto se crea una nueva ley de despidos lo cual, sin duda, constituye un asunto diferente, contrario a la disposición constitucional.**

De otra parte, el título de la Ley Núm. 7 de 2009 ocupa dos páginas y media del texto del estatuto, que se dedican casi en su totalidad a describir en detalle todas las enmiendas sobre medidas de ingresos y mejor fiscalización que se incluyeron en el Capítulo II y aquellas relacionadas a las medidas fiscales que se incorporaron en el Capítulo IV. Sin embargo, la porción que se refiere a las medidas de control y reducción de gastos operacionales y de nómina dispuestas en el Capítulo III es sumamente parca y generalizada. **En otras palabras, el título de la ley no informa todos los asuntos o materias que forman parte del Capítulo III del estatuto y no les anuncia a los**

**legisladores y a los ciudadanos de qué trata el Capítulo III.**

Contrario a la descripción sumamente pormenorizada de los asuntos atendidos en los Capítulos II y IV, en la porción que se refiere a las medidas de control y reducción de gastos operacionales y de nómina incluidas en el Capítulo III, el título de la Ley Núm. 7 de 2009 meramente alude a:

> …en lo referente a la reducción de gastos, establecer un plan de tres fases para la reducción de la nómina gubernamental;…

Lo anterior no describe, ni siquiera escuetamente, el contenido del Capítulo III de la Ley Núm. 7 de 2009. Primero, **este capítulo contiene más de un asunto distinto a la reducción de la nómina gubernamental.** Por ejemplo, en el Capítulo III se suspende el sistema de relaciones laborales en el sector público, que incluye la negociación colectiva y los convenios colectivos; se suspende la aplicación del principio de mérito; se limita el sistema de administración de personal y está implícita una reorganización del gobierno central. Segundo, **aun si se aceptara, para efectos del análisis, que el Capítulo III trata de sólo un asunto, éste no se anuncia claramente en el título.** En otras palabras, al leer el título de la ley, las personas o entidades afectadas no se enteran de las implicaciones de la medida.

Podría plantearse que la frase "para otros fines", incluida en la legislación, resuelve el problema

constitucional. Sin embargo, ya este Tribunal se ha expresado sobre ese aspecto:

> Aunque términos como "etcétera" y "para otros fines" frecuentemente se usan en los títulos de las leyes, tales frases tienen muy poco efecto sobre la validez de los estatutos. Aunque estos términos pueden servir para advertir que materias adicionales a las especificadas en el titulo aparecen en la ley, tales términos no pueden convalidar la inclusión de disposiciones incongruentes.[339]

Ante este cuadro, y dado que la ley incluye una cláusula de separabilidad,[340] **lo que procede es declarar nulo el Capítulo III y mantener la vigencia del resto del contenido de la Ley Núm. 7 de 2009.**


## III

### Conclusión

El análisis que he expuesto en estas apresuradas páginas me lleva a disentir enérgicamente de la decisión a la que hoy se adhiere la mayoría del Tribunal. **Veo con mucha tristeza la posición asumida por la mayoría en esta decisión ante asuntos tan desgarradoramente complejos para la historia de nuestro pueblo.** Ésta es una decisión desinformada, resultado de un improvisado y mal aplicado proceso de certificación. En ausencia de prueba, la

---

[339] Laboy v. Saurí, supra, pág. 428.

[340] Ley Núm. 7 de 9 de marzo de 2009, Artículo 71.

mayoría acaba por deshacer los fundamentos metodológicos de la mejor hermenéutica constitucional y termina en el terreno de la especulación acientífica.

**La Constitución es algo más que un depósito de palabras**, es un pacto social maduro entre el Estado y los ciudadanos, que ha sido bordado lentamente y se ha cimentado en décadas de consenso. Central a este pacto está el valor que le hemos concedido al trabajo en la estructura social de nuestro país. Nuestros tribunales han avalado esta apreciación por muchas décadas. Hoy, con esta determinación, la mayoría de este Tribunal rompe este pacto social y abandona en el desamparo a miles de ciudadanos que han perdido su modo de vida y mantiene en la inseguridad jurídica a los que aún conservan sus puestos.

El capítulo III de la Ley Núm. 7 de 2009 elimina de un plumazo el derecho de los empleados públicos a retener sus puestos de empleo, a la vez que deroga o suspende derechos que eran parte de sus contratos de trabajo. **Así, el esfuerzo humano que representa el trabajo, esa importante propiedad, que posibilita la reproducción social y la integridad de los contratos que la contenían, han sido tirados por la borda, junto con medio siglo de interpretación constitucional democrática y de avanzada. En fin, todo lo que significa el Capítulo III, desde su faz a su aplicación, es inconstitucional.**

Los pactos sociales entre los diversos componentes de un pueblo no deben deshacerse sino expandirse hacia nuevas

fronteras de justicia social. **El desarrollo de las sociedades no se puede fundamentar en la desigualdad ni en la violencia institucional, aniquilando los sueños que el trabajo provee a los más débiles. Nuestros retos económicos no pueden ser solventados aplastando la dignidad de nuestros servidores públicos.** Ante los nuevos retos, son necesarios nuevos pactos y consensos sociales. A éstos no podremos llegar cultivando la desconfianza de los ciudadanos en las instituciones.

Lamentablemente, después de esta decisión, el derecho constitucional en las escuelas de derecho se enseñará "antes" y "después" de la Ley Núm. 7 de 2009, pero no como el derecho de filiación antes y después de nuestra honrosa decisión en Ocasio v. Díaz,[341] ni como la ley de divorcio antes y después de Figueroa Ferrer v. E.L.A.,[342] casos que ampliaron y fortalecieron los derechos del individuo frente al Estado. Todo lo contrario, **esta decisión será estudiada como aquella que entronizó al Estado como el protagonista principal del sistema frente al ciudadano. Ante esto, yo disiento. No puedo mantener silencio, ni ser cómplice de esta enajenada visión.**

> Liana Fiol Matta
> Jueza Asociada

---

[341] 88 D.P.R. 676 (1963).

[342] 107 D.P.R. 250 (1978).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Olga Domínguez Castro y otros<br>    Recurridos<br><br>       v.<br><br>Gobierno del Estado Libre Asociado de P.R. y otros<br>    Peticionarios | CT-2009-4 |
| Kristy J. González Bou y otros<br>    Recurridos<br><br>       v.<br><br>Estado Libre Asociado de P.R. y otros<br>    Peticionarios en<br>    Certificación | CT-2009-5 |
| Zoraida Martínez Román y otros<br>    Recurridos<br><br>       v.<br><br>Estado Libre Asociado de P.R. y otros<br>    Peticionarios | CT-2009-6 |
| Erika Vispo Figueroa<br>    Recurrida<br><br>       v.<br><br>Estado Libre Asociado de P.R. y otros<br>    Peticionarios | CT-2009-9 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 2 de febrero de 2010

Disiento. No puedo avalar con mi voto un dictamen como el hoy emitido que trastoca las vidas de miles de servidores públicos sin concederles a éstos su verdadero día en corte. La Opinión mayoritaria se revela como galimatías constitucionales, expuestas así, sin un análisis jurídico riguroso que acompañe la extensa e innecesaria disertación, y carente, además, de evidencia que fundamente

sus conclusiones. El sustento de miles de servidores públicos merecía un Tribunal que examinara a cabalidad sus planteamientos a la luz de la prueba que en su momento se presentara, y no que se atendieran sus reclamos mediante una decisión que valida, cual sello de goma, los argumentos del Estado.

El trámite acelerado de certificación adoptado por este Tribunal para resolver apresuradamente las controversias planteadas, hizo que ello fuera posible. Así, el récord en estos casos está huérfano de prueba que sostenga las "conclusiones" a las que llega la mayoría con respecto a la Ley núm. 7 de 9 de marzo de 2009, según enmendada (Ley 7). Ello denota la fatalidad del proceso adjudicativo seguido por este Tribunal pues los casos ante nuestra consideración presentan, no sólo asuntos estrictamente de Derecho, sino que plantean controversias cuya resolución no es factible sin recibir prueba alguna.

Por ejemplo, mediante los recursos presentados se cuestionó la validez constitucional de la Ley 7, con diversos argumentos concernientes a: discrimen por afiliación política, discrimen por razón de edad, menoscabo de obligaciones contractuales y violaciones al principio de mérito y a la antigüedad del empleado, entre otros. Alegaciones como éstas requerían, como mínimo, que se celebrara una vista en la que se presentara prueba sobre las violaciones constitucionales invocadas. ¿Cómo es posible que podamos atender argumentos como éstos y tomar

una determinación al respecto si no le hemos dado la oportunidad al empleado de presentar su caso?

La despreocupación que muestra la mayoría de los miembros de este Tribunal --al certificar estos casos en un trámite *"fast track"* o *"por descargue"*-- y su determinación de resolver las controversias planteadas sin el beneficio de la prueba requerida, demuestra la liviandad con la cual se ha dispuesto de los reclamos de estos empleados públicos. Ello, a mi juicio, vulnera los valores más elementales de debido proceso de ley y de un procedimiento justo.

Por otro lado, el intento fallido de la mayoría por distinguir su reciente dictamen en *Hernández Colón v. Policía de P.R.*, res. el 13 de octubre de 2009, 2009 TSPR 154, sobre los derechos adquiridos, es un vivo ejemplo de la carencia de rigor de la Opinión mayoritaria. En *Hernández Colón*, se dijo sobre los derechos adquiridos que "son las facultades legales regularmente ejercidas [mientras que] las expectativas, [son] aquellas facultades no ejercidas al momento del cambio de legislación", íd., pág. 27, y que los primeros son "una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior". *Íd,* pág. 29, citando a *Consejo de Titulares v. William Hospitality Group*, 168 D.P.R. 101, 109 (2006). Inclusive, se indicó que tales derechos son de tal naturaleza que "ni la Legislatura al promulgar una nueva ley, ni el Gobernador

mediante una orden ejecutiva, los puede lesionar o ignorar. … [Éstos] se incorpora[n] dentro del patrimonio del titular del derecho y está protegido constitucionalmente frente a cualquier gestión gubernamental que pretenda intervenirlo". *Íd.*, págs. 27-28. De ahí se concluyó que los ex gobernadores peticionarios "no poseían una mera expectativa sobre el derecho de protección [mediante escoltas], sino que estos (sic) ostentan un derecho adquirido en virtud de sus respectivos retiros como primeros ejecutivos del país, bajo un estado de derecho específico". *Íd.*, pág. 30.

En la Opinión que hoy emite este Tribunal, se dispone que los empleados públicos que fueron cesanteados al amparo de la Ley 7 no disfrutan de derechos adquiridos sobre sus empleos "pues se encuentra ausente el elemento del **amparo de una ley anterior** que hubiere concedido tal derecho". Op. del Tribunal, pág. 76. (Énfasis en el original). Confieso, que se me dificulta comprender este razonamiento y considero que el malabarismo jurídico que realiza la mayoría para concluir lo anterior es totalmente improcedente. Antes bien, la distinción elaborada en la Opinión del Tribunal levanta numerosas interrogantes. Cómo pueden crearse derechos adquiridos mediante prácticas administrativas y en ausencia de disposiciones estatutarias, pero no mediante una extensa legislación que, protegiendo el principio de mérito, regula todo lo relacionado a: reclutamiento y selección; ascensos y descensos; traslados; adiestramientos; retribución; jornada

laboral; beneficios marginales; retención, suspensiones y cesantías de los miles de empleados que se desempeñan en el servicio público.[343]

De igual forma, cabría preguntarse cómo es posible que los convenios colectivos suscritos por las uniones sindicales y el Estado, al amparo de la Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico, Ley núm. 45 de 25 de febrero de 1998, no establezcan una "situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior". Por qué las protecciones contenidas en esos convenios colectivos no son "consecuencia de un hecho idóneo, al producirlos en virtud de una ley vigente en el tiempo en que el hecho ha sido realizado, y que se han incorporado a una persona". *Hernández Colón*, *supra*, pág. 28, *citando a Consejo de Titulares*, *supra*, pág. 108-09, *citando a su vez a* J.M. Suárez Collía, *El principio de irretroactividad de las normas jurídicas*, 2da ed. rev., Madrid, Actas, 1994, pág. 55. Lo cierto es que, en estricto rigor, el mismo raciocinio que utilizó la mayoría para concluir que los ex gobernadores tenían un derecho adquirido al uso de escoltas policíacas exigía, en esta ocasión, que se concluyese que los empleados públicos despedidos tenían igualmente un derecho adquirido sobre su empleo. La inconsistencia entre ambos dictámenes es

---

[343] Véase, Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley núm. 184 de 3 de agosto de 2004, 3 L.P.R.A. 1461.

evidente e irrefutable. Nada, que esta falta de constancia sólo se puede entender --tal vez-- cuando, desde la orilla, observamos el flujo y reflujo de la marea.

En suma, el esfuerzo de la mayoría por distinguir lo indistinguible y su afán por disponer de las controversias ante nuestra consideración sin contar con los elementos de juicio necesarios, me obligan a disentir del curso de acción que hoy toma este Tribunal.


                                    Anabelle Rodríguez Rodríguez
                                         Juez Asociada